## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

SAMUEL SCHULTZ,

       Plaintiff,

       v.

ROYAL CARIBBEAN CRUISES, LTD., D/B/A AZAMARA CLUB CRUISES, AND MCO PRODUCTIONS LLC

       Defendants.

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Samuel Schultz, by and through his undersigned counsel hereby files this lawsuit against Defendants, ROYAL CARIBBEAN CRUISES, LTD. d/b/a AZAMARA CLUB CRUISES and MCO PRODUCTIONS, LLC and as grounds therefore alleges:

### NATURE OF THE ACTION

1. Samuel Schultz ("Mr. Schultz"), Plaintiff, brings this action against Defendants Royal Caribbean Cruises, Ltd. ("RCCL") d/b/a Azamara Club Cruises ("Azamara"), and MCO productions LLC ("MCO") (collectively, "Defendants"), for violation of Title I of the Americans With Disabilities Act, 42 U.S.C § 12112(a).

2. Mr. Schultz, an accomplished opera singer, was hired by the Defendants to perform aboard Azamara cruise ships.

3. Mr. Shultz is a protected individual with a disability pursuant to the Americans with Disabilities Act, 42 U.S.C §§ 12101-12117 ("ADA"), as he suffers from major depression.

4. On or about March 2018, Mr. Schultz moved into RCCL housing in Miami, Florida to begin rehearsal for the cruise, which was scheduled to depart on March 25, 2018.

However, after disclosing that he had been diagnosed with depression and had, seven years prior, attempted suicide following a traumatic incident, RCCL terminated Mr. Schultz's employment because of his disability.

5. Mr. Schultz was not examined by RCCL medical personnel nor was he given an opportunity to appeal the decision, pursuant to the International Labor Organization Guidelines ("ILO") process.

6. Mr. Schultz now brings this action seeking declaratory relief, actual damages, compensatory damages, liquidated damages, front pay and/or reinstatement, back pay, punitive damages, interest, attorneys' fees and costs.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over Mr. Schultz's Americans With Disabilities Act claim pursuant to 28 U.S.C. § 1331.

8. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred within the Southern District of Florida.

## PARTIES

**Samuel Schultz**

9. Plaintiff Samuel Schultz is an individual residing in Dunn County, in the State of Wisconsin.

10. Mr. Schultz was hired by Defendants on January 18, 2018 to perform as an opera singer on Azamara cruise ships.

11. By the time he was hired, Mr. Schultz had decades of experience in the industry. He had previously worked as a principal soloist for the Utah Opera, the Berkshire Festival Opera, the Washington National Opera, the Houston Grand Opera, and Opera Omaha.

12. Mr. Schultz is a qualified individual with a disability (see above).

**Royal Caribbean Cruises, Ltd.**

13. Defendant Royal Caribbean Cruises, Ltd. ("RCCL"), is an American global cruise company, incorporated in Liberia, doing business within Miami-Dade County in the State of Florida and maintains corporate headquarters within the City of Miami at 1050 Caribbean Way, Miami, FL 33132.

14. RCCL is publicly traded on the New York Stock Exchange and the dominant shareholders are citizens or institutions of the United States.

15. During all relevant times, Defendant RCCL was Mr. Schultz's employer within the meaning of all applicable statutes.

16. RCCL owns and operates three global cruise brands: Royal Caribbean International, Celebrity Cruises, and Azamara Club Cruises. They also own a fifty percent joint venture interest in TUI Cruises, a forty-nine percent interest in Pullmantur, and thirty-six percent interest in SkySea Cruises, which RCCL refers to as their "Partner Brands."

17. As of December 31, 2017, RCCL and its subsidiaries employed approximately 66,000 shipboard employees as well as 6,000 full-time and 100 part-time shoreside employees.

18. According to RCCL's corporate website, www.rclcorporate.com/investors/corporate-governance/, RCCL maintains a "Board of Directors," comprised of four committees, including the Audit Committee; Compensation Committee; Nomination and Corporate Governance Committee; and Safety, Environment and Health Committee. The functions of the Board of Directors include: selecting, evaluating, and compensating the CEOs of its subsidiaries; reviewing, approving, and monitoring fundamental financial and business strategies; and providing counsel and oversight on the section, evaluation,

development, and compensation of senior executives. Among the members of the Board of Directors is Chairman and Chief Executive Officer of RCCL, Richard D. Fain.

**Azamara Club Cruises**

19. Defendant Azamara Club Cruises. ("Azamara"), is a wholly owned subsidiary of RCCL doing business within Miami-Dade County in the State of Florida and maintains corporate headquarters within the City of Miami at 1050 Caribbean Way, Miami, FL 33132.

20. Azamara is luxury cruise line designed to serve the North American, United Kingdom, and Australian markets. Azamara operate two ships, the Azamara Quest and the Azamara Journey. A third ship, the Azamara Pursuit, made its maiden voyage in August 2018.

21. During all relevant times, Defendant Azamara was Mr. Schultz's employer within the meaning of all applicable statutes.

22. As of December 31, 2017, Azamara, combined with RCCL, its parent company, and RCCL's other wholly owned subsidiaries, employed approximately 66,000 shipboard employees as well as 6,000 full-time and 100 part-time shoreside employees.

**MCO Productions LLC**

23. Defendant MCO is a Limited Liability Company in the State of Florida with its office located at 12253 SW 82nd Street, Miami, Florida 33156.

24. MCO produces custom operatic and classical vocal productions for cruise lines and other performing arts partners.

25. During all relevant times, Defendant MCO was Ms. Schultz's employer within the meaning of all applicable statutes.

26. Upon information and belief, MCO created the productions to be performed aboard the Azamara, including arrangements and costumes. RCCL, however, retained their right

to approve all decisions regarding the performance and onboard staffing to ensure that they were appropriate.

27. MCO employed approximately 30 employees in the 2018 calendar year.

## EXHAUSTION OF REMEDIES

28. Plaintiff Schultz contends that he has exhausted all administrative remedies prior to the filing of this action.

29. In particular on or about May 31, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. (See true and correct copy of Charge of Discrimination attached hereto as Exhibit A).

30. Plaintiff has exhausted his administrative remedies as they relate to these below causes of action in that on September 21, 2018 the Equal Employment Opportunity Commission issued a Notice of Right to Sue. (See true and correct copy of Notice of Right to Sue attached hereto as Exhibit B). Additionally, more than 180 days have passed since the filing of Plaintiff's Charge of Discrimination.

## FACTUAL ALLEGATIONS

31. On January 19, 2018, Mr. Schultz was hired by MCO to perform as an opera singer aboard the Azamara Journey, departing from Singapore on March 25, 2018 and reaching its final destination, London, England, on June 17, 2018. The cruise was set to sail to approximately fifty destinations in approximately twenty-six difference countries.

32. The Azamara Journey is a foreign flag vessel, owned an operated by an American employer and the ADA applies to such vessels. *See* 42 U.S.C. § 12112(c)(1); *see also Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 132 (2005) (acknowledging that Congress did not intent its statutes not to apply to foreign-flag vessels that serve, employ, or otherwise affect

American citizens); *International Longshoremen's Local 1416 v. Ariadne Shipping Co.,* 397 U.S. 195, 199-200 (1970) (applying the National Labor Relations Act to foreign-flag vessels); *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000) (applying the ADA to a foreign-flag vessel); *EEOC v. Bermuda Star Line, Inc.*, 744 F.Supp. 1109, 1113 (M.D. Fla. 1990) (applying Title VII to a foreign-flag vessel).

33. Application of the ADA to Ms. Schultz's complaint will not interfere with the internal affairs of the ship, violate the law of Liberia or the Bahamas, nor violate any international treaties. *See Spector*, 545 U.S. at 131; *see also McCulloch v. Sociedad Nacional de Marneros de Honduras*, 372 U.S. 10 (1963); *Benz v. Comania Naviera Hidalgo*, *S.A.*, 353 U.S. 138 (1957). RCCL's cruise ships fly Bahamian flags. Bahamian law protects those with disabilities by ensuring equal access to the opportunity of suitable employment. *See* Persons With Disabilities (Equal Opportunities) Bill, 2014 part III, 14 (Bahamas). Liberian law, the country of RCCL's incorporation, also protects the rights of individuals with disabilities. *See* UN General Assembly, *Convention on the Rights of Persons with* Disabilities, Art. 27, U.N. Doc. A/RES/61/106 (Jan. 24, 2007) (ratified by Liberia on July 26, 2012).

34. As application of the ADA will not interfere with the internal affairs of the ship in this matter, application of the laws of the United States is appropriate and necessary . *See Lauritzen v. Larsen*, 345 U.S. 571, 583 (1953); *see also Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308 (1970); *Romero v. International Terminal Operating Co.*, *superseded by* statute, 358 U.S. 354, 378 (1959), 45 U.S.C. § 59, *as recognized in Miles v. Apex Marine Corp.*, 498 U.S. 19, 33 (1990); *Bermuda Star Line*, 744 F. Supp. at 1111.

**Mr. Schultz's Employment and Onboard Responsibilities with the Defendants**

35. At the time he was hired, Mr. Schultz was already an accomplished opera singer. He had previously worked as a principal soloist for the Utah Opera, the Berkshire Festival Opera, the Washington National Opera, the Houston Grand Opera, and Opera Omaha.

36. Based on his reputation and skill, MCO was enthusiastic about Mr. Schultz joining the production team. In fact, they based many of the performance arrangements on his participation.

37. Upon beginning his employment with MCO, Mr. Schultz entered into what MCO titled an "Independent Contractor Agreement" (the "Agreement"). The Agreement was to remain in effect, unless terminated earlier, until July 17, 2018, when the Azamara cruise was scheduled to conclude.

38. Despite the label of the Agreement, MCO and RCCL maintained complete control of the employment relationship. For example, MCO established and implemented the rehearsal schedule and performance schedule during the cruise are determined by the cruise director. By the nature of his employment relationship, Mr. Schultz could not work for other cruise lines during the time he was working for MCO, ACL, or RCCL. MCO created, and RCCL approved, the performances that Mr. Schultz and his colleagues were to perform. Further, RCCL, as demonstrated by his termination, retained the right to terminate the employment of the performers.

39. Moreover, Addendum #2 of the Agreement states that the cast performing on the vessels will be employees of Azamara and will be obligated to comply with Azamara's policies and procedures as such. See Exhibit C.

40. The Guidelines for Onboard Life, provided by MCO, further dictate the performers' dress code while in public areas, prohibit performers from using the elevators, and control their use of other public spaces.

41. Further, once the hiring process was fully completed with RCCL, Mr. Schultz would have received an RCCL employment agreement. This contract would have been for the initial sixteen-week cruise, with an option to extend for another twenty weeks.

42. As per the Agreement, the services Mr. Schultz was to provide included rehearsing opera productions, opera cabarets, and recital music for the shows aboard the ship. Further, the Guidelines for Onboard Life indicate that the performers are expected to operate spotlights for other shows, assist with guest participated shows, host guest social get-togethers, dance at dance parties held on the ship, and partake in other daily activities, among other responsibilities.

43. Mr. Schultz was required to complete an online safety training, completed by all employees, but was not informed that he would have any duties, daily nor in emergency situations, other than those associated with performing or entertaining guests. Further, the safety training focused on how to handle pirate attacks and using the lifeboats, in the event it was necessary.

44. Based on the experience of entertainers on the other Azamara ship, Mr. Schultz was informed that the onboard activities, which the performers were required to participate in, occurred more often when the ship was at sea and generally range from forty to sixty minutes. Further, because it is a destination cruise, the cruise was scheduled to port quite often – sometimes daily – with its longest stint at sea being four days between Salalah, Oman and Safaga, Egypt. When docked, the performers are able disembark the ship to partake in tourist

activities. Some performers, however, were required to remain on the ship for guests that remained onboard.

**Required Medical Examination**

45. In January, Graham Fandrei, Founder and CEO of MCO, informed Mr. Schultz that, as part of the hiring process, RCCL requires a medical examination. However, Mr. Fandrei indicated that this process was primarily used for drug testing.

46. On January 18, 2018, Mr. Fandrei provided Mr. Schultz with an approved list of medical providers and forms, which needed to be completed by each such provider. Mr. Schultz then reached out to Ms. Vanessa Rojo, of Crew Member Medical LLC, a privately held company, and scheduled a medical appointment for January 26, 2018.

47. At the appointment, Mr. Schultz completed a form regarding his previous diagnosis of depression and indicated that in 2011 he had attempted suicide but had recovered to good effect. Neither the doctor nor the nurse who examined him commented on this information during the examination.

48. On February 7, 2018, Ms. Rojo informed Mr. Schultz that his forms were received and that he should allow seventy-two hours for the final review.

49. Thereafter, on February 15, 2018, Ms. Marian Gertrude, a PEME Nurse Specialist with RCCL, emailed Ms. Rojo seeking a compressive report regarding his psychiatric history. In this email, RCCL recognized that ILO state that such cases should be assessed on a "case-by-case" basis to determine the likelihood of reoccurrence after at least two years without further episodes.

50. After inquiring whether there was an approved list of doctors for this evaluation, Mr. Schultz was informed that they expect, due to his psychiatric history, that he has his own psychiatrist and, if not, he should seek a referral from his medical provider.

51. On February 28, 2018, Mr. Schultz provided RCCL with a summary of treatment and clinical history from his treating physician, Dr. Bernard M. Gerber. Dr. Gerber has been treating Mr. Schultz for treatment of major depression, which during all relevant times was in remission.

52. Dr. Gerber's letter, dated February 26, 2018, informed RCCL that Mr. Schultz has been on the same medication for a number of years and has remained stable on this medication. Further, the letter stated that Mr. Schultz has shown no signs of recurring illness for the past seven years.

53. Dr. Gerber stated that Mr. Schultz had been "compliant with treatment and has been functioning well at home and at work." As Mr. Schultz is used to intense, episodic rehearsals and performances, Mr. Gerber observed that he is capable of adapting to changes in scheduling and has a positive response to work demands.

54. Dr. Gerber certified that Mr. Schultz was fully capable of managing the work requirements of employment onboard the ship and that his treatment only required infrequent – approximately once every six to twelve months – clinical follow-up." Dr. Gerber was not concerned that being onboard a ship or in foreign ports for extended periods of time would negatively impact his maintenance of the remission of his depression.[1]

55. Further, Dr. Gerber completed the Safety Medical Certification Form provided by RCCL and Azamara. On this form Mr. Schultz's doctor indicated that he could work without risk, without accommodation, and that his medications would not impair his ability to perform safely.

---

[1] Plaintiff will produce his doctor's not i*n camera* or under confidentiality agreement due to its private information/data.

56. On March 2, 2018, RCCL confirmed that they had received the report and would begin their review. Additionally, RCCL requested further information regarding his lab results, which they indicated were "questionable," and his allergy to codeine. Mr. Schultz informed them that, after leaving several voice messages for Ms. Rojo, he had been informed that the issue with his lab results had been resolved and explained the discovery of his codeine allergy. RCCL informed Mr. Schultz that they would connect with Ms. Rojo to receive the proper documentation.

**Finalizing Clearance and Beginning Rehearsal**

57. In recognition of the difficulties being experienced with regard to the hiring process, Mr. Fandrei informed Mr. Schultz and four other cast members that Azamara was managing the hiring of performers for the first time. Further, Mr. Fandrei explained, RCCL had recently changed the hiring process and requirements without sharing the details with Azamara, who was now trying to conform to them.

58. On March 4, 2018, Mr. Schultz traveled to Miami and began rehearsals. The rehearsal space was owned by RCCL and the performers, including Mr. Schultz, resided in housing owned and provided by RCCL per diem.

59. During the first weeks of rehearsal, Mr. Schultz had the opportunity to tour the Azamara Quest, the sister ship of the Azamara Journey, the ship upon which Mr. Schultz was hired to perform.

60. On March 9, 2018, Mr. Schultz received an email from Ineisa Real, a PEME Nurse Specialist from RCCL, informing him that the report had been reviewed externally, by Broward Health Systems, and then internally by the medical department. Ms. Real further informed Mr. Schultz that maritime medical standards had not been met and, therefore, they

were unable to approve him to work at sea. Mr. Schultz sought clarification on what standards they were referring to but did not receive a response.

61. That day, Mr. Schultz met with Mr. Fandrei, Ms. Signe Bjorndal, Azamara Entertainment Director, and Ms. Monica Soderman, Production Manager of MCO, to discuss the medical examination and provide additional information about his history.

62. During this meeting, Mr. Schultz was told that his psychiatrist likely does not understand the stress of working at sea, being in a new port every few days, and that he may have to work many hours a day.

63. Upon the conclusion of the meeting, Ms. Bjorndal informed Mr. Schultz that she would work to get the matter cleared up.

**Termination or, in the Alternative, Refusal to Hire Based on Mr. Schultz's Disability or Perceived Disability**

64. On March 12, 2018, Mr. Schultz met with Dr. Benjamin Shore, Chief Medical Consultant for RCCL and Azamara, and Mr. Fandrei. Dr. Shore informed them that the RCCL medical consultant refused to change his opinion and, therefore, Mr. Schultz was not welcome to join RCCL.

65. On March 13, 2008, Mr. Schultz was notified via email by Dr. Shore, that he had been deemed "not medically fit for duty at sea" citing "persistent and recurrent conditions involving Major Depression and associated complication."

66. Mr. Shore indicated that the availability of support systems and medical monitoring for recurrent conditions was limited, despite the fact that Dr. Gerber had stated Mr. Schultz only needed follow-up visits once every six to twelve months for medication management only. Mr. Shore further stated that, despite Mr. Schultz's personal physician's

opinion that he was fit to work at sea, his doctor is likely unaware of the ILO Guidelines which the ship must follow.

67. Mr. Schultz had never been personally examined by Dr. Shore or any other medical professional at RCCL or Azamara. Nor did Mr. Shore at any time suggest or ask that Mr. Schultz submit to an examination by a physician designated by Dr. Shore or RCCL.

68. RCCL, Azamara, and Dr. Shore obviously assumed that Mr. Schultz was disabled and, therefore, deemed him unfit for sea based on that assumption.

69. Thereafter, on March 14, 2018, Mr. Schultz received an email from RCCL stating that a copy of his employment contract was available for review on the "Crew Portal."

70. On March 15, 2018, Mr. Schultz received a follow-up email from RCCL indicating that he was "unfit for duty."

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Discrimination Because of Disability)**
**(Title I of the Americans With Disabilities Act, 42 U.S.C 12112(a).)**
**(Against All Defendants)**

71. Mr. Schultz incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

72. The Americans with Disabilities Act ("ADA") prohibits any employer from discriminating against an employee in regard to job application procedures . . . hiring . . . or discharge of employment on the basis of disability. 42 U.S.C § 12112(a).

73. Defendants violated the Americans with Disabilities Act when they terminated his employment because they regarded Mr. Schultz as disabled or, in the alternative, Defendants refused to hire Mr. Schultz because they regarded him as disabled.

74. Defendants' violations of the Americans with Disabilities Act, as described in the Complaint, were willful and intentional. Defendants did not make a good faith effort to comply with the ADA with respect to Mr. Schultz.

75. As a direct result of Defendants' discriminatory acts, Mr. Schultz is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A. Declaring that the acts, practices, and omissions complained of herein are unlawful and violate the ADA;

B. Directing Defendants to pay Mr. Schultz his back pay, front pay and/or reinstatement, equity awards, compensatory damages, liquidated damages, and pre-judgment interest for violations of the ADA;

C. Directing Defendants to pay exemplary and punitive damages commensurate with Defendants' ability to pay and sufficient to punish and deter continuation of Defendants' discriminatory and unlawful employment practices;

D. Awarding Mr. Schultz reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5); and

E. Awarding such other legal and equitable relief as this Court deems necessary, just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Mr. Schultz demands a trial by jury on all questions of fact raised by the complaint.

Dated this 1st day of October 2018.

                        s/Lindsey Wagner
                        Cathleen Scott, Esq.
                        Florida Bar No. 135331
                        Primary e-mail: CScott@scottwagnerlaw.com
                        Secondary e-mail: mail@scottwagnerlaw.com
                        Lindsey Wagner, Esq.
                        Florida Bar No. 86831
                        Primary e-mail: LWagner@scottwagnerlaw.com
                        Secondary e-mail: mail@scottwagnerlaw.com
                        SCOTT WAGNER & ASSOCIATES, P.A.
                        Jupiter Gardens
                        250 South Central Boulevard
                        Suite 104-A
                        Jupiter, FL 33458
                        Telephone: (561) 653-0008
                        Facsimile: (561) 653-0020
                        Secondary Address: 101 Northpoint Parkway
                        West Palm Beach, FL 33407
                        www.ScottWagnerLaw.com


                        Kathleen Peratis, Esq.
                        Nina R. Frank, Esq.
                        **OUTTEN & GOLDEN LLP**
                        685 Third Avenue, 25th Floor
                        New York, New York 10017
                        Telephone: (212) 245-1000
                        Facsimile: (646) 509-2071