OUTTEN & GOLDEN LLP
Kathleen Peratis, Esq.
KP@outtengolden.com
Aliaksandra Ramanenka, Esq.
aramanenka@outtengolden.com
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: 212.245.1000

Paul W. Mollica, Esq.
pwmollica@outtengolden.com
161 North Clark Street, Suite 1600
Chicago, Illinois 60601
Telephone: 312.809.7010

SCOTT WAGNER & ASSOCIATES, P.A.
Lindsey Wagner, Esq.
lwagner@scottwagnerlaw.com
250 South Central Boulevard
Jupiter Gardens, Suite 104-A
Jupiter, Florida 33458
Telephone: 561.653.0008

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SAMUEL SCHULTZ,<br><br>Plaintiff,<br><br>v.<br><br>ROYAL CARIBBEAN CRUISES, LTD.,<br>D/B/A AZAMARA CLUB CRUISES, AND<br>MCO PRODUCTIONS LLC,<br><br>Defendants. | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:18-cv-24023 (RNS)<br><br>Judge Robert N. Scola, Jr |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 1

I.     DEFENDANT RCCL OPERATES AS A U.S. ENTITY. ...................................... 1

II.    PLAINTIFF SCHULTZ HAS A HISTORY OF MAJOR DEPRESSION. ....................... 3

III.   RCCL JOINTLY WITH MCO PRODUCTIONS EMPLOYED SCHULTZ DURING
REHEARSAL PERIOD IN FLORIDA, THEN MADE SCHULTZ A CONDITIONAL
OFFER OF EMPLOYMENT FOR A SHIPBOARD POSITION AND WITHDREW
IT AFTER LEARNING OF HIS HEALTH HISTORY. ............................................. 4

    A.  RCCL Jointly with MCO Productions Employed Schultz for Rehearsals. ...................... 4

    B.  Schultz Submitted to Pre-Employment Medical Exam (PEME). ................................... 5

    C.  Offer Withdrawn Because of Schultz's Suicide Attempt. ................................................ 6

    D.  RCCL Considered "Record of" Disability and Regarded Schultz as Disabled. .............. 9

ARGUMENT ................................................................................................................. 9

I.     SCHULTZ PREVAILS AS A MATTER OF LAW ON PARTS OF HIS CLAIM. ........... 9

    A.  RCCL Is an Employer Under The ADA, Despite Foreign Incorporation. ..................... 10

    B.  Schultz Is Disabled Within the Meaning of the ADA. ................................................ 12

    C.  Direct Evidence Establishes that RCCL Refused to Employ Schultz Because of His
Disability. ................................................................................................................. 14

II.    RCCL CANNOT PREVAIL AS A MATTER OF LAW ON ITS DEFENSES. .............. 14

    A.  RCCL Cannot Show That Claim Falls Within "Internal Order" Exception. ................. 14

    B.  RCCL Cannot Show That It Would Violate Foreign Law to Employ Schultz. ............. 16

    C.  RCCL Did No Individualized Assessment of Schultz's "Direct Threat." ..................... 18

CONCLUSION ............................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page(s)**

*Bakeer v. Nippon Cargo Airlines*,
    No. 09 Civ. 3374, 2011 WL 3625103 (E.D.N.Y. July 25, 2011) ...........................................10

*Barot v. Embassy of Republic of Zambia*,
    299 F. Supp. 3d 160 (D.D.C. 2018) .....................................................................................10

*Benz v. Compania Naviera Hidalgo, S.A.*,
    353 U.S. 138 (1957).............................................................................................................15

*Bragdon v. Abbott*,
    524 U.S. 624 (1998).............................................................................................................18

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002)...............................................................................................................18

*Cribbs v. NFI Network Logistic Solutions, LLC*,
    No. Civ. 411–263, 2014 WL 4805328 (S.D. Ga. Sept. 26, 2014) ...........................................14

*Dellmuth v. Muth*,
    491 U.S. 223 (1989).............................................................................................................16

*Denty v. SmithKline Beecham Corp.*,
    109 F.3d 147 (3d Cir. 1997).................................................................................................10

*Dowd v. Int'l Longshoremen's Ass'n*,
    975 F.2d 779 (11th Cir. 1992)..............................................................................................15

*Downey v. Adloox Inc.*,
    238 F. Supp. 3d 514 (S.D.N.Y. 2017)....................................................................................10

*Downie v. BF Weston, LLC*,
    No. 16 Civ. 81396, 2016 WL 7451427 (S.D. Fla. Dec. 23, 2016) ...........................................11

*EEOC v. Kloster Cruise, Ltd.*,
    888 F. Supp. 147 (S.D. Fla. 1995) ...................................................................................10, 11

*EEOC v. Kloster Cruise Ltd.*,
    939 F.2d 920 (11th Cir. 1991) .............................................................................................15

*EEOC v. N. Memorial Health Care*,
    908 F.3d 1098 (8th Cir. 2018) ..............................................................................................1

*EEOC v. Prevo's Family Mkt., Inc.*,
    135 F.3d 1089 (11th Cir. 1998) ...........................................................................................18

*EEOC v. Royal Caribbean Cruises, Ltd.*,
    771 F.3d 757 (11th Cir. 2014) ...................................................................................15

*Elliott v. British Tourist Auth.*,
    986 F. Supp. 189 (S.D.N.Y. 1997).........................................................................10, 11

*Forsyth v. Univ. of Ala. Bd. of Trustees*,
    No. 17 Civ. 00854, 2018 WL 3012343 (N.D. Ala. June 15, 2018) ...........................12

*Frazier-White v. Gee*,
    818 F.3d 1249 (11th Cir. 2016) ...................................................................................1

*Gaujacq v. Electricite de France Int'l. N. Am., Inc.*,
    572 F. Supp. 2d 79 (D.C. Cir. 2008)..........................................................................10

*Hansen v. Danish Tourist Bd.*,
    147 F. Supp. 2d 142 (E.D.N.Y. 2001) .................................................................10, 11

*Haynes v. City of Montgomery, Ala.*,
    344 Fed. Appx. 519 (11th Cir. 2009)..........................................................................13

*Hillburn v. Murata Electronics N. Am., Inc.*,
    181 F.3d 1220 (11th Cir. 1999) .................................................................................13

*Hirsbrunner v. Martinez Ramirez*,
    438 F. Supp. 2d 10 (D.P.R. 2006)..............................................................................10

*Jones v. Halstead Mgt. Co., LLC*,
    81.F. Supp. 3d 324, 324-35 (S.D.N.Y. 2015) .............................................................1

*Jouanny v. Embassy of France*,
    No. 16 Civ. 135, 2017 WL 2455023 (D.D.C. June 5, 2017) .....................................10

*LaChance v. Duffy's Draft House, Inc.*,
    146 F.3d 832 (11th Cir. 1998) ...................................................................................18

*Lewis v. City of Union City, Ga.*,
    934 F.3d 1169 (11th Cir. 2019) ...........................................................................13, 18

*Lobo v. Celebrity Cruises, Inc.*,
    704 F.3d 882 (11th Cir. 2013) ...................................................................................15

*Lowe v. Ala. Power Co.*,
    244 F.3d 1305 (11th Cir. 2001) .................................................................................19

*Lyes v. City of Rivera Beach, Fla.*,
    166 F.3d 1332 (11th Cir. 1999) .................................................................................11

*McCulloch v. Sociedad Nacional de Marineros de Honduras,*
   372 U.S. 10 (1963)..................................................................................15

*McKenzie v. Dovala,*
   242 F.3d 967 (10th Cir. 2001) ...............................................................19

*Menzie v. Ann Taylor Retail, Inc.,*
   No. 11 Civ. 416, 2013 WL 709608 (N.D. Fla. Feb. 27, 2013) ...............14

*Merritt v. Dillard Paper Co.,*
   120 F.3d 1181 (11th Cir. 1997) .............................................................14

*Mileski v. Gulf Health Hosps., Inc.,*
   No. 14 Civ. 0514, 2016 WL 1295026 (S.D. Ala. March 31, 2016)..................12, 13

*Morelli v. Cedel,*
   141 F.3d 39 (2d Cir. 1998)....................................................................10

*Olson v. Chao,*
   No. 17 Civ. 10970, 2019 WL 4773884 (D. Mass. Sept. 30, 2019).........12

*Peeler v. Boeing Co.,*
   No. 14 Civ. 0552, 2015 WL 6626537.....................................................19

*Peters v. Baldwin Union Free Sch. Dist.,*
   320 F.3d 164 (2d Cir. 2003)..................................................................12

*Pina v. Henkel Corp.,*
   No. 07 Civ. 4048, 2008 WL 819901 (E.D. Pa. Mar. 26, 2008) ..............10

*School Bd. of Nassau Cnty. v. Arline,*
   480 U.S. 273 (1987)..........................................................................18, 19

*Spector v. Norwegian Cruise Line Ltd.,*
   545 U.S. 119 (2005)....................................................................11, 14, 15

*Stevens v. Premier Cruises, Inc.,*
   215 F.3d 1237 (11th Cir. 2000) .............................................................15

*Stokes v. City of Montgomery,*
   No. 07 Civ. 686, 2008 WL 4369247 (M.D. Ala. Sept. 25, 2008)...........19

*Wang v. General Motors, LLC,*
   371 F. Supp. 3d 407 (E.D. Mich. 2019).................................................16

*Wolski v. City of Erie,*
   900 F. Supp. 2d 553 (W.D. Pa. 2012)....................................................19

**Statutes**

42 U.S.C. § 12102 ................................................................................................12

42 U.S.C. § 12111 ................................................................................................18

42 U.S.C. § 12112 ......................................................................................15, 16, 17

42 U.S.C. § 12113 ................................................................................................18

**Other Authorities**

29 C.F.R. pt. 1640 App. § 1630.2 .........................................................................13

29 C.F.R. § 1630.2 ............................................................................12, 13, 18, 19

*EEOC Enforcement Guidance on National Origin Discrimination* (Nov. 18,
   2016), https://www.eeoc.gov/laws/guidance/national-origin-guidance.cfm ..........................11

*EEOC Enforcement Guidance on the Americans with Disabilities Act And
   Psychiatric Disabilities* (1997), https://www.eeoc.gov/policy/docs /psych.html..................19

Fed. R. Civ. P. 44.1 ...............................................................................................17

Fed. R. Civ. P 56 ....................................................................................................1

Restatement (Third) of Foreign Relations Law § 213 cmt. d (1987).............................11

Stephen J. Befort, *Direct Threat and Business Necessity: Understanding and
   Untangling two ADA Defenses,* 39 Berkeley J. Emp. & Lab. L. 377, 378
   (2018).............................................................................................................18

## INTRODUCTION

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment on a claim, defense, or "part of each claim or defense." Fed. R. Civ. P 56(a). Plaintiff Samuel Schultz ("Schultz") seeks summary judgment on three parts of his claim under the Americans with Disabilities Act (ADA) and the Florida Civil Rights Act (FCRA)[1]: that RCCL is an "employer," that Schultz has a "disability," and that he was denied employment [2] because of disability. He also seeks summary judgment on RCCL's defenses: interference with "internal order" of a foreign-flagged ship, a supposed conflict with Maltese law, and "direct threat." There are no genuine disputes of material fact on these issues, and Schultz should prevail as a matter of law.

## STATEMENT OF FACTS

### I.    DEFENDANT RCCL OPERATES AS A U.S. ENTITY.

Defendant Royal Caribbean Cruises Ltd., a Liberian corporation with corporate headquarters in the Port of Miami, operates cruise ships worldwide. (SMF ¶1.) As of December 31, 2017, RCCL and its subsidiaries employed approximately 66,000 shipboard employees as well as 6,000 full-time and 100 part-time shoreside employees. (SMF ¶2.)

Other than its nation of incorporation, all other considerations place RCCL in the United States.[3] Its principal place of business is Miami, including its headquarters. (SMF ¶4.) Its Marine Operations division responsible for support of "technical operations of the ship in terms of maintenance, repair, navigation, safety" is located here, as is Hotel Operations, which supports

---

[1] The brief addresses the claim through the framework of the ADA. Claims under the FCRA are analyzed by the same framework. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).

[2] "Denied employment" is the shorthand we will use for the circumstances of this case, *i.e.*, that Schultz was conditionally offered employment by RCCL, spent time rehearsing in Florida, then was told that the offer was withdrawn. Withdrawing a conditional offer is an adverse action. *EEOC v. N. Memorial Health Care*, 908 F.3d 1098, 1106 (8th Cir. 2018); *Jones v. Halstead Mgt. Co., LLC*, 81.F. Supp. 3d 324, 324-35(S.D.N.Y. 2015).

[3] On December 13, 2019, the Court ordered Defendant to produce certain materials requested by Plaintiff and bearing upon RCCL's U.S. status and described in a Proposed Order (ECF No. 71, attachment 14), but the Court did not set a due date.  Upon Defendant's compliance, as the Court directed during the December 13, 2019 hearing, Plaintiff will supplement the record on Reply.

customer experiences. (SMF ¶5.) It maintains its largest hiring operation in the U.S., including recruitment of ship management (executive committee members, captains, hotel directors, staff captains, chief engineers) and entertainment for RCCL's ships. (SMF ¶6.) The job description of "Performer," for which Schultz was recruited, specified that they be U.S. citizens. (SMF ¶15.)

RCCL shareholders, officers and directors are primarily domestic. Institutional investors owned some 72% of the outstanding shares of RCCL and many or most of those institutional investors are U.S.-based or -incorporated mutual funds. (SMF ¶7.) Nine out of 10 RCCL's largest institutional investors are American companies. (*Id.*) All officers and senior management of RCCL reside in the U.S., as do nine of twelve members of its Board of Directors. (SMF ¶8.)

RCCL's major market is, likewise, the U.S.; its citizens and residents make up one of the largest percentages or proportions in terms of RCCL's revenue and customer base. (SMF ¶9.) Passenger revenues generated by sales originating in the U.S. were approximately 61% of total passenger ticket revenues in 2018, 59% in 2017 and 55% in 2016. (*Id.*) The U.S. is one of the largest markets to which RCCL directs its marketing. (SMF ¶10.) Industry cruise guests are primarily sourced from North America, some 47% of global cruise guests in 2018. (*Id.*) RCCL operates four call centers in the U.S.: in Miramar, Florida; Weston, Florida; Wichita, Kansas; and Springfield, Oregon, which employ approximately 1,000 employees. (SMF ¶11.) The vast majority of RCCL's ships will at one time or another port domestically. (SMF ¶12.)

RCCL, in its Form 10-K, describes the panoply of U.S. laws that it must follow. (SMF ¶13.)  RCCL stipulated that "the ADA applies to Royal Caribbean, and Royal Caribbean follows the ADA with respect to its shoreside operations." (SMF ¶ 14.) Even as to shipboard crew, RCCL recognizes the ADA for some purposes. For example, RCCL has a "Safety" form, which it requests the psychiatrists of applicants with mental disorders to complete, and that form is commonly referred to as the "ADA Psych Questionnaire" (SMF ¶15); *see also* RCCL pre-employment medical examination ("PEME") nurse's email, in which the nurse states, "The ADA Report is received." (*Id.*). RCCL for some applicants also used a form called "Limitation of Major Life Activities," drawn from ADA criteria. (*Id.*) RCCL concedes that "U.S. Citizens or Green Card Holders" are "ADA protected applicants" in its interpretation of the Guidelines on the Medical Examinations of Seafarers ("ILO Guidelines") (*id.*).

Other U.S. connections included that (1) RCCL required that performers hired through MCO Productions for the position that Schultz sought be U.S. citizens (SMF ¶33); (2) the choice

of law in contracts between RCCL and MCO (with limited exceptions), and MCO and Schultz, was Florida law (SMF ¶16); (3) RCCL uses an American bank to pay performers (SMF ¶17); and (4) RCCL maintains its corporate data on servers located in the U.S. (SMF ¶5).

Conversely, RCCL connections to Liberia are virtually nonexistent. It has no employee offices, executives, managers, investors, marketing efforts, or travel agencies in Liberia; nor does it purchase goods or services in Liberia. (SMF ¶¶18–19, 21.) RCCL executives and managers do not go to Liberia for business. (SMF ¶18.) RCCL's status in Liberia is "non-resident domestic corporation." (SMF ¶19.) It is incorporated in Liberia primarily because of taxation and shipping. (*Id*.) Liberian law has no application outside the taxation issue and does not regulate safety or employment. (SMF ¶20.) RCCL does not claim that Liberian law has any application in this case. (*Id.*) RCCL's Assistant General Counsel Faso was not aware whether Liberian law applies to any of its contracts. (*Id.*) RCCL at most employs one or two Liberia citizens, while U.S. citizens comprise approximately 10% (or 6,600 people) of its shipboard employees. (SMF ¶21.) RCCL's Rule 30(b)(6) witness could not even identify Liberia on a map of Africa. (SMF ¶22.)

## II.     PLAINTIFF SCHULTZ HAS A HISTORY OF MAJOR DEPRESSION.

Samuel Schultz is a 33-year-old U.S. citizen and an opera singer. (SMF ¶23.) In May 2010, Schultz was drugged and raped. (SMF ¶24.). He attempted suicide after the rape, but immediately called for help. (*Id*.) His psychiatrist Dr. Bernard Gerber testified this was a unique episode and, since 2011, he made no such attempt and has not even had suicidal ideation. (*Id.*) According to Dr. Gerber, Schultz—who was also previously diagnosed with major depression—

> has remained stable and has shown no signs of recurring illness for the past 7 years … He is fully capable of managing with the work requirements of employment onboard ship. Given his profession as a singer, he is used to changes in routine and schedules…. His condition is in remission and he has been functioning very well at home and at work with no restrictions. [SMF ¶ 25, *quoting* Gerber report.]

In his Report to RCCL, Dr. Gerber described Schultz's condition as "major depression, recurrent, currently in remission (ICD-10 code F33.42)." (SMF ¶ 26.) Dr. Gerber testified that the term "recurrent" is a technical term used in the diagnostic criteria meaning "more than one episode during the person's lifetime" (thus, his diagnosis will *always* be "major depression recurrent" no matter how long he is in remission), while the clinical term "remission" means "no current active symptoms of the underlying disorder." (*Id*.) As of February 2018, Schultz had not had any episodes of Major Depressive Disorder since his 2011 suicide attempt; was "not

showing any persistent or recurring symptoms of clinical depression" or "experiencing persistent or recurrent impairing symptoms"; and was not suffering any impairing effects of his medication. (SMF ¶27.)

Schultz's condition, though in remission with treatment, substantially limits several major life activities when active. (SMF ¶28.) Without the ameliorative effects of medicine, such major life activities as Schultz's ability to sleep, learn, concentrate, think, communicate and work would be substantially limited. (*Id.*) Schultz testified that, without medication, he would be impaired in thinking, concentrating, working, self-care, and communication. (*Id.*)

## III.   RCCL JOINTLY WITH MCO PRODUCTIONS EMPLOYED SCHULTZ DURING REHEARSAL PERIOD IN FLORIDA, THEN MADE SCHULTZ A CONDITIONAL OFFER OF EMPLOYMENT FOR A SHIPBOARD POSITION AND WITHDREW IT AFTER LEARNING OF HIS HEALTH HISTORY.

### A.   RCCL Jointly with MCO Productions Employed Schultz for Rehearsals.

Around November 2017, MCO Productions LLC ("MCO") entered into a Production License and Services Agreement with RCCL to provide on-board entertainment. (SMF ¶29.) RCCL created the agreement with MCO that established joint control over the cast members before they boarded the ship and formally became crew members. (*Id.*) Rehearsals were in Miami, on RCCL property, under RCCL control, and RCCL provided technical support. (*Id.*)

On January 19, 2018, Schultz and MCO entered into an Independent Contractor Agreement. (SMF ¶30.) RCCL dictated many of its terms and included an addendum. (*Id.*) It specified that Performers may be treated as employees of RCCL, that the contract was governed by Florida law, and that Performers had to be U.S. citizens "fully conversant in English." (SMF ¶31.) He was paid $1,000 per week and $50 per diem for rehearsal time, which was paid by RCCL through MCO. (SMF ¶32.)  RCCL organized the cast members' "day to day life" during the rehearsals. (SMF ¶33.)  Cast members including Schultz lived in RCCL-leased housing, were to be hired and contracted with directly by RCCL, and their compensation and key responsibilities were jointly determined by MCO and RCCL. (*Id.*)  They were to receive benefits onboard the RCCL ship, they were to receive RCCL's job description, and they were required to be U.S. citizens. (*Id.*)  RCCL subjected cast members to its "Rules and Regulations" for the housing facilities during rehearsals. (SMF ¶34.) RCCL reimbursed Schultz for expenses, such as clothing, relating to the rehearsals and cast members went on a tour of a sister ship, Azamara

Quest, with RCCL's Director of Entertainment to meet the Cruise Director and the entertainment crew. (*Id.*)

On or about March 1, 2018, RCCL made a conditional offer of employment to Schultz to perform on one of its ships (*i.e.*, we "confirm our offer of employment to you as <u>Performer</u>"), pending RCCL pre-employment medical clearance and background checks. (SMF ¶35.)

**B. Schultz Submitted to Pre-Employment Medical Exam (PEME).**

Under the Maritime Labour Convention ("MLC") which RCC asserts binds it, RCCL required that each new hire for a shipboard position pass a "Pre-Employment Medical Exam" ("PEME") to obtain a "Medical Certificate for Service at Sea." (SMF ¶36.) Under the MLC, an "approved medical provider" (*not* RCCL or any "shipowner") conducts examinations of applicants and "exercise full professional independence in exercising their medical judgement" to determine their fitness. (*Id.*) Once approved by an approved medical provider, shipowners have complied with their obligation under MLC, as confirmed in Plaintiff's expert report.[4] (*Id.*) As RCCL itself has said, "The general rule is if [the medical examination is] done and approved at an approved provider, we do not need to receive and approve. However, since even our approved providers make mistakes, we will review if sent to us." (*Id.*)

The approved medical providers found Schultz fit. (SMF ¶37.) On January 26, 2018, Schultz saw Dr. Michael Platzman at a clinic called Medrite Urgent Care in New York or "Medigo" (an RCCL-approved provider). (SMF ¶38.) Dr. Platzman was trained by RCCL and provided with ILO Guidelines. (*Id.*) Schultz completed an RCCL form called RCL Employment Medical Examination Form A ("Form A"), in which he revealed that he was being treated for depression, that he had attempted suicide following a rape, and that he had made a "great recovery." (*Id.*) Dr. Platzman, after a thorough examination of Schultz, completed the RCL Pre-Employment Medical Examination Form B ("Form B"), indicating that Schultz was "fit for duty" "without restrictions" and "able to perform all activities of their job" (checked boxes). (*Id.*)

Around February 7, 2018, these documents were then sent to another RCCL-approved provider, Dr. Hadad at Broward Health. (SMF ¶39.) Dr. Hadad, like Dr. Platzman, deemed Schultz "fit after defect corrected." (*Id.*) Specifically, Dr. Hadad determined that Schultz was fit after the "correction" of submitting a report from his psychiatrist as to "exclude likelihood of

---

[4] *See* pp. 16-17, *infra*.

recurrence…." (*id.*) thereby signaling that Schultz was being assessed on a "case-by-case" basis, the portion of ILO Guidelines that deems applicants fit even if they have some past or present medical issue rather than the portion that requires applicants to be deemed unfit (*id.*).[5]

On February 16, 2018, RCCL emailed Schultz that he needed to get a report from a psychiatrist. (SMF ¶42.) Pursuant to RCCL's request (SMF ¶40), Schultz obtained a Report from his treating psychiatrist Dr. Gerber (SMF ¶41) and forwarded it to RCCL, along with the completed "Safety" form that RCCL refers to as "ADA Psych Questionnaire." (SMF ¶43) Dr. Gerber based the report on "[his] clinical work with Mr. Schultz since 2012, including the [February 22, 2018] visit … as well as [his] occasional conversations with Dr. Balick, who had continued to have a connection with Mr. Schultz for therapy work over those years." (SMF ¶41) In his report, Dr. Gerber addressed all the issues identified by RCCL.[6] (SMF ¶42.) He also noted that Schultz had maintained remission for many years and had shown "no signs of recurring illness for the past 7 years." (*Id.*)  On the ADA Psych Questionnaire/Safety form, Dr. Gerber stated that there was little or no risk of harm to Schultz himself or others. (*Id.*)

### C.  Offer Withdrawn Because of Schultz's Suicide Attempt.

---

[5] Appendix E of the ILO Guidelines (Exhibit 33 to Peratis Dec., p.31, D001006; *see* SMF ¶39) has a spreadsheet providing an easy-to-use template of "Fitness Criteria for Common Medical Conditions" for the guidance of medical providers.  It is laid out in five columns: **1.** Diagnostic codes.  **2.** Name of condition.  **3.** "Incompatible with reliable performance," whether temporary ("T") or permanent ("P"). As for mood disorders, if the person has "persistent or recurrent impairing symptoms" (*id.*) then he or she is "unfit." Column 3 is significant because RCCL's Dr. Shore applied it to disqualify Schultz, whereas all other RCCL-designated physicians as well as RCCL's PEME team, applied Column 5. **4.** "Able to perform some but not all duties…" **5.** "Able to perform all duties worldwide…"  As for mood disorders under Column 5, the person is deemed "fit" if a case by case assessment has excluded "likelihood of recurrence after two years with no episodes and with no medication or on medication with no impairing effects."

[6] While Dr. Shore claimed that Dr. Gerber had addressed some issues inadequately, he then admitted that he (Dr. Shore) did not seek to follow up to get additional answers or information because it would have made no difference to his conclusion that Schultz was unfit. (SMF ¶47 (Shore Dep. 320:2-321:23, 323:8-326:4, 342:23-343:6, 373:1-375:20).)

Dr. Gerber's report, along with the ADA Psych Questionnaire, was then evaluated by RCCL's in-house medical consultant Dr. Benjamin Shore. (SMF ¶43.)  Dr. Shore is Board-certified in emergency medicine, not psychiatry, and has not practiced medicine for many years. (*Id.*) Despite the "approved medical provider" having found Schutz "fit" (SMF ¶37), RCCL apparently decided to impose its own standards (SMF ¶¶45–46) and Dr. Shore declared Schultz unfit (SMF ¶44).  He admitted in his deposition that "I don't deal [with] that many [ ] people [who] have psychiatric disorders."  (SMF ¶43.)  Neither Dr. Shore nor any RCCL-employed medical personnel examined Schultz. (*Id.*) (As noted, RCCL-approved Dr. Platzman examined Schultz and found him fit, as did RCCL-approved physician Dr. Hadad. (SMF ¶¶37–38.)  Dr. Shore testified that he did not speak with Schultz,[7] nor did he review the job description regarding the functions of his job. (SMF ¶43.)

Without ever examining Schultz and without consultation with any psychiatrist, and in violation of the strictures of the MLC making the "approved medical provider" the independent arbiter of fitness, Dr. Shore determined on behalf of RCCL that Schultz was "not medically fit for duty at sea." (SMF ¶44.) Dr. Shore purported to base his decision upon the ILO Guidelines. (*Id.*) Dr. Shore's decision, however, is inconsistent with the MLC and ILO Guidelines (not to mention the ADA) and is instead consistent only with his own written RCCL "Interpretation" of the ILO Guidelines, which have no force of law. (SMF ¶¶45–46.)

---

[7] Dr. Shore was mistaken about a number of significant aspects of the job for which Schultz was a candidate. For example, Dr. Shore thought Schultz would be sharing a room. (SMF ¶43.) In fact, he was to have a private stateroom. (*Id.*)  Dr. Shore also thought Schultz would be making a "Pacific crossing."  In fact, Schultz would have been in port 74 out of 97 days (or 76% of the time) of his employment with RCCL. (The duration of the employment on board the ship for which Plaintiff applied, was approximately 14 weeks. The ship would depart from Singapore on March 25, 2018 and arrive at its final destination – Stockholm – on June 29, 2018.) (*Id.*) The total number of days of employment was thus 97 days, and the ship was in a port on 74 of them, or 76% of the time. (*Id.*)  According to RCCL, this is a high proportion of port days and Azamara prides itself on that in that it focusses on destinations and its "marketing positioning … is that [it] spend[s] more time in port… This includes more port days [and] longer stays in port, anywhere from 8:00, 9:00, 10:00 o'clock at night, midnight, overnights [.]" (*Id.*)

By Dr. Shore's interpretation, a "persistent or recurrent" symptom can mean "any *single* episode of impairment which may impact the crewmember's ability to safely perform his/her essential job functions and SOLAS duties or which exceeds the ability to treat onboard." (SMF ¶46.) Thus, the word "recurrent," to Dr. Shore and to RCCL, means "one" single event. This "interpretation" is not found in the ILO Guidelines. (*Id.*)[8] A single "serious" episode no matter how long ago it occurred could render a person permanently unfit to work on a ship. (*Id.*).

Dr. Shore demonstrated prejudice against anyone who had ever attempted suicide:

> But if somebody has taken a serious step towards ending their life, I would have defined that as something that is an impairment of seriousness and severity enough that I wouldn't think that that person would be safe to put onboard. And then I look to the definition to see about recurrent or persistent symptoms to confirm what we had originally decided. [SMF ¶52, Shore Dep. 185:4–25.]

Dr. Shore consider the likelihood of a future suicide attempt as essentially irrelevant:

> My answer is very simple. *That it doesn't matter whether it is likely or not.* One only needs to try to commit suicide on a cruise ship one time, and the preponderance of the act being successful is very much against favor of the individual. … *In simpler words, it doesn't matter whether it's a likely or unlikely event.* You only need to try once, and if you're successful we have a tragedy on our hands. [SMF ¶47, Shore Dep. 201:2–203:12 (emphasis added).]

He further testified that he was "familiar with the propensity of people who suffer from anxiety or major depression…to hurl themselves overboard and the temptation is there, and the opportunity is there." (SMF ¶46.) He testified that he was concerned about his professional status: "Likely? You are asking me to make an opinion about somebody I didn't examine…. [I]t doesn't matter whether it's a likely or unlikely event. … If guess wrong and I try to quantify a risk … then it's my neck on the chopping block…." (SMF ¶47, Shore Dep. 200:14–19, 203:1–12, 204:10–16.) He elaborated that "[he] can simply say that it was not a risk that [he] felt was willing to be taking. [sic] [He] didn't quantify that risk." (SMF ¶47, Shore Dep. 206:19–207:24.) He said that the concept of remission "has no application at sea."  (SMF ¶47.)

---

[8] Dr. Shore also demonstrated confusion about what "recurrent" means. When Schultz was being considered by RCCL, he had had no episode of depression since 2011 and was thus in remission. (SMF ¶¶25–27.)  Nevertheless, Dr. Shore testified with no basis in the record that Schultz had "recurrent symptoms since 2011."  (*See* SMF ¶46, Shore Dep 486:3–487:11; *see also* SMF ¶52.)

Another RCCL doctor, Director of Medical Operations Ruben Parejo, who is also not a psychiatrist and does not know any psychiatrist who specializes in maritime stressors, testified:

> in this case that we're talking about here, somebody that tried to kill themselves, that committed suicide -- I mean that tried to commit suicide or had depression, major depression, I think it's inhumane or cruel to put them in a position where they will be far away from their support, far away from where they feel safe, to put them in a place where they are going to be working, dealing with stress, and *all they can see is an ample ocean where they can jump overboard*. [SMF ¶48, Parejo Dep. 91:11–93:13.]

He compared someone with suicidal ideation to a passenger saying they have a "bomb" on a plane and testified that a 30-year-old suicide attempt would be disqualifying. (SMF ¶48*.*)

On March 9 and 13, 2018, RCCL advised Schultz that he had been found unfit for duty. (SMF ¶49.)

### D.  RCCL Considered "Record of" Disability and Regarded Schultz as Disabled.

RCCL reviewed records that disclosed his Major Depression diagnosis during the hiring process. (SMF ¶51.) Dr. Shore informed Schultz that RCCL's "medical team has assessed your persistent and recurrent conditions involving Major Depression and associated complications. Under the applicable ILO Guidelines, the Company cannot medically clear you for shipboard duty." (SMF ¶44.) Dr. Shore testified: "It's clear to me that if—in this specific—if we're talking about this specific case, in Mr. Schultz's case, that if he chose to stop his medication that his condition would recur" (SMF ¶52) and "I would say anybody who that [has] a need for both psychiatric and psychological counselling on a regular basis, who has both been diagnosed with severe depression and anxiety, who needs multiple pharmacological support would be ineligible, yes." (SMF ¶ 52 (Shore Dep. 199:1–11)). Dr. Shore focused singularly on the suicide attempt: "If somebody has taken a serious step towards ending their life I would have defined that as something that is an impairment of seriousness and severity enough that I wouldn't think that person would be safe on board." (SMF ¶ 52 (Shore Dep. 185:4–25)).

## ARGUMENT

## I.  SCHULTZ PREVAILS AS A MATTER OF LAW ON PARTS OF HIS CLAIM.

### A.  RCCL Is an Employer Under The ADA, Despite Foreign Incorporation.

RCCL has argued that it is not a covered entity under the ADA because it is a foreign employer incorporated in Liberia and sailing under the Maltese flag, and thus beyond the extraterritorial reach of 42 U.S.C. § 12112(c). Yet, critically, RCCL recruited, rehearsed and lodged Schultz here, indeed requiring that applicants be U.S. citizens.  (SMF ¶¶ 15, 31–35.) RCCL has a plethora of connections to the United States, set forth in the facts above. (*See id.*) Thus, it may not invoke the shibboleth of extraterritoriality to insulate itself from U.S. law.

Outposts of foreign entities operating on American soil expose themselves directly to U.S. employment-discrimination law for violations committed here (such as the decision not to employ Schultz), because foreign employers making use of this forum are entitled to no more than equal treatment with domestic employers. *See, e.g.*, *Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998) (holding that Title VII, ADA, and ADEA all "apply to a foreign company's domestic operations"); *Denty v. SmithKline Beecham Corp.*, 109 F.3d 147, 151 (3d Cir. 1997) ("the ADEA does apply to foreign firms operating on U.S. soil") (citation omitted); *Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 177 & n.16 (D.D.C. 2018) ("Title VII and the ADEA apply to foreign employers doing business in the United States"); *Jouanny v. Embassy of France*, No. 16 Civ. 135, 2017 WL 2455023, at *5 (D.D.C. June 5, 2017) (ADEA covers worker in French Embassy to the U.S.); *Downey v. Adloox Inc.*, 238 F. Supp. 3d 514, 520–22 (S.D.N.Y. 2017) (ADEA applied to New York branch office of French ad agency); *Bakeer v. Nippon Cargo Airlines*, No. 09 Civ. 3374, 2011 WL 3625103, at *30–31 (E.D.N.Y. July 25, 2011) (denying motion to dismiss; Title VII and ADEA apply to Japanese company with office in NYC); *Gaujacq v. Electricite de France Int'l. N. Am., Inc.*, 572 F. Supp. 2d 79, 86–87 (D.C. Cir. 2008) (Title VII applies to French utility with branch in DC; "having chosen to operate in the United States, [defendant] is subject to its laws, and [plaintiff] is afforded the protection of those laws, including Title VII"); *Pina v. Henkel Corp.*, No. 07 Civ. 4048, 2008 WL 819901, at *8 (E.D. Pa. Mar. 26, 2008) (German company with office in Pennsylvania; "a foreign company may be liable under the ADEA for discrimination against employees on U.S. soil"); *Hirsbrunner v. Martinez Ramirez*, 438 F. Supp. 2d 10, 16 (D.P.R. 2006) (Argentine company operating in Puerto Rico; "Title VII applies to foreign corporations to the extent that they employ people and discriminate against them within the United States"); *Hansen v. Danish Tourist Bd.*, 147 F. Supp. 2d 142, 148 (E.D.N.Y. 2001) ("Tourist Board conducts foreign operations in its New York City

office," thus "defendant is subject to the ADEA"); *Elliott v. British Tourist Auth.*, 986 F. Supp. 189, 191–92 (S.D.N.Y. 1997) (ADEA covered employee in British tourism agency officed in NYC); *EEOC v. Kloster Cruise, Ltd*., 888 F. Supp. 147, 150–52 (S.D. Fla. 1995) (ADEA applied to Bermuda subsidiary of a Norwegian parent with employees in Florida).

The joint employment of Schultz by MCO and RCCL during the rehearsal period,[9] RCCL's offer of employment, the processing of the offer, including medical review and "onboarding," and the withdrawal of the offer, occurred in the U.S. from February to March 2018, as to which the ADA applies. *See Spector v. Norwegian Cruise Line Ltd*., 545 U.S. 119, 131-32 (2005) (we "presume Congress does intend its statutes to apply to *entities in United States territory that serve, employ, or otherwise affect American citizens*, or that affect the peace and tranquility of the United States, even if those entities happen to be foreign-flag ships") (emphasis added).

Moreover, a foreign-incorporated employer will be deemed a domestic employer if it has sufficient U.S. contacts. *See EEOC Enforcement Guidance on National Origin Discrimination* (Nov. 18, 2016), at 28, https://www.eeoc.gov/laws/guidance/national-origin-guidance.cfm ("If an employer is not incorporated in the United States … various factors will be considered to determine whether the employer has sufficient connections to the United States to make it an American employer," including "the employer's principal place of business, the nationality of dominant shareholders and/or those holding voting control, and the nationality and location of management."); Restatement (Third) of Foreign Relations Law § 213 cmt. d (1987).

Under every approach, as to every relevant factor laid out in the case law and EEOC guidance, RCCL was an entity operating in the U.S. and subject to domestic law when it chose

---

[9] "In making determinations regarding joint employment or integrated employment, the Eleventh Circuit has applied the standard promulgated by the National Labor Relations Board. *Lyes v. City of Rivera Beach, Fla*., 166 F.3d 1332, 1341-42 (11th Cir. 1999) (applying NLRB test to Title VII cases). "This standard requires the Court to examine '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'" *Downie v. BF Weston, LLC*, No. 16 Civ. 81396, 2016 WL 7451427, at *3 (S.D. Fla. Dec. 23, 2016) (quoting *Lyes*, 166 F.3d at 1341).. Here, all of the four factors are present (*infra* at pp.4–5), thus MCO and RCCL were Schultz's joint employers during rehearsals.

not employ Schultz, a decision made here (and thus the violation was complete here). The domestic connections are overwhelming: its principal place of business is in Florida; its technical operations are based in the U.S.; its management is located here; it maintains a major hiring operation here (including, for relevant purposes, shipboard entertainment); the vast majority of its ships will dock here; it has four call centers here, with over 1000 employees; its officers and nine (out of twelve) of its directors live here; its predominant market is here; and applicants for Schultz's position were required to be U.S. citizens. (SMF ¶¶4–17, 33.) By contrast, RCCL's connections to Liberia (its nation of incorporation) were trivial, so much so that its designated Rule 30(b)(6) witness couldn't identify the country on a map. (SMF ¶¶18–22.)

Thus, both because RCCL is an American employer and the violation occurred in the United States, the Court should apply the ADA to RCCL's denial of employment to Schultz.

**B.  Schultz Is Disabled Within the Meaning of the ADA.**

Under 42 U.S.C. § 12102(1), a person with a "disability" is one with "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." "Disability" is to be "construed in favor of broad coverage…to the maximum extent permissible under the terms of this chapter." *Id.* § 12102(4)(a). "An individual may establish coverage under any one or more of these three prongs of the definition of disability." 29 C.F.R. § 1630.2(g)(2). Schultz meets the requirements of each of these prongs.

First, under subsection 12102(1)(A), Schultz has an impairment—major depression—that EEOC regulations deem, by its very nature, to substantially limit the major life activity of brain function. *See* 29 C.F.R. § 1630.2(j)(3)(iii) (finding it a "predictable assessment" that "major depressive disorder … substantially limit[s] brain function"); *Olson v. Chao*, No. 3:17 Civ. 10970, 2019 WL 4773884, at *9 (D. Mass. Sept. 30, 2019) (citing regulation); *Forsyth v. Univ. of Ala. Bd. of Trustees*, No. 17 Civ. 00854, 2018 WL 3012343, at *3 (N.D. Ala. June 15, 2018) ("depression is a mental impairment") (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir.), *amended*, 102 F.3d 1118 (11th Cir. 1996)). It is also held to substantially limit the major life activity of caring for oneself. *See, e.g.*, *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir. 2003) ("[a] mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself"); *Mileski v. Gulf Health Hosps., Inc.*, No. 14 Civ. 0514, 2016 WL 1295026, at *15 (S.D. Ala. March 31, 2016) ("depression (which led to a

- 12 -

suicide attempt) substantially limited one or more of [plaintiff's] major life activities—specifically, caring for herself"). An impairment that is in remission but may return in a substantially limiting form is also a disability. 29 C.F.R. § 1630.2(j)(1)(vii). Without the ameliorative effects of medicine, such major life activities including Schultz's ability to sleep, learn, concentrate, think, communicate and work would be substantially limited. (SMF ¶28.)

Second, Schultz meets subsection 12102(1)(B) because he has a "record of" such impairment. A person has a record of a disability if "a record relied upon by an employer indicates that the individual has or had a substantially limiting impairment." 29 C.F.R. pt. 1640 App. § 1630.2(k). *Accord Hillburn v. Murata Electronics No. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999); *Mileski*, 2016 WL 1295026, at *13 n.49. Several records that RCCL reviewed in connection with Schultz disclosed his major depression diagnosis. (SMF ¶51.)

Finally, he meets the requirements of subsection 12102(1)(C), in that he was "regarded as having such an impairment" by RCCL and "subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Relieving an employee from duty supposedly to protect them from self-harm is a common pattern in regarded-as cases. *See, e.g.*, *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1181 (11th Cir. 2019) ("stated reason for putting Lewis on leave—that [defendant] feared for her safety in view of her heart condition—demonstrates the [defendant]'s belief that Ms. Lewis's medical condition set her apart from other police officers"); *Haynes v. City of Montgomery, Ala.*, 344 Fed. Appx. 519, 520 (11th Cir. 2009) (reliance on "doctor's evaluation of Haynes in deciding not to return Haynes to duty" supported regarded-as-disabled claim). RCCL's Chief Medical Consultant, Dr. Benjamin Shore, the representative who determined that Schultz was "unfit," clearly regarded him as disabled. According to Dr. Shore, Schultz suffered from "severe anxiety state, depression or other mental disorder likely to impair performance" and such disorder featured "persistent or recurrent symptoms" as set forth in the description applied to Schultz from the ILO Guidelines. (SMF ¶44.) Dr. Shore also wrote Schultz to report that "[RCCL's] medical team has assessed your persistent and recurrent conditions involving Major Depression and associated complications. Under the applicable ILO Guidelines, the Company cannot medically clear you for shipboard duty." (*Id.*) Dr. Shore testified repeatedly to the same effect about Schultz's impairment in his deposition. (SMF ¶¶44, 46–47, 52.) Under any of the three definitions provided by the ADA, Schultz has a disability.

### C. Direct Evidence Establishes that RCCL Refused to Employ Schultz Because of His Disability.

Under well-established principles of employment-discrimination law, one may establish an employer's discriminatory intent directly by an admission by an agent of the employer that its decision was based on the plaintiff's protected status. "Direct evidence" is "evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption …." *Merritt v. Dillard Paper Co*., 120 F.3d 1181, 1189 (11th Cir. 1997) (citations and internal quotation marks omitted). *See, e.g., Cribbs v. NFI Network Logistic Solutions, LLC*, No. Civ. 411–263, 2014 WL 4805328, at \*4 (S.D. Ga. Sept. 26, 2014) ("[t]he paradigmatic example of direct evidence would be a memorandum from company management directing the termination of an employee because he is disabled"); *Menzie v. Ann Taylor Retail, Inc*., No. 11 Civ. 416, 2013 WL 709608, at \*4 (N.D. Fla. Feb. 27, 2013) (direct evidence where manager told plaintiff "she could never be a manager because of her bipolar disorder and that [manager] never would have hired [plaintiff] had she known of her disorder"). Here, the explanation in RCCL's memorandum for not employing Schultz leaves no doubt that the decision was because of his mental disability: "the Company medical team has assessed your persistent and recurrent conditions involving Major Depression and associated complications" and "cannot medically clear you for shipboard duty." (SMF ¶44.) This is bolstered by the significant testimony of Dr. Shore of the reasons he refused to certify Schulz. There is no need for inference or additional proof of why he was denied employment.

## II.   RCCL CANNOT PREVAIL AS A MATTER OF LAW ON ITS DEFENSES.

### A. RCCL Cannot Show That Claim Falls Within "Internal Order" Exception.

RCCL will argue that this case falls within a judge-made "narrow exception," *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 121, 131 (2005), that requires (as a matter of international comity) a "clear statement" for a domestic law to apply to foreign-flag vessels for claims that "implicate the internal order of the foreign vessel rather than the welfare of American citizens."

In *Spector*, the Fifth Circuit had categorically held (as RCCL would argue here) that the ADA does not apply to foreign vessels in U.S. ports based on this narrow exception. *Id.* at 127. The Supreme Court reversed. *Id.* at 127–28. It reasoned that, if that presumption applied in a sweeping manner to all of Title III, it would distort rather than effectuate Congressional intent.

*Id.* at 132, 139. The Court assessed each disputed provision separately to decide whether there was potential for interference with the internal affairs of the foreign vessel. *Id.* at 132–33.

The internal-order exception has no applicability here. Schultz is a U.S. citizen, and the ADA violation occurred on U.S. soil. The internal-order presumption concerns itself with extension of domestic laws to *foreign nationals* on foreign-flag vessels. *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19 (1963) ("[t]he question, therefore, appears to us more basic; namely, whether the [NLRA] as written was intended to have any application to foreign registered vessels employing alien seamen"); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 143 (1957) ("Congress did not fashion [the LMRA] to resolve labor disputes between nationals of other countries operating ships under foreign laws"). Conversely, it is reasonable "to presume Congress does intend its statutes to apply to entities in U.S. territory that serve, employ, or otherwise affect American citizens." *Spector*, 545 U.S. at 121.

The Eleventh Circuit cases addressing this presumption uniformly hold that it limits application of U.S. law to *foreign nationals*. *See*, *e.g.*, *EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 762–63 (11th Cir. 2014) (defendant presents "a legitimate question regarding whether the EEOC has jurisdiction over the claims of foreign nationals on foreign-flagged ships"); *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 888 & n.10 (11th Cir. 2013) (LMRA and NLRA do not apply to wage disputes between foreign-flagged ship and foreign crew members); *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000) ("this presumption generally has been applied where application of American law would interfere with the relations between the ship's foreign owner and the ship's foreign crew"); *Dowd v. Int'l Longshoremen's Ass'n*, 975 F.2d 779, 788–89 (11th Cir. 1992) (presumption governs reach of U.S. statute to "practices of owners of foreign vessels which are temporarily present in an American port with regard to foreign employees working on these vessels"). *Cf. EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 923–24 (11th Cir. 1991) (while not deciding "whether Title VII will ultimately apply to the instant case," court of appeals reverses district court's order quashing EEOC subpoena investigating Title VII charge of U.S. citizen who claimed she was fired because of pregnancy).

To the extent that Congress must make a "clear statement" with respect to application of domestic law to a foreign-flag ship, Title I of the ADA meets this test. That title (in contrast to Title III of the ADA in *Spector*) includes a highly-variegated provision regarding the statute's extraterritorial reach and application to foreign employers, 42 U.S.C. § 12112(c). Indeed, the

- 15 -

statute specifically sets out how to resolve conflicts (as here) between the demands of U.S. and foreign law, *see id.* § 12112(c)(1). As these provisions are both "unequivocal and textual" (*Dellmuth v. Muth*, 491 U.S. 223, 230 (1989)), they overcome any judicial presumption.

### B. RCCL Cannot Show That It Would Violate Foreign Law to Employ Schultz.

RCCL may argue that the ADA is inapplicable because "with respect to an employee in a workplace in a foreign country," actions that would otherwise constitute discrimination are not unlawful "if compliance with [the ADA] would cause [the] covered entity to violate the law of the foreign country in which such workplace is located." 42 U.S.C. § 12112(c)(1). RCCL would argue that Schultz was not medically fit under the ILO Guidelines,[10] promulgated under the Maritime Labour Convention ("MLC")—specifically under the criteria that address mood/affective disorders (*id.*), and thus RCCL did not find him "fit," preventing a designated medical provider from issuing him a certificate of fitness. RCCL bears the burden of proving this defense. *See*, *e.g.*, *Wang v. General Motors, LLC*, 371 F. Supp. 3d 407, 419 (E.D. Mich. 2019).

The only evidence in the record on this legal issue, submitted by *plaintiff*—the expert report of Nicholas Valenzia and Dr. Veronique Dalli dated October 25, 2019 (SMF ¶54, hereinafter "Dalli Report")—establishes conclusively that employing Schultz would *not* have violated Maltese law, and instead would have been entirely consistent with Maltese legal requirements. *First*, Schultz met the conditions laid out MLC and ILO Guidelines to the extent they are adopted by Maltese law. (Dalli Report at 3–10.) As summarized, "[a]pplicable legislation simply requires that a seafarer be certified by a duly qualified medical practitioner as medically fit to perform in that capacity" (*id.* at 12), which Schultz met in that a duly qualified

---

[10] While RCCL treats it as such, the ILO Guidelines are not the only applicable "law of" Malta under 42 U.S.C. § 12112(c)(1). Indeed, the ILO Guidelines are not "law" at all. They "do not aim to replace in any way the judgment or experience of the medical practitioner" and are meant simply as "a tool to assist in the conduct of examination of seafarers." (SMF ¶53). RCCL's Chief Medical Officer testified that the Guidelines are not law. (*Id.* ("They're guidelines and we adhere to them as closely as we can. And there's a bit of discretion to be used, unlike a policy or law, so I consider these to be guidelines.")) If they are to be treated as law, nevertheless, the Dalli Report conclusively demonstrates that RCCL would not have violated them by employing Schultz. (SMF ¶54.)

medical practitioner certified that Schultz was fit, but RCCL nevertheless refused to employ him. *Second*, Malta has its own anti-discrimination law, the "Equal Treatment Regulations," that safeguards the employment rights of the disabled. (*id.* at 10–11.)  RCCL never considered these in its incomplete quest to comply with Maltese law. In fact, RCCL's in-house employment counsel Faso testified that he could not recall even if Malta had an equal employment opportunity law, and Dr. Shore admitted that he has no training on the laws of Malta. (SMF ¶54.)

As explained in the Dalli Report, RCCL's argument ignores the full range of the applicable law of Malta, which, taken together, establish that Schultz had the right under Maltese law to the job for which he applied. (SMF ¶56). In addition, RCCL's application of the ILO Guidelines on Mood Disorders to this case was clearly wrong. This is because under Column 3 "Incompatible with Reliable Performance" (*i.e.*, unfit) is applicable *only* if an applicant has "recurrent and persistent impairing symptoms." (SMF ¶45.) But Schultz did not have "persistent and recurring symptoms."  In fact, he had had only one "impairing symptom," the one suicide attempt in 2011. He was thus properly under the rubric of Mood Disorders Column 5: "Able to Perform All Duties."  Column 5 provides for a "Case by case assessment to exclude likelihood of recurrence after at least two years with no further episodes and with no medication or on medication with no impairing effects."  (SMF ¶55.)  This perfectly fits Schultz:  he had had more than two years without episodes (his suicide attempt was in 2011 and up to today, there has been no such attempt or even ideation). (*Id.*)  This is why RCCL-approved physicians who approved Schultz (Dr. Platzman and Dr. Hadad), and the RCCL PEME nurses who advised him to get a psychiatrist report referred to and operated under Column 5 and not Column 3. (SMF ¶37.) Schultz was "fit" under ILO Guidelines as properly applied.  (Dalli Report at 11–15.)[11]

The Court is the final arbiter of the requirements of foreign law. Fed. R. Civ. P. 44.1 ("[t]he court's determination [of a foreign country's law] must be treated as a ruling on a question of law"). Based upon the fact record, the Dalli Report, and an independent review of Maltese law (including RCCL's obvious misinterpretation of the ILO Guidelines), there is one inescapable conclusion: that employing Schultz would not have violated Maltese law.

---

[11] While RCCL might argue that it is entitled to set a higher standard than the MLC—ILO, it must, under the ADA, show that such higher standards are job related for the position in question and consistent with business necessity, 42 U.S.C. § 12112(b)(6), which it has never done.

**C. RCCL Did No Individualized Assessment of Schultz's "Direct Threat**."

RCCL has asserted that employing Schultz in a shipboard position would have been a direct threat to the health and safety of Schultz and others. Yet the record shows as a matter of law that RCCL performed no individualized assessment of Schultz and relied on prejudice, stereotypes and speculation that he might hurt himself, which as a matter of law fails to establish "direct threat." *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (11th Cir. 1998) (direct-threat inquiry meant "to prohibit employers from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics"). *See also Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86-87 (2002) (decrying "workplace paternalism"). (Although designated as a defense, our circuit places the burden on plaintiffs to prove that the employer did not meet its obligations under "direct threat." *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998).)

The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). *See also* 29 C.F.R. § 1630.2(r) ("significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation"). It is a defense to an ADA action that the employer imposes "qualifications standards" that "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). Still, such an assessment of "direct threat" must be objective:

> [It] must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly '*individualized assessment* of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended.

*Echazabal*, 536 U.S. at 86 (quoting 29 C.F.R. § 1630.2(r)) (emphasis added). *Accord Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) ("risk assessment must be based on medical or other objective evidence"); *Lewis*, 934 F.3d at 1184–85; Stephen F. Befort, *Direct Threat and Business Necessity: Understanding and Untangling two ADA Defenses,* 39 Berkeley J. Emp. & Lab. L. 377, 378 (2018). Employers are expected to consider "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." 29 C.F.R. § 1630.2(r). *Accord School Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 288 (1987) (same under Rehabilitation Act). An employer's mere

good-faith belief that a significant risk exists is not enough. *See*, *e.g.*, *Lowe v. Ala. Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) ("a good-faith belief that a significant risk of harm exists is insufficient if it is not grounded in medical or other objective, scientific evidence").

The bald fact that Schultz once attempted suicide years ago is not enough to make out a "direct threat" defense *See*, *e.g., McKenzie v. Dovala*, 242 F.3d 967, 974–75 (10th Cir. 2001) (for police officer who made suicide attempt, "no evidence suggesting in what way, once [plaintiff] had undergone rehabilitation and had been cleared by her doctor, employing McKenzie in a position that does not require the use of force would create a direct threat to the public or to her co-workers"); *Peeler v. Boeing Co.*, No. 14 Civ. 0552, 2015 WL 6626537, at *3 W.D. Wash. Oct. 30, 2015) ("[w]hile Dr. Bailey's report would support a plausible argument that plaintiff's health would be in imminent and likely jeopardy if she returned to the factory floor before acquiring adequate coping skills [owing to suicidal ideations], the regulations are very specific regarding the kind of assessment an employer must make and against which the reasonableness of a threat determination will be measured"); *Wolski v. City of Erie*, 900 F. Supp. 2d 553, 559–61 (W.D. Pa. 2012) (insufficient to predicate "direct threat" on fact that employee previously attempted suicide, *citing EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*); *Stokes v. City of Montgomery*, No. 07 Civ. 686, 2008 WL 4369247, at *7–8 (M.D. Ala. Sept. 25, 2008) (denying summary judgment on direct threat defense based on single suicide attempt); *EEOC Enforcement Guidance On The Americans With Disabilities Act And Psychiatric Disabilities* (1997), https://www.eeoc.gov/policy/docs /psych.html ("35. Does an individual who has attempted suicide pose a direct threat when s/he seeks to return to work? No, in most circumstances. As with other questions of direct threat, an employer must base its determination on an individualized assessment of the person's ability to safely perform job functions when s/he returns to work. Attempting suicide does not mean that an individual poses an imminent risk of harm to him/herself when s/he returns to work. In analyzing direct threat (including the likelihood and imminence of any potential harm), the employer must seek reasonable medical judgments relying on the most current medical knowledge and/or the best available factual evidence concerning the employee.")

RCCL's "assessment" of Schultz's fitness (SMF ¶¶43–53) lacks any individualization and is legally insufficient. Dr. Shore's testimony demonstrates prejudice and lack of individualization. He asserted his "familiarity" with "the propensity of *people* who are in an

anxious or a very depressed state who suffer from either anxiety or major depression to hurl themselves overboard, and the temptation is there and the opportunity is there" (SMF¶46, Shore Dep. 417:5–11.) thereby lumping Schultz with anyone who has ever tried to commit suicide, no matter how long ago and no matter how diligent and compliant with medication and therapy for the intervening years. Dr. Parejo did the same. Plaintiff's expert report from Dr. Lawrence Amsel, MD, a psychiatrist with Columbia Medical Center and expert in the study of suicide, described in detail how an individualized determination actually works—examining the attempt, considering whether it was caused by a trauma, the therapy and medication regime pursued, the lack of ideation, and many other factors. Assessing those factors, Dr. Amsel concludes that Schultz is "no more likely to be a danger to himself or others during the proposed cruise, than the average person without his psychiatric history." (SMF ¶57.) Dr. Gerber also testified that Schultz's risk of any active suicidal ideation was "quite low." (SMF ¶42.) All medical professionals who examined Schultz, those who did so on behalf of RCCL, and those who treated Schultz, found Schultz to be fit. (SMF ¶¶37–42.) Because RCCL's decision to the contrary was objectively unfounded, it fails as a matter of law.

<u>**CONCLUSION**</u>

For the above-stated reasons, Schultz's motion for summary judgment should be granted, and the case set for trial for all issues that remain undecided, including damages and other relief.

## <u>CERTIFICATE OF SERVICE</u>

**I hereby certify** that a true and correct copy of the foregoing was served by electronic filing on January 13, 2020 on all counsel or parties of record on the Service List below.

Dated: January 13, 2020    <u>s/ Kathleen Peratis</u>
            Kathleen Peratis, Esq.

            <u>s/Lindsey Wagner</u>
            Lindsey Wagner

OUTTEN & GOLDEN LLP    SCOTT WAGNER & ASSOCIATES, P.A.
Kathleen Peratis, Esq.     Lindsey Wagner, Esq.
KP@outtengolden.com     lwagner@scottwagnerlaw.com
Aliaksandra Ramanenka, Esq.   250 South Central Boulevard
aramanenka@outtengolden.com  Jupiter Gardens, Suite 104-A
685 Third Avenue, 25th Floor   Jupiter, Florida 33458
New York, New York 10017    Telephone: 561.653.0008
Telephone: 212.245.1000

Paul W. Mollica, Esq.
pwmollica@outtengolden.com
161 North Clark Street, Suite 1600
Chicago, Illinois 60601
Telephone: 312.809.7010

*Attorneys for Plaintiff*

## <u>SERVICE LIST</u>

David M. DeMaio
Florida Bar No. 886513
david.demaio@ogletreedeakins.com
Gregory R. Hawran
Florida Bar No. 55989
gregory.hawran@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
Two Datran Center
9130 S. Dadeland Blvd, Suite 1625
Miami, Florida 33156
Telephone: 305.374.0506
Facsimile: 305.374.0456

*Attorneys for Defendant*