OUTTEN & GOLDEN LLP
Kathleen Peratis, Esq.
KP@outtengolden.com
Aliaksandra Ramanenka, Esq.
aramanenka@outtengolden.com
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: 212.245.1000

Paul W. Mollica, Esq.
pwmollica@outtengolden.com
161 North Clark Street, Suite 1600
Chicago, Illinois 60601
Telephone: 312.809.7010

SCOTT WAGNER & ASSOCIATES, P.A.
Lindsey Wagner, Esq.
lwagner@scottwagnerlaw.com
250 South Central Boulevard
Jupiter Gardens, Suite 104-A
Jupiter, Florida 33458
Telephone: 561.653.0008

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SAMUEL SCHULTZ,<br><br>        Plaintiff,<br><br>v.<br><br>ROYAL CARIBBEAN CRUISES, LTD.,<br>D/B/A AZAMARA CLUB CRUISES,<br><br>        Defendant. | **PLAINTIFF'S OPPOSITION TO ROYAL CARIBBEAN CRUISES LTD.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:18-cv-24023 (EGT)<br><br>Judge Edwin G. Torres |

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

RCCL IS HEADQUATERED IN FLORIDA, AND THE EVENTS OCCURRED THERE ........ 2

ARGUMENT ................................................................................................................. 4

I.     Schultz's Claim Falls Outside the Narrow Exception of "Internal Order" ........................ 4

    A.     The "Internal Order" Presumption Only Applies to Extending U.S. Law to the
        Affairs of *Foreign* Crew, Not to the Rights of U.S. Crew ...................................... 4

        1.     The Eleventh Circuit Limits "Internal Order" to Foreign Crew ................. 4

        2.     Supreme Court "Internal Order" Cases Are Confined to Interference
                With Relations Between Foreign-Owned Ship and Foreign Crew ............. 8

    B.     "Internal Order" Presumption Only Covers Activity at or on a Ship .................. 14

    C.     If Needed, There Is A Maritime Choice-of-Law Standard in *Lauritzen* ............... 17

    D.     Conclusion: The Cruise-Line Industry Always Cries "Wolf" in These Cases ..... 19

II.    Florida Civil Rights Act (FCRA) Applies to the Present Case ......................................... 20

    A.     Florida Has an Interest in Discrimination That Occurs in Florida ...................... 20

    B.     RCCL's Dormant Commerce Clause Argument Is Frivolous ............................. 23

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                            **PAGE(S)**

*Alberts v. Royal Caribbean Cruises Ltd.*,
   834 F.3d 1202 (11th Cir. 2016) ...................................................................................14

*Alim v. KBR, Inc.*,
   No. 11 Civ. 1746, 2012 WL 12857421 (N.D. Tex. Mar. 15, 2012) .......................................18

*Allen v. Int'l Tel. and Tel. Corp.*,
   164 F.R.D. 489 (D. Ariz. 1995) ...................................................................................19

*Alliance of Auto. Mfrs. v. Gwadosky*,
   430 F.3d 30 (1st Cir. 2005) ........................................................................................24

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) .................................................................................................16

*Benz v. Compania Naviera Hidalgo, S.A.*,
   353 U.S. 138 (1957) ...............................................................................................6, 9

*Bernstein v. Virgin America, Inc.*,
   227 F. Supp. 3d 1049 (N.D. Cal. 2017) ........................................................................25

*Bowers v. NCAA*,
   151 F. Supp. 2d 526 (D.N.J. 2001) ..................................................................23, 24, 25

*Brooks v. Hess Oil V.I. Corp.*,
   809 F.2d 206 (3d Cir. 1987) .........................................................................................8

*Carbotrade S.p.A. v. Bureau Veritas*,
   99 F.3d 86 (2d Cir. 1996) ..........................................................................................16

*Cragg v. Dist. Bd. of Trs. of Miami-Dade Coll.*,
   No. 17 Civ. 20300, 2018 WL 8334585 (S.D. Fla. Nov. 30, 2018) .........................................21

*Dowd v. Int'l Longshoremen's Ass'n*,
   975 F.2d 779 (11th Cir. 1992) ...................................................................................1, 6

*Dresdner Bank AG v. M/V OLYMPIA VOYAGER*,
   446 F.3d 1377 (11th Cir. 2006) ....................................................................................7

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982) .................................................................................................24

*EEOC v. Bermuda Star Line, Inc.*,
   744 F. Supp. 1109 (M.D. Fla. 1990) .............................................................................3

EEOC v. Kloster Cruise Ltd.,
939 F.2d 920 (11th Cir. 1991) ..................................................................17

EEOC v. Royal Caribbean Cruises, Ltd.,
771 F.3d 757 (11th Cir. 2014) ...........................................................1, 6, 7

Ferrer v. MedaSTAT USA LLC,
No. 03 Civ. 277, 2004 WL 2595955 (W.D. Ky. July 8, 2004)................20

Gomez v. Honeywell Intern., Inc.,
510 F. Supp. 2d 417 (W.D. Tex. 2007)....................................................22

Healy v. Beer Inst., Inc.,
491 U.S. 324 (1989)..................................................................................24

Hellenic Lines Ltd. v. Rhoditis,
398 U.S. 306 (1970)..................................................................................17

Hesterly v. Royal Caribbean Cruises Ltd.,
No. 06 Civ. 22862, 2008 WL 516495 (S.D. Fla. Feb. 25, 2008)............15

Hirst v. Skywest, Inc.,
910 F.3d 961 (7th Cir. 2018) ...................................................................23

IMS Internet Media Servs., Inc. v. Hwei Chyun Lau,
No. 17 Civ. 21299, 2018 WL 2007044 (S.D. Fla. Jan. 12, 2018) ..........19

Incres S. S. Co. v. Int'l Maritime Workers Union,
372 U.S. 24 (1963)......................................................................10, 11, 12

Int'l Longshoremen's Local 1416, AFL-CIO v. Ariadne Shipping Co.,
397 U.S. 195 (1970)..............................................................10, 11, 12, 13

Jose v. M/V Fir Grove,
765 F. Supp. 1024 (D. Or. 1991) ...............................................................8

Joshua v. City of Gainesville,
768 So. 2d 432 (Fla. 2000)........................................................................20

Koukorinis v. S/T Eurypyle,
214 F. Supp. 344 (E.D. Va. 1963) ..............................................................8

Lauritzen v. Larsen,
345 U.S. 571 (1953)...................................................................1, 14, 15, 17

Lobo v. Celebrity Cruises, Inc.,
704 F.3d 882 (11th Cir. 2013) ..........................................................6, 7, 8

*M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*,
   890 F.3d 995 (Fed. Cir. 2018)....................................................................................15

*Marine Cooks and Stewards, AFL v. Panama S. S. Co.*,
   362 U.S. 365 (1960)....................................................................................9, 10

*Marks v. United States*,
   430 U.S. 188 (1977)....................................................................................5

*Maryeli's Lovely Pets, Inc. v. City of Sunrise*,
   No. 14 Civ. 61391, 2015 WL 11197773 (S.D. Fla. June 25, 2015) .................................23, 24

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
   372 U.S. 10 (1963)....................................................................................6, 10, 11

*Merrion v. Jicarilla Apache Tribe*,
   455 U.S. 130 (1982)....................................................................................23

*Mousa v. Lauda Air Luftfahrt, A.G.*,
   258 F. Supp. 2d 1329 (S.D. Fla. 2003) ...................................................................21

*Nat'l Transp. Safety Bd. v. Carnival Cruise Lines, Inc.*,
   723 F. Supp. 1488 (S.D. Fla. 1989) .......................................................................15

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
   472 U.S. 159 (1985)....................................................................................23

*New Energy Co. of Indiana v. Limbach*,
   486 U.S. 269 (1988)....................................................................................24

*In re Park West Galleries, Inc.*,
   No. 09-2076, 2010 WL 56044 (W.D. Wash. Jan. 5, 2010) .............................................24, 25

*Parry v. Outback Steakhouse of Fla., Inc.*,
   No. 06 Civ. 00804, 2006 WL 2919018 (M.D. Fla. Oct. 11, 2006).........................................21

*Pharmaceutical Care Mgt. Ass'n v. Rowe*,
   429 F.3d 294 (1st Cir. 2005)............................................................................24

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)....................................................................................24

*Port of Houston Authority of Harris Cnty., Tex. v. Int'l Organ. of Masters, Mates*
   *& Pilots, AFL-CIO*,
   456 F.2d 50 (5th Cir. 1972) ...........................................................................6, 7

*Priyanto v. M/S Amsterdam*,
   No. 07-CIV-3811, 2009 WL 175739 (C.D. Cal. Jan. 23, 2009)...........................................22

*Romero v. Int'l Terminal Operating Co.*,
358 U.S. 354 (1959)........................................................................................17

*S.D. Myers, Inc. v. City & Cty. of San Francisco*,
253 F.3d 461 (9th Cir. 2001) ..........................................................................25

*Sarac v. Univ. of S. Florida Bd. of Trs.*,
No. 18 Civ. 02485, 2020 WL 97782 (M.D. Fla. Jan. 8, 2020) ........................21

*Se. Fisheries Ass'n v. Dep't of Natural Res.*,
453 So.2d 1351 (Fla. 1984)..............................................................................22

*Shekoyan v. Sibley Int'l Corp.*,
409 F.3d 414 (D.C. Cir. 2005) .........................................................................22

*Sigalas v. Lido Mar., Inc.*,
776 F.2d 1512 (11th Cir. 1985) .......................................................................17

*Sinclair v. De Jay Corp.*,
170 F.3d 1045 (11th Cir. 1999) .................................................................20, 23

*South-Central Timber Development, Inc. v. Wunnicke*,
467 U.S. 82 (1984)...........................................................................................23

*Spector v. Norwegian Cruise Line Ltd.*,
545 U.S. 119 (2005)................................................................................ *passim*

*Stevens v. Premier Cruises, Inc.*,
215 F.3d 1237 (11th Cir. 2000) ..................................................................1, 4, 6

*Sullivan v. Oracle Corp.*,
662 F.3d 1265 (9th Cir. 2011) .........................................................................25

*Tarasewicz v. Royal Caribbean Cruises Ltd.*,
No. 14 Civ. 60885, 2015 WL 3970546 (S.D. Fla. June 30, 2015) ....................3

*Toro Co. v. Krouse, Kern & Co.*,
644 F. Supp. 986 (N.D. Ill. 1986), *aff'd*, 827 F. 2d 155 (7th Cir. 1987) ..........19

*Torrico v. Int'l Bus. Machines Corp.*,
213 F. Supp. 2d 390 (S.D.N.Y. 2002)..............................................................22

*United States v. Bustos-Guzman*,
685 F.2d 1278 (11th Cir. 1982) .......................................................................15

*United States v. Flores*,
289 U.S. 137 (1933)..........................................................................................15

*United States v. Ionia Mgt. S.A.*,
   555 F.3d 303 (2d Cir. 2009) ........................................................................................16

*United States v. Jho*,
   534 F.3d 398 (5th Cir. 2008) ...............................................................................15, 16

*United States v. Julio Diaz*,
   678 F.2d 1031 (11th Cir. 1982) .................................................................................15

*United States v. Parness*,
   503 F.2d 430 (2d Cir. 1974) ........................................................................................6

*United States v. Pena*,
   684 F.3d 1137 (11th Cir. 2012) .................................................................................16

*United States v. Riker*,
   670 F.2d 987 (11th Cir. 1982) ...................................................................................15

*United States v. Royal Caribbean Cruises, Ltd.*,
   11 F. Supp. 2d 1358 (S.D. Fla. 1998) .......................................................................15

*White v. Mass. Council of Constr. Emp'rs, Inc.*,
   460 U.S. 204 (1983) ...............................................................................................2, 23

*Windward Shipping (London) Ltd. v. American Radio Ass'n, AFL-CIO*,
   415 U.S. 104 (1974) .............................................................................................10, 13

*Wolf v. J.I. Case Co.*,
   617 F. Supp. 858 (E.D. Wis. 1985) .....................................................................22, 23

*Yoder v. Western Express, Inc.*,
   181 F. Supp. 3d 704 (C.D. Cal. 2015) ......................................................................25

*Young v. Norwegian Seafarers' Union*,
   138 So. 3d 1189 (Fla. Dist. Ct. App. 2014) ..............................................................22

## STATUTES

18 U.S.C. § 1001 ...............................................................................................15, 16

42 U.S.C. § 12101(b) ................................................................................................4

42 U.S.C. § 12111(4) ..............................................................................................20

42 U.S.C. § 12112(c)(1) .............................................................................11, 17, 18

42 U.S.C. § 12201 .......................................................................................2, 22, 23

Civil Rights Act of 1991, Pub. L. 102–166, 105 section 109 Stat. 1071 (1991)
(codified at 42 U.S.C. §§ 2000e–1(c), 12111(4), & 12112(c)).................................................17

Fla. Stat. § 760 ...........................................................................................................................21

**OTHER AUTHORITIES**

EEOC Enforcement Guidance on National Origin Discrimination (Nov. 18,
2016), https://www.eeoc.gov/laws/guidance/national-origin-guidance.cfm ...........................3

Restatement (Third) of Foreign Relations Law § 501 (1987) ...............................................3

Restatement (Third) of Foreign Relations Law § 502 (1987) ......................................14, 15

U.N. Convention on the High Seas of 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200,
Article 5(1)...................................................................................................................................3

## INTRODUCTION

The "internal-order" presumption cited by defendant Royal Caribbean Cruises Ltd. (RCCL) applies "where application of American law would interfere with the relations between the ship's foreign owner and the ship's foreign crew." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000). But RCCL would have this Court be the first to extend it to prevent the application of American law to a ship's *U.S.* crew. Repeatedly, the Eleventh Circuit has stated that the presumption applies to interference with the affairs of *foreign* workers aboard foreign ships. This includes cases that RCCL ought to have cited but didn't. In *EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 762–63 (11th Cir. 2014)—where RCCL was represented by the same counsel as in this case—our circuit summarized the "internal order" presumption as "whether the EEOC has jurisdiction over the [ADA] claims *of foreign nationals on* foreign-flagged ships" (emphasis added). In its brief in the Eleventh Circuit, RCCL itself argued that the presumption "stands for the proposition that U.S. laws purporting to regulate the working relationship between vessel owner and crew *do not apply to the foreign crew* of foreign-flagged vessels even when those vessels are in U.S. territory" (emphasis added). Brief of Defendant-Appellee RCCL at 38, *EEOC v. Royal Caribbean Cruise Lines*, 771 F.3d 757 (11th Cir. 2014) (No. 13-13519) (*EX.51*[1]). *See Dowd v. Int'l Longshoremen's Ass'n*, 975 F.2d 779, 788–89 (11th Cir. 1992) (presumption governs reach of U.S. law to "practices of owners of foreign vessels which are temporarily present in an American port *with regard to foreign employees* working on these vessels") (emphasis added; citation ommitted). By contrast, *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 132 (2005) (plurality), extending Title III of the ADA to cruise ships for U.S. passengers in U.S. waters, held that we "presume Congress does intend its statutes to apply to entities in U.S. territory that serve, employ, or otherwise affect American citizens."

Alternatively, there is no legal reason to apply the "internal order" presumption to employment decisions that do not actually take place *at or on a ship*, such as the one involved here, but are instead fully made and executed in U.S. headquarters. Law-of-the-flag is a pragmatic doctrine that generally allows one state's law to sail the sea with the ship, as noted in yet another controlling authority that RCCL elected not to cite. *See Lauritzen v. Larsen*, 345 U.S. 571, 585 (1953) (courts "apply the law of the flag on the pragmatic basis that there must be some

---

[1]All references to "*EX. __*" are to the contemporaneously filed Notice of Filing Exhibits 1-55.

law *on shipboard*, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her") (emphasis added). Yet here, the actions that Schultz challenges took place at U.S. headquarters, not on a ship. Finally, to the extent that it would be necessary to do so, application of the choice-of-law rule laid out by the Supreme Court in *Lauritzen*—weighing the place of the wrongful act, law-of-the-flag, allegiance or domicile of the injured, allegiance of the defendant shipowner, place of contract, inaccessibility of a foreign forum, and law of the forum—points conclusively to U.S. law (the ADA) as the rule of decision.

RCCL also argues that the Florida Civil Rights Act, Fla. Stat. § 760, (FCRA) should not apply to the decision to deny Schultz employment because he was not a resident of Florida and his work would eventually be performed outside of Florida. Yet as RCCL itself notes (RCCL Br. at 19 n.16), "RCCL is present in Florida, the decision not to employ him was made in Florida, and the decision was communicated to him while he was briefly in Florida for rehearsals." RCCL understates the point: it is not only "present" in Florida, it is *headquartered* there. It is, for every practical purpose, a Florida employer. Its decision about Schultz was made and carried out in Florida, where he was rehearsing for the RCCL cruise when he learned that his conditional employment was revoked. Florida has an interest in preventing and correcting discrimination that occurs there, against an employee whose entire tenure with the employer was in Florida.

Finally, because Congress authorizes state and local laws that meet or exceed the scope of the ADA (42 U.S.C. § 12201, not cited by RCCL), the dormant Commerce Clause argument is frivolous. *White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 213 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce.") (citation omitted). For the reasons set forth below, RCCL's motion should be denied.

### RCCL IS HEADQUATERED IN FLORIDA, AND THE EVENTS OCCURRED THERE

For the reasons laid out in detail in Schultz's own motion for summary judgment, RCCL for all relevant purposes should be treated as a domestic employer for purposes of applying the ADA to its operations. [2] As to every relevant factor laid out in the case law and EEOC

---

[2] Because the focus of RCCL's brief is principally legal—whether the ADA applies to offers of employment to U.S. citizens on a foreign-flagged ship, and whether the FCRA extends to work outside of Florida—Schultz need not respond in this brief line-by-line to RCCL's asserted

Guidance,[3] RCCL is an entity headquartered in the U.S. and subject to domestic law when it chose to recruit, assess, medically examine, partially train and employ, and then deny employment to Schultz, all of which was done in the U.S. (and thus the violation was completed here). The domestic connections are overwhelming: RCCL's principal place of business is in Florida; its management is located here; its Marine and Hotel Operations are based in the U.S.; it maintains a major hiring operation here (including, for relevant present purposes, shipboard entertainment); the vast majority of its ships dock here; its officers and nine (out of twelve) directors live here; its predominant market is here; and applicants for Schultz's position were required to be U.S. citizens. (Schultz's SMF ¶¶1–24.) In its very administration of its hiring process, RCCL recognizes the saliency of Title I of the ADA by applying it to U.S. applicants. (*Id.* ¶¶19–23.) RCCL also asserts no substantial connection to Malta, though it does contend that the Azamara *Journey* is flagged there and thus Maltese law constitutes the law-of-the-flag.[4]

---

"Summary of Undisputed Material Facts" (RCCL Br. at 1–4). Schultz's opposition to these facts, as relevant, may be found in his response to the RCCL statement of undisputed material facts.

[3] *EEOC Enforcement Guidance on National Origin Discrimination* (Nov. 18, 2016), at 28, https://www.eeoc.gov/laws/guidance/national-origin-guidance.cfm.

[4] RCCL has not established a *genuine link* between the Azamara *Journey* where Schultz would have worked and Malta. RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 501 (1987) (law-of-the-flag applies "only if there is a genuine link between the state and the ship"); U.N. Convention on the High Seas of 1958, 13 U.S.T. 2312, Article 5(1) (for "law of the flag" convention to apply, "[t]here must exist a genuine link between the State and the ship; in particular, the State must effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag"); *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2015 WL 3970546, at *7 (S.D. Fla. June 30, 2015) (notes phenomenon of "flags of convenience" where foreign-flagged ships have only a nominal connection to the state of the flag)(citation omitted); *EEOC v. Bermuda Star Line, Inc.*, 744 F. Supp. 1109, 1112 (M.D. Fla. 1990) (finding that "other than flying the Panamanian flag, and being registered in that country, the [cruise ship] appears to have no other connections to Panama," where cruise-line company was otherwise connected to the U.S.). RCCL has not made a record on this factual predicate (and it would, of course, be improper to do so on reply when it is too late to respond).

- 3 -

The relevant events, people and entities are all based in the United States, particularly in Florida, including Schultz's recruitment, rehearsals, and training and all of the individuals and records involved in those events. (*Id.* ¶¶52–53, 59, 153–54.) Doctors involved in Schultz's medical examination for RCCL were also located in the United States. (*Id.* ¶71 (New York), ¶¶160–61 (Florida).) As RCCL admits, (RCCL Br. at 19, n.16), the ultimate decision to deny Schultz employment "was communicated to him while he was briefly in Florida for rehearsals." There is no record of Schultz boarding the Azamara *Journey* where he was scheduled to work.

<u>**ARGUMENT**</u>

**I.    Schultz's Claim Falls Outside the Narrow Exception of "Internal Order"**

There is a strong interest in assuring that disabled U.S. residents are protected by the ADA. *See* 42 U.S.C. § 12101(b); *Spector*, 545 U.S. at 132 (plurality) (ADA was "designed to provide broad protection for the disabled"); *Stevens*, 215 F.3d at 1242 (same). RCCL argues, though, that this case falls within a "narrow exception," *Spector*, 545 U.S. at 131 (plurality), that there must be a "clear statement" in the statute for U.S. law to apply to foreign-flag vessels for claims that "implicate the internal order of the foreign vessel rather than the welfare of American citizens." As seen below, the "internal order" presumption applies only to extending U.S. law to the affairs of *foreign crew* on foreign vessels; it has never been held to bar the application of U.S. law in the U.S. to protect the welfare of U.S. citizens such as Schultz who are employed there.[5]

**A.    The "Internal Order" Presumption Only Applies to Extending U.S. Law to the Affairs of *Foreign* Crew, Not to the Rights of U.S. Crew**

**1.    The Eleventh Circuit Limits "Internal Order" to Foreign Crew**

In *Spector*, the Fifth Circuit originally held that Title III of ADA (the ADA's public-accommodation chapter) was "altogether inapplicable to foreign vessels," *Spector*, 545 U.S. at 125, even when sailing in U.S. waters, based on a rigid application of the "internal order"

---

[5] To clarify, RCCL does *not* make an argument based on extraterritoriality, i.e., that the ADA does not apply because Schultz's job would have eventually been located outside of the U.S.; RCCL specifically eschews such an argument in its brief, limiting itself to "internal order." *See* RCCL Br. at 5, internal-order presumption "against applying 'American law to the 'internal management and affairs' of a foreign-flag ship' is one that is 'separate and different' from the presumption against extraterritorial application of U.S. law" (*quoting Stevens*, 215 F.3d at 1242).

exception. *Spector*, 545 U.S. at 129 (Fifth Circuit "held that Title III does not apply to foreign-flag cruise ships in United States waters because the statute has no clear statement or explicit text mandating coverage for these ships"). The Supreme Court rejected such an unqualified extension of the "internal order" presumption. The Court reasoned that to grant a blanket exemption from the ADA over a foreign-flagged ship's internal affairs was contrary to both the Court's own case law and "sound principles of statutory interpretation."[6] In another section (joined by a plurality), the opinion distinguished between applications of U.S. law to activity on foreign-flagged ships on the one hand, and to U.S. citizens on the other. "It is reasonable to presume Congress intends no interference with matters that are primarily of concern only to the ship and the foreign state in which it is registered"; otherwise, we "presume Congress does intend its statutes to apply to entities in U.S. territory that serve, employ, or otherwise affect American citizens." *Id.* at 131–2. While allowing that "[t]he precise content" of "internal order" may be "difficult to define with precision," the plurality held that the "guiding principles" are "the desire for international comity and the *presumed lack of interest by the territorial sovereign* [here, the U.S.] in matters that bear no substantial relation to the peace and tranquility of the port." *Id.* at 133 (emphasis added).[7]

This case lands squarely on the protecting-U.S.-citizens side of the line. Schultz is a U.S. citizen—indeed, it was precondition of the "Performer" job that he be a U.S. citizen (Schultz SMF ¶56). The internal-order presumption occupies itself with the extension of U.S. laws to the affairs of *foreign crew* on foreign-flag vessels. *McCulloch v. Sociedad Nacional de Marineros de*

---

[6] *Id.* at 129–30 (while "a general statute will not apply to certain aspects of the internal operations of foreign vessels temporarily in United States waters, absent a clear statement" by Congress, "[t]he broad clear statement rule adopted by the Court of Appeals …[that] would apply to every facet of the business and operations of foreign-flag ships" would be "inconsistent with the Court's case law and with sound principles of statutory interpretation").

[7] This section was joined by three justices (Kennedy, Stevens, and Souter), while two other justices making up the majority would have rejected application of "internal order" essentially altogether to Title III (other than to protect against international conflicts in law, which is already assured under Title I, 42 U.S.C. § 12122(c)(1)). *Id.* at 142–45 (Ginsburg, J., with Breyer, J., concurring in part and concurring in the judgment). This makes the plurality the governing opinion as the narrowest basis for the holding. *Marks v. United States*, 430 U.S. 188, 193 (1977).

- 5 -

*Honduras*, 372 U.S. 10, 19 (1963) ("[t]he question, therefore, appears to us more basic; namely, whether the [NLRA] as written was intended to have any application to foreign registered vessels employing alien seamen"); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 143 (1957) ("Congress did not fashion [the LMRA] to resolve labor disputes between nationals of other countries operating ships under foreign laws"). (These cases are discussed in the next section.) Congress expressed a statutory interest in protecting Americans from disability discrimination.

The Eleventh Circuit cases addressing this presumption uniformly hold that it limits extension of U.S. law to the affairs of *foreign crew* aboard foreign-flagged ships and say nothing about U.S. employees. *See*, *e.g.*, *EEOC v. Royal Caribbean Cruises, Ltd.*, 771 F.3d at 762–63 (defendant presents "legitimate question regarding whether the EEOC has jurisdiction over the claims of foreign nationals on foreign-flagged ships"); *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 888 (11th Cir. 2013) (LMRA and NLRA do not apply to wage disputes between foreign-flagged ship and foreign crew members)[8]; *Stevens*, 215 F.3d at 1242 ("this presumption generally has been applied where application of American law would interfere with the relations between the ship's foreign owner and the ship's foreign crew"); *Dowd,* 975 F.2d 779, 788–89 (11th Cir. 1992) (presumption governs reach of U.S. law to "practices of owners of foreign vessels which are temporarily present in an American port *with regard to foreign employees* working on these vessels") (emphasis added).[9] RCCL itself has argued that "[t]he

―――――――――――――

[8] RCCL quotes *Lobo* (RCCL Br. at 6–7) but omits the next sentence: "We need not labor long to determine whether a wage dispute between a foreign-flag vessel *and its foreign crew* falls within the internal affairs of a ship." *Lobo*, 704 F.3d at 888 (emphasis added). To underscore, the opinion specifies that "the Stewards are engaged in a wage dispute with their employer, Celebrity, and their labor union, FIT," and "All parties in this dispute are foreign." *Id.* RCCL commits the same error later (RCCL Br. at 14–15), quoting *Lobo* but omitting the next sentence: "the Supreme Court has already determined that wage disputes *between a foreign vessel and its foreign crew* fall within the internal affairs of a ship." *Lobo*, 704 F.3d at 889 (emphasis added).

[9] Other circuits agree. *See, e.g., United States v. Parness*, 503 F.2d 430, 439–40 (2d Cir. 1974) (*Benz* and *McCulloch* "deal with labor disputes involving alien staffs aboard foreign flag vessels operating in United States territorial waters"); *Port of Houston Authority of Harris Cnty., Tex. v. Int'l Organ. of Masters, Mates & Pilots, AFL-CIO*, 456 F.2d 50, 53 n.4 (5th Cir. 1972)

*Benz/McCulloch* line of cases, reaffirmed most recently in *Spector* and *Lobo*, stands for the proposition that U.S. laws purporting to regulate the working relationship between vessel owner and crew ***do not apply to the foreign crew*** of foreign-flagged vessels even when those vessels are in U.S. territory" (emphasis added). Brief of Defendant-Appellee RCCL at 38, *EEOC v. Royal Caribbean Cruise Lines*, 771 F.3d 757 (11th Cir. 2014) (No. 13-13519) (attached as *EX.51*).[10] The conclusion that "internal order" concerns application of U.S. law only to the affairs of *foreign* crew is so pervasive that RCCL has a heavy lift to persuade this Court go much farther than the caselaw and deprive US citizens of protection.

RCCL argues that *Lobo* counsels against a case-by-case analysis of whether application of domestic law might in some cases apply to the affairs of foreign crew. (RCCL Br. at 10.) In *Lobo*, the issue was whether the enforcement mechanisms of the LMRA and NLRA could be extended to an Indian-national's wage dispute with a foreign shipowner, where the crew was already organized under foreign law with a foreign union. *Lobo*, 704 F.3d at 886 (plaintiff seeking arbitration of "foreign seaman's claim for wages allegedly due under a collective bargaining agreement"). There was no reason to analyze on a granular, factual level whether there would have been actual interference with relations between foreign crew and a foreign-flagged ship in that case; it could be decided as a matter of law under the "internal order" presumption that U.S. law did not apply to foreign crew, and thus the fact that the employer had some connections to the U.S. was immaterial. *Id.* at 887 ("*Benz* and *McCulloch* foreclosed the application of the LMRA and the NLRA to wage disputes between foreign ships and foreign seamen"); *id.* at 888 ("these statutes do not apply to *wholly-foreign* disputes") (emphasis added); *id.* ("the NLRA does not extend to foreign crews working aboard foreign ships"); *id.* ("[w]e need not labor long to determine whether a wage dispute between a foreign-flag vessel and its foreign

---

(*McCulloch* and *Ariadne* "involved the validity of injunctions against unions or National Labor Relations Board activities in connection with *foreign vessels or crews*") (emphasis added).

[10] RCCL also cites *Dresdner Bank AG v. M/V OLYMPIA VOYAGER*, 446 F.3d 1377 (11th Cir. 2006) (RCCL Br. at 9–10), yet that case did not concern the "internal order" presumption; it was a choice-of-law issue in a foreclosure action in admiralty (no party argues that this case belongs in admiralty). That case provides no guidance on the statutory question of whether the ADA applies to U.S. citizens seeking employment from a U.S.-based cruise-line business.

crew falls within the internal affairs of a ship"); *id.* at 889 ("[b]ecause the Supreme Court has already determined that wage disputes between a foreign vessel and its foreign crew fall within the internal affairs of a ship, we are foreclosed from revisiting the question"). Conversely, because application of *U.S.* law to *U.S.* (not foreign) crew stands outside the purview of the "internal order" presumption, this issue may be decided as a matter of law in favor of Schultz.[11]

RCCL cites (RCCL Br. at 8–9) one out-of-circuit decision involving U.S. crewmembers, *Brooks v. Hess Oil V.I. Corp.*, 809 F.2d 206, 208 n.2 (3d Cir. 1987). But in that case no party disputed the application of Liberian law (*id.*), rendering the discussion of U.S. crew and law dicta. *Jose v. M/V Fir Grove*, 765 F. Supp. 1024, 1032 (D. Or. 1991) (distinguishing *Brooks* on this ground). From the 33 years since, RCCL cites no cases supporting the proposition that U.S. employees are bound by law-of-the-flag even while situated in U.S. waters; the dicta in *Brooks* is an island onto itself. RCCL also cites a 57-year-old out-of-circuit district court case to argue that enforcing U.S. law on behalf of U.S. citizens in U.S. territory may induce "every other nation with one of its citizens serving as or applying to be a member of the crew … do the same thing." RCCL Br. at 11 (*citing Koukorinis v. S/T Eurypyle*, 214 F. Supp. 344, 346-47 (E.D. Va. 1963)). This line of argument mirrors the absolutist position taken by the Fifth Circuit in *Spector*—that the ADA categorically stops at the gangplank, for the sake of comity—but that approach that is foreclosed by the Supreme Court's decision. The Court held that a categorical ban on applying U.S. civil rights law to cruise-ships would defy Congressional intent. *Spector*, 545 U.S. at 132.

### 2.   Supreme Court "Internal Order" Cases Are Confined to Interference With Relations Between Foreign-Owned Ship and Foreign Crew

A complete study of the modern Supreme Court authority cited by RCCL (and two cases that RCCL inexplicably omitted from its argument) confirms that the reach of "internal order" is limited to the affairs of foreign crew. In the first case, *Benz*, the Court considered whether the Labor Management Relations Act of 1947 (LMRA) covered a dispute between a foreign ship and its foreign crew, for purposes of preempting a state-law diversity suit for damages. Importantly,

---

[11] RCCL argues that *Lobo* does not support a points-of-contact analysis (RCCL Br. at 17), "a choice of law analysis determined by the points of contact an employer has with the United States." *Lobo*, 704 F.3d at 889. If the instant case involved foreign crew and a foreign-flagged ship, then the presence of the employer in the U.S. might not tip the analysis. But the instant case involves the different circumstance of a U.S. citizen and a decision executed on U.S. territory.

> It should be noted at the outset that the dispute from which these actions sprang arose on a foreign vessel. It was between a foreign employer and a foreign crew operating under an agreement made abroad under the laws of another nation. The only American connection was that the controversy erupted while the ship was transiently in a United States port and American labor unions participated in its picketing.

*Benz*, 353 U.S. at 142. While not specifically invoking the "internal order" presumption, the Court held that Congress "did not fashion [LMRA] to resolve labor disputes *between nationals of other countries* operating ships under foreign laws." *Id.* at 143 (emphasis added). Congress could, if it "had so chosen[,] … have made the Act applicable to wage disputes arising on foreign vessels *between nationals of other countries* when the vessel" enters U.S. waters, but "nothing in the Act itself or its legislative history … indicates in any way that the Congress intended to bring *such* disputes within the coverage of the Act." *Id.* at 142 (emphasis added). The history of the LMRA "describes the boundaries of the Act *as including only the workingmen of our own country* and its possessions." *Id.* at 144 (emphasis added). The Court pointed to sponsor Rep. Hartley's characterization of the Act as "a bill of rights both *for American workingmen and for their employers*." *Id.* (emphasis added). The Court also rehearsed the various actual and proposed amendments to the Seamen's Act of 1915—which concerns wages and hours for crew (including foreign crew) on foreign vessels—and held that "foreign applicability" of U.S. law would not be inferred absent "the affirmative intention of the Congress clearly expressed." *Id.* at 146–47.

In *Marine Cooks and Stewards, AFL v. Panama S. S. Co.*, 362 U.S. 365 (1960) (a case that RCCL does not cite in its brief), the Court *declined* to extend the *Benz* "internal order" presumption to the Norris-LaGuardia Act's withdrawal of federal-court jurisdiction to issue restraining orders or injunctions against strikes. The shipping company urged the Court to follow *Benz*, but the Court rejected application of the "internal order" presumption to the much broader language of Norris-LaGuardia. *Benz*, the Court noted, addressed whether the LMRA "governed the internal labor relations of a foreign ship *and its foreign workers under contracts made abroad* while that ship happened temporarily to be in American waters." *Id.* at 369. "Unlike the situation in the *Benz* case, in which American unions to which the foreign seamen did not belong picketed the foreign ship in sympathy with the strike of the foreign seamen aboard, the union members here were not interested in the internal economy of the ship, but rather were interested in preserving job opportunities for themselves in this country." *Id.* at 372 n.12.

*McCulloch*, the next case in this line of authority, reviewed the jurisdiction of the National Labor Relations Board (NLRB) over a shipboard labor dispute under the National Labor Relations Act (NLRA). A maritime union applied to the NLRB to organize a foreign crew. 372 U.S. at 12. The Court held that the NLRB's reach did not extend to "the operations of foreign flagships employing alien crews" for the narrow reason that such organizing campaigns did not involve circumstances affecting "commerce" as defined by the NLRA, *i.e.*, because maritime operations of foreign-flag ships employing alien seamen are not in "commerce" for purposes of the Act. *Id.* at 19–21. Citing *Benz*, the Court held that "[w]e continue to believe that if the sponsors of the original Act or of its amendments conceived of the application now sought by the Board they failed to translate such thoughts into describing the boundaries of the Act as including foreign-flag vessels *manned by alien crews*." *Id.* at 20 (emphasis added). Particularly important to the decision was the fact that the application of U.S. law would have created a direct conflict with Honduran labor law (while RCCL points to no conflict here). *Id.* at 21. *McCulloch* noted that the NLRB's jurisdiction over foreign crew "aroused vigorous protests from foreign governments and created international problems for our Government," *id.* at 17, while there is no suggestion that such protests would arise if the NLRB applied U.S. law to American seamen.

The Court has since reiterated that *McCullough* concerned application of U.S. law to *foreign* crew. *Windward Shipping (London) Ltd. v. Am. Radio Ass'n, AFL-CIO,* 415 U.S. 104, 111 (1974) ("In *McCulloch*, we held that the National Labor Relations Board had improperly assumed jurisdiction under the Act to order an election involving *foreign crews* of foreign-flag ships" (emphasis added)); *Int'l Longshoremen's Local 1416, AFL-CIO v. Ariadne Shipping Co.*, 397 U.S. 195, 198 (1970) ("[i]n *McCulloch* an American seamen's union petitioned for a representation election *among the foreign crew members* of a Honduran-flag vessel who were already represented by a Honduran union, certified under Honduran labor law" (emphasis added)); *Incres S. S. Co. v. Int'l Maritime Workers Union*, 372 U.S. 24, 27 (1963) (in *McCulloch*, "we were immediately concerned with the Board's jurisdiction to direct an election, holding that the Act had no application to the operations of foreign flagships *employing alien crews*") (emphasis added); *see also Spector*, 545 U.S. at 131 (plurality) (noting that *McCulloch* "held the NLRA inapplicable to labor relations between a foreign vessel and its foreign crew … because the particular application of the NLRA would interfere with matters that concern only the internal operations of the ship").

RCCL argues that *McCullough* holds "that even the '*possibility* of international discord,'" *McCulloch*, 372 U.S. at 21 (emphasis added), gives rise to the presumption that the law of the flag state controls the internal order of a seagoing vessel. (RCCL Br. at 9.) It cites no other authority for this proposition, and in the case of *McCulloch*, the conflict was not merely possible but manifest, as the next sentences show: "Especially is this true on account of the concurrent application of the Act and the Honduran Labor Code that would result with our approval of jurisdiction. Sociedad, currently the exclusive bargaining agent of Empresa under Honduran law, would have a head-on collision with N.M.U. should it become the exclusive bargaining agent under the Act." 372 U.S. at 21. RCCL wrenches the language out of context to confect a rule that does not exist. The threshold is more than a mere possibility of discord. *Spector*, 545 U.S. at 137 (plurality) (presumption applies where modification to conform to ADA "*would* conflict with SOLAS [International Convention for the Safety of Life at Sea] or some other international legal obligation (emphasis added)); *Ariadne*, 397 U.S. at 200 ("Application of United States law to resolve a dispute over the wages paid the men for their longshore work, accordingly, would have threatened no interference in the internal affairs of foreign-flag ships *likely to lead to conflict* with foreign or international law") (emphasis added). RCCL nowhere shows how honoring the ADA with respect to Schultz's employment is likely to cause *any* change in the relations between foreign ship operators and their foreign crews. And if there actually were a conflict, Congress resolves this by giving employers a conflict of law defense.[12]

In *Incres* (another case not discussed by RCCL), decided jointly with *McCulloch*, the petitioner was a London shipper operating two Liberian-registered vessels; the "crews of both vessels are nonresident aliens, most of whom are Italians, and they are recruited and hired in Italy." 372 U.S. at 25 The respondent was a union formed "for the primary purpose of organizing foreign seamen on foreignflag ships." *Id.* at 25–26. The union, among other things, "persuaded some crew members of the Nassau not to perform their duties" and interfered with the movement of the ships. *Id.* at 26. The Court held that the NLRB had no jurisdiction over the labor dispute

---

[12] "It shall not be unlawful under this section for a covered entity to take any action that constitute discrimination under this section with respect to an employee in a workplace in a foreign country if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located." 42 U.S.C. § 12112(c)(1).

because its "jurisdiction to prevent unfair labor practices, like its jurisdiction to direct elections, is based upon circumstances 'affecting commerce,' and we have concluded that maritime operations of foreign-flag ships employing alien seamen are not in 'commerce' within the meaning of s 2(6), 29 U.S.C. s 152(6)." *Id.* at 27. Again, the nexus was the foreign crew.

In *Ariadne*, the Court distinguished *Benz* and held that the NLRA did apply to "peaceful picketing protesting substandard wages paid by foreign-flag vessels *to American longshoremen* working in American ports." 397 U.S. at 196 (emphasis added). Summarizing its decisions in *Benz*, *McCulloch*, and *Incres*, the Court held that "[i]n these cases, we concluded that, since the Act primarily concerns strife between American employers and employees, we could reasonably expect Congress to have stated expressly any intention to include within its coverage disputes between foreign ships and their *foreign crews*." *Id.* at 198–99 (emphasis added in both). Because the longshoremen's "dispute centered on the wages to be paid American residents" who loaded the ship, *id.* at 199, there was no call to apply the "internal order" presumption. The Court excepted for future consideration situations "in which the longshore work, although involving activities on an American dock, is carried out entirely by a ship's foreign crew, pursuant to foreign ship's articles." *Id.* at 199, n.4.

Here, RCCL argues (RCCL Br. at 7) that the salient fact in *Ariadne* was not that the longshoremen were U.S. residents, but that the Court was giving priority to the law-of-the-flag, particularly "that inquiry into the 'internal discipline and order' of a foreign vessel" was "an intervention thought likely to 'raise considerable disturbance not only in the field of maritime law but in our international relations as well.'" *Ariadne*, 397 U.S. at 198 (emphasis added) (*quoting McCulloch*, 372 U.S. at 19). And yet the very passages cited by RCCL in favor of this analysis confirm that the U.S. residence of the workers was, indeed, essential to the decision. RCCL, however, uses ellipses twice to elide this fact. In its claim that "[t]hey were … hired to work exclusively on American docks as longshoremen," (RCCL Br. at 8), RCCL omits the words "[t]hey were *American residents* …." *Ariadne*, 397 U.S. at 199 (emphasis added). Where RCCL quotes that "critical inquiry then is whether the longshore activities … were within the 'maritime operations of foreign-flag ships'" (RCCL Br. at 8), they again omit the language "whether the longshore activities *of such American residents* …." *Ariadne*, 397 U.S. at 200 (emphasis added). Finally, the Court stated that even if some foreign crew might be found unloading ships, the case was not about them: "The participation of some crew members in the

longshore work does not obscure the fact that this dispute centered on the *wages to be paid American residents*, who were employed by each foreign ship not to serve as members of its crew but rather to do casual longshore work." *Ariadne*, 397 U.S. at 199 (emphasis added). The fact of the longshoremen being American residents was stressed *three times* in that paragraph, before it was doctored by RCCL.

Finally, in *Windward Shipping*, the Court applied the "internal order" presumption to decide whether the NLRB had exclusive jurisdiction over a dispute between foreign-flag shipowners and a union picketing in support of foreign crew on board. The Court especially noted that "[t]he crews of both vessels are composed entirely of foreign nationals, represented by foreign unions and employed under foreign articles of agreement." 415 U.S. at 106. As in *McCulloch*, the Court held that the affairs of foreign crew did not fall within the meaning of "affecting commerce," in view of the ordinary berth that Congress and courts give to cases involving "international maritime trade." *Id.* at 112–13. By contrast, the Court noted the "clear congressional purpose" that the LMRA apply to "American workers and employers." *Id.* at 110.

The Court noted with respect to "internal order" that while the picketing in that case did "not involve the inescapable intrusion into the affairs of foreign ships that was present in *Benz* and *Incres*," *id.* at 113, it had the same practical effect of regulating relations between a foreign shipowner with foreign crew by use of economic pressure. "The picket signs … protested the *wages paid to foreign seamen* who were employed by foreign shipowners under contracts made outside the United States." *Id.* at 114 (emphasis added). "A decision by the foreign owners *to* raise foreign seamen's wages to a level mollifying the American pickets would have the most significant and far-reaching effect on the maritime operations of these ships throughout the world." *Id.* The Court noted that the case would be different if it involved legal rights on U.S. territory: "Unlike *Ariadne*, the protest here could not be accommodated by a wage decision on the part of the shipowners which would affect only wages paid within this country." *Id.*

The full run of these Supreme Court cases reveals a single commonality: that because extension of U.S. labor law *to the affairs of foreign crew* (such as organizing them, regulating their pay, or permitting sympathy pickets to raise their wages) interferes with internal order between foreign shipowners *and their foreign crew*, U.S. laws should not be so extended unless Congress specifies otherwise. This is vastly different than seeking, as here, to apply U.S. law to the relations between a *U.S. citizen* and a U.S. employer. Nothing in this line of authority would

give an employer such as RCCL license to discriminate in the hiring of disabled U.S. citizens, let alone turn its cruise ships into U.S.-law-free zones for U.S. citizens who are in its employ.[13] RCCL treats the affairs of foreign crew as a happenstance of these cases,[14] yet it proves on review to be integral to the holdings.

## B.   "Internal Order" Presumption Only Covers Activity at or on a Ship

If the "internal order" presumption could, under some applications, apply to U.S. crew (and no controlling law or case provides that it does), RCCL's argument fails for an alternative reason—the entirety of RCCL's violation (recruitment, conditional offer, medical review, rehearsals, orientation, and denial of employment) occurred in the U.S. at the hands of RCCL personnel at headquarters, not at or on a foreign-flagged ship. It is undisputed that Schultz was denied employment and thus never once boarded, or even ventured near, the Azamara *Journey*. As RCCL itself wrote in a brief, "the whole purpose of the law of the flag' is "to provide a ship with sovereignty *while it is on the high seas* since no country has sovereignty over these waters." Brief of Defendant-Appellee RCCL at 20, *Alberts v. Royal Caribbean Cruises Ltd.*, 834 F.3d 1202 (11th Cir. 2016) (No. 15-14775), 2016 WL 1295714 (emphasis added) (attached as *EX.52*). (In *Alberts*, the personal-injury claim was under maritime law and occurred aboard a ship.)

As the Supreme Court held in *Lauritzen*, 345 U.S. 571, 585 (1953), courts "apply the law of the flag on the pragmatic basis that there must be some law *on shipboard*, that it cannot change at every change of waters, and no experience shows a better rule than that of the state that owns her" (emphasis added). The law-of-the-flag once used to be regarded as a principle of sovereignty, i.e., "that a ship is constructively a floating part of the flag state," but courts in modern times have abandoned that "rather mischievous fiction." *Id.*; *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 502(2) rptr. note 3 (1987).

---

[13]   This is no small matter in this case; RCCL's own statement of material facts admits by implication that thousands of their cruise-ship employees are Americans. RCCL SMF ¶6 (citing statistic that "fewer than 10%" of 70,000 such workers are U.S. citizens).

[14]*See, e.g.*, RCCL Br. at 5 ("[a]lthough the seafarers in *Benz* and *McCulloch* were foreign crew, *Benz* and *McCulloch* were not decided on that basis); *id.* at 7 ("Schultz may argue that *Benz*, *McCulloch*, and *Lobo* … are inapposite here because the plaintiff crewmembers in those cases were foreign nationals, not U.S. citizens," but arguing that *Ariadne* was to the contrary).

- 14 -

Considering this practical rationale, courts invariably hold that law-of-the-flag applies specifically to the *ship itself* or *shipboard activity*. *See, e.g.*, *United States v. Flores*, 289 U.S. 137, 158 (1933) (law-of-the-flag applies to "all things done on board") (*quoted in Lauritzen*, 345 U.S. at 585); *United States v. Bustos-Guzman*, 685 F.2d 1278, 1280 (11th Cir. 1982) ("the 'law of the flag' governs conduct aboard the ship" (citing *Flores*, 289 U.S. at 150-51)); *United States v. Julio Diaz*, 678 F.2d 1031, 1033 (11th Cir. 1982) (same, quoting *United States v. Riker*, 670 F.2d 987, 988 (11th Cir. 1982)); *Hesterly v. Royal Caribbean Cruises Ltd.*, 06 Civ. 22862, 2008 WL 516495, at *10, n.8 (S.D. Fla. Feb. 25, 2008) (law-of-the-flag applied to doctors who furnish shipboard care even when the ship is docked); *Nat'l Transp. Safety Bd. v. Carnival Cruise Lines, Inc.*, 723 F. Supp. 1488, 1490 (S.D. Fla. 1989) ("'law of the flag' governs the occurrences on board a ship"(citations omitted)); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 502(2) (1987) ("flag state may exercise jurisdiction to prescribe, to adjudicate, and to enforce, with respect *to the ship or any conduct that takes place on the ship*") (emphasis added); *see also M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda.*, 890 F.3d 995, 1004 (Fed. Cir. 2018) (law-of-the-flag used to determine "what nation's law applies to disputes *aboard a ship*" (emphasis added; citation omitted)); *United States v. Jho*, 534 F.3d 398, 405–06 (5th Cir. 2008) ("*actions aboard that ship* are subject to the laws of the flag state" (emphasis added; citation omitted)).[15] RCCL

---

[15] While not essential to the resolution of this motion, not even all shipboard activities are swept into the law-of-the-flag rule, as defendant well knows. *United States v. Royal Caribbean Cruises, Ltd.*, 11 F. Supp. 2d 1358 (S.D. Fla. 1998). There, RCCL was charged with violations of 18 U.S.C. § 1001 for making false oil record book (ORB) entries onboard its vessel. *Id.* at 1361. That section, *inter alia*, makes it a crime to knowingly and willfully "make[ ] any materially false, fictitious, or fraudu-lent statement or representation," 18 U.S.C. § 1001(a)(2), or "make[ ] or use[ ] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry[.]" *Id.* § 1001(a)(3). RCCL tried to wriggle out of U.S. law by arguing that because the duty to make entries "occurs at the time of the discharge," the U.S. could not impose a duty on it to make entries in its ORB with respect to discharges on the high seas. *Royal Caribbean Cruises, Ltd.*, 11 F. Supp. 2d at 1363. The district court disagreed, holding that "the fact that the alleged false statement in a § 1001 case was not made within the jurisdictional bounds of the United States is not necessarily fatal to the claim[,]" and "even if the

also cites *Argentine Republic v. Amerada Hess Shipping Corp.*, on this point (RCCL Br. at 12–13), but that case literally turned on activities that occurred on the high seas (a military attack on a vessel), not activities that entirely occurred in U.S. territory. 488 U.S. 428, 431 (1989).

While the law-of-the-flag is a pragmatic standard that allows a choice of law to follow the ship from port to port, RCCL furnishes no basis—let alone controlling authority—to stretch that rationale to conduct *off* the ship, to actions confined entirely to RCCL's headquarters in Florida involving someone who had not boarded the ship. The Eleventh Circuit has noted, for instance, that the law-of-the-flag does not control the physical port where the ship docks. *United States v. Pena*, 684 F.3d 1137, 1145–46 (11th Cir. 2012) (*quoting Jho*, 534 F.3d at 409 (law-of-the-flag does not "encroach[] on the well-settled rule that a sovereign may exercise jurisdiction to prosecute violations of its criminal laws committed in its ports")). The case for applying it to hiring decisions in landlocked corporate headquarters, by extension, is nonexistent. *Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 92 (2d Cir. 1996) (law-of-the-flag did not control where "actions of employees of BV's Greek office [issuance of allegedly fraudulent certificates] g[a]ve rise to the instant dispute"). For this additional reason, summary judgment must be denied.[16]

Because the "internal order" presumption does not apply, there is no need to consider RCCL's further argument whether Congress "*clearly extended* the employment-discrimination provisions of Title I of the ADA to crew employed on foreign-flag vessels" (RCCL Br. at 12–14, emphasis added), because there is no "clear statement" standard for applying U.S. law to U.S. citizens on U.S. territory. Nevertheless, it is worth noting that the RCCL brief gets a point of law critically wrong. At the time the ADA was passed in 1990, it lacked provisions that made it

_____

statement is arguably true at the time it was made in the location it was made, if the statement is false as a matter of United States law and fulfills the other requirements for a § 1001 claim, it is actionable." *Id.*; *accord United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 308 (2d Cir. 2009) (citing *Jho*, 534 F.3d 398, with approval).

[16] Schultz appreciates that this argument might mean that U.S. law applies to conduct off a ship, but not onboard a ship, so (for instance) discriminatory hiring but not discipline at sea. Yet partial coverage is not unprecedented under the ADA. *See, e.g.*, *Spector*, 545 U.S. at 138 (four justice plurality) (application of Title III of ADA to cruise ships is "case-by-case"). Here, the Court need not reach the full extent of this principle, because all of the events occurred off ship.

extraterritorial, so Congress had no occasion to consider whether the ADA would apply outside of U.S. territory. The extraterritorial provision was only added later, clarifying that Congress *did* intend for U.S. disabilities law to follow U.S. citizens out of the country. As amended by section 109 of the Civil Rights Act of 1991, Pub. L. 102–166, 105 Stat. 1071 (1991) (codified at 42 U.S.C. §§ 2000e–1(c), 12111(4), & 12112(c)), the ADA clearly manifests Congress's intention to give the statute extraterritorial effect. That section, entitled "Protection of Extraterritorial Employment," amended the ADA's definition of "employee" to provide that "[w]ith respect to employment in a foreign country, [the] term includes an individual who is a citizen of the United States" and added the defense of conflict of law, *id.* (citing 42 U.S.C. § 12112(c)(1)). This amendment took place on Nov. 21, 1991, so following RCCL's chronological rule of priority, Congress's last expression of its intent was that Title I of the ADA applies beyond U.S. borders.

### C. If Needed, There Is A Maritime Choice-of-Law Standard in *Lauritzen*

Finally, even if there were a need to make a choice of law (U.S. or Malta), the Supreme Court has provided a multipart test for sorting out such issues at maritime in *Lauritzen*, in the context of whether the Jones Act applied to a shipboard injury. *Lauritzen* identified seven factors: (1) place of the wrongful act, (2) law-of-the-flag, (3) allegiance or domicile of the injured, (4) allegiance of the defendant shipowner, (5) place of contract, (6) inaccessibility of a foreign forum, and (7) law of the forum. 345 U.S. at 582–93; *see also, e.g.*, *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 308–10 (1970); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 381-84 (1959); *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 923–24 (11th Cir. 1991). The final *Lauritzen* factor, law of the forum, "is entitled to little weight because 'fortuitous circumstances ... often determine the forum.'" *Sigalas v. Lido Mar., Inc.*, 776 F.2d 1512, 1517 (11th Cir. 1985) (quoting *Lauritzen*, 345 U.S. at 590–91). Courts also consider whether the defendant has a base of operations in the United States. *See Hellenic Lines Ltd.*, 398 U.S. at 309 (listing as "another factor of importance"). Here, the vast majority of *Lauritzen* factors point unmistakably to applying U.S. law: the wrongful act occurred in Florida, the injured party is a U.S. citizen, the offer of employment was made in the U.S., a U.S. forum is far more accessible than Malta, and RCCL is headquartered in Florida.

RCCL contends (RCCL Br. at 4, 17–18) that Schultz had remedies under Maltese law to address RCCL's failure to hire him as a crewmember. As a threshold matter, Veronique Dalli submits (for consideration under Fed. R. Civ. P 44.1, attached as *EX.53*) an expert declaration

demonstrating in detail that no Maltese forum would have exercised jurisdiction over a claim of discrimination that occurred geographically in the U.S., not on board a foreign-flagged ship.

Also, nowhere does RCCL suggest that the proposed review process would have practically assisted Schultz or avoided the need for this action. Schultz was turned down March 9, 2018; the ship sailed about two weeks later, and there was never again an opera-themed RCCL cruise where Schultz could have performed. Unless RCCL is suggesting that it would have held the *Journey* in port while Schultz exhausted his appeals, it is a common-sense conclusion that the ship would have sailed without him and he would have been injured. RCCL does not argue that Maltese law would have provided remedial relief for disability discrimination. The suggestion that Schultz might have had other remedies does not preclude resort to the ADA or FCRA. RCCL points to no statutory language or other legal doctrine, compelling Schultz to exhaust or make an election of Maltese remedies or that gave a Maltese venue exclusive jurisdiction. (Had any such argument existed, we surely would have heard about it by now: RCCL would have moved for transfer for *forum non conveniens* or urged Malta as the choice-of-law in this case.) *See*, *e.g.*, *Alim v. KBR, Inc.*, No. 3:11-CV-1746-N, 2012 WL 12857421, at *4–12 (N.D. Tex. Mar. 15, 2012) (foreign worker could proceed with both Title VII and UAE labor law claims). The issue presented here is whether the ADA (and FCRA, as argued below) cover the employment relationship in this case, not whether other legal regimes might have also covered it.

RCCL finally makes a cursory argument (RCCL Br. at 11–12) that following the ADA may conflict with the Maritime Labour Compliance, though critically *not* saying whether it would violate the MLC in Schultz's case. Congress provides an affirmative defense exactly tailored to this argument. 42 U.S.C. § 12112(c)(1). Plaintiff has already argued in his motion for summary judgment, along with expert testimony, that compliance with the MLC did not conflict with applying the ADA. The record shows that all that would have been required was for RCCL and its agent Dr. Shore, following ADA standards as well as the other doctors involved in the evaluation process, to clear Schultz for duty and provide him with a valid medical certificate.[17]

---

[17]Additionally, the Court should disregard RCCL's assertions regarding foreign law and strike relevant paragraphs (¶¶11-19) in Faso Declaration (ECF. No. 94-1) because such assertions are not made by an expert and do not comply with Fed. R. Civ. P., Rule 56 (c)(4), requiring that a declaration must be made on personal knowledge by a competent declarant. *See*

- 18 -

### D.        Conclusion: The Cruise-Line Industry Always Cries "Wolf" in These Cases

The RCCL ultimately argues (RCCL Br. at 11) that application of the ADA would "cause chaos onboard" and "sow chaos among seafaring nations by impeding uniformity."[18] It is par for cruise-line defendants to make alarmist arguments in these cases—as they did in *Spector*—to avoid application of U.S. law onboard ship. *See* Brief of Respondent Norwegian Cruise Line Ltd., at 37–43, *Spector*, 545 U.S. 119 (2005) (No. 03-1388), 2005 WL 227227, at *37-43 (ADA would interfere in "life-threatening situations," "bankrupt[]" cruise lines, and "encourage international retaliation against the United States") (attached as *EX.54*); Brief of Amicus Curiae International Council of Cruise Lines[19] in Support of Respondent, 2005 WL 240662, at *18-20 (applying ADA to cruise ships could cause "chaos" and "jeopardize lives") (attached as *EX.55*).

---

*Allen v. Int'l Tel. and Tel. Corp.*, 164 F.R.D. 489, 492 (D. Ariz. 1995) ("It is not enough that an affiant *assert* that he or she has personal knowledge of the facts recited; the facts themselves must show that they are matters known to the affiant personally and are not based upon hearsay or upon 'information and belief'"); *Toro Co. v. Krouse, Kern & Co*., 644 F. Supp. 986, 990 (N.D. Ill. 1986) ("The mere fact that the introductory paragraph in an affidavit recites that it is based on personal knowledge will not cure [substantive] deficiencies"), *aff'd*, 827 F. 2d 155 (7th Cir. 1987). To the extent that RCCL intends to offer Mr. Faso's statements as relevant material on foreign law pursuant to Fed. R. Civ. P. 44.1, the Court should strike the statements because they "lack[] . . . indicia of reliability" required for such submissions. *IMS Internet Media Servs., Inc. v. Hwei Chyun Lau*, No. 17 Civ. 21299, 2018 WL 2007044, at *4 (S.D. Fla. Jan. 12, 2018) (Torres, M.J.). Much like the declaration that this Court struck in *IMS*, the above-referenced statements in Mr. Faso's declaration "consist of vague references" to certain laws, "contain[] conclusions of law that lack any substantive legal analysis," and the declaration "does not include any background information on [Mr. Faso's] legal experience." *Id.*

[18] RCCL's argument that it would then have to apply the laws of 125 nations on board ship (RCCL Br. at 9) is overkill. The Court is only called upon to decide whether the ADA applies to U.S. citizens, like Schultz. It has no cause to decide what law would apply to the rest of the crew.

[19] RCCL is part of that association. *See* Wikipedia, "Cruise Lines International Association," https://en.wikipedia.org/wiki/Cruise_Lines_International_Association.; Cruise Lines Int'l Assoc. website, https://cruising.org/cruise-vacationer/cruise-lines/royal-caribbean-international.

And yet, when the Supreme Court ultimately held that Title III of the ADA could apply to foreign-flagged cruise ships, despite the operators' predictions of "chaos," the cruise-ship business continued to flourish (until the recent outbreak of Covid-19, which of course is in no way connected to this case). Fifteen years later, cruise ships still dock at Florida ports. *See*, *e.g.*, Business Observer, "Cruise industry surges with Florida at the helm" (Nov. 29, 2019), https://www.businessobserverfl.com/article/ cruise-industry-surges-with-florida-at-the-helm (quoting Cruise Lines International Association CEO and President touting the growth of the cruise-line industry in Florida). There is no reason to credit industry hype.

CCL likewise drops into a footnote (RCCL Br. at 15, n.11) the ways in which it contends the ADA would conflict with "internal order" of a ship. The Court should treat this for what it is: a footnote-point that is 100% lawyer-driven argument, without citation to authority, history, or any other basis. It is no different than lawyers arguing 15 years ago that extension of Title III of the ADA to protect the rights of disabled American passengers would lead to "chaos," a prediction that evidently proved unfounded. At any rate, what RCCL is demanding, bottom-line, is that cruise-ships get a special exemption from Title I of the ADA, one that Congress did not authorize, because it might require applying different laws to Americans than other crew. This is little more than what every other multinational employer faces when it recruits and hires U.S. citizens to fill roles overseas (as RCCL did when it specified U.S. citizenship for "Performers"); it's a common human-resources management issue. It does not mean that U.S. citizens forfeit rights, even extraterritorially, that Congress expressly gave them. 42 U.S.C. § 12111(4) ("The term 'employee' means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.")

## II.     Florida Civil Rights Act (FCRA) Applies to the Present Case

### A.     Florida Has an Interest in Discrimination That Occurs in Florida

The FCRA is intended and "requires a liberal construction to preserve and promote access to the remedy intended by the Legislature." *Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000). Commensurate with this liberal principle, the FCRA has been held to cover discrimination by employers who are based and take adverse actions in Florida, regardless of where other contacts may lie. *Sinclair v. De Jay Corp.*, 170 F.3d 1045, 1046–48 (11th Cir. 1999) (applying FCRA to Tennessee corporation with small outpost in Florida); *Ferrer v. MedaSTAT USA LLC*, 2004 WL 2595955, at *4 (W.D. Ky. July 8, 2004) (under FRCA, "Florida, the state

- 20 -

where the alleged discriminatory and tortuous actions occurred, has a stake in preventing sexually discriminatory conduct by an employer to an employee located in its state").

RCCL cites no statutory language or cases limiting the geographic scope of the FRCA, and the only district court decision on the topic confirms that the FCRA may apply to a Florida employer's operations even outside of the country. *Parry v. Outback Steakhouse of Fla., Inc.*, No. 8:06–CV–00804–T–17TBM, 2006 WL 2919018, at *3–4 (M.D. Fla. Oct. 11, 2006) (FCRA may apply to Florida-based employer where employment occurred in the Cayman Islands), *motion to reconsider denied*, 2006 WL 3313352 (Nov. 14, 2006). *Cf. Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F. Supp. 2d 1329, 1341 (S.D. Fla. 2003) (determining 15-employee minimum, court notes "no geographical limitation on the face" of FCRA and "FCRA does not contain clauses similar to those in Title VII limiting its extraterritorial effect"). The Court should adopt the reasoning of *Parry* and hold that the FCRA can apply to an out-of-state workplace.

Also, nothing in the language of FCRA limits its coverage to Florida residents only. While *Parry*, 2006 WL 2919018, at *4, mentions "citizens" of Florida, the FCRA itself speaks more broadly of protecting *individuals within the state*, not residents specifically. Fla. Stat. § 760.01(2) ("general purposes of the Florida Civil Rights Act of 1992 are to secure *for all individuals within the state* freedom from discrimination because of . . . handicap . . . and to promote the interests, rights, and privileges *of individuals* within the state"); *id.* § 760.10 (prohibitions cover "individuals"). FCRA does not define "employee," but defines "person" as

> an individual, association, corporation, joint apprenticeship committee, joint-stock company, labor union, legal representative, mutual company, partnership, receiver, trust, trustee in bankruptcy, or unincorporated organization; any other legal or commercial entity; the state; or any governmental entity or agency.

Fla. Stat.§ 760.02(6). Again, critically, FCRA sets no residential/citizenship limitations here.

Non-residents do bring claims under FCRA. *See Sarac v. Univ. of S. Fla. Bd. of Trs.*, No. 8:18-cv-02485-T30-SPF, 2020 WL 97782, at *1 (M.D. Fla. Jan. 8, 2020) (foreign national doctor); *Cragg v. Dist. Bd. of Trs. of Miami-Dade Coll.*, NO. 17-20300-CIV-ALTONAGA/ O'Sullivan, 2018 WL 8334585, at *1 (S.D. Fla. Nov. 30, 2018) (Nevada resident attending college in Florida). Even if physical presence in Florida were a prerequisite to coverage under the FRCA, Schultz had already begun rehearsing for the RCCL cruise in Florida at the time that he was finally denied employment and was "within the state" when notified that RCCL was

revoking his offer. There is no suggestion that employment for a week in Florida is any less protected under the FCRA than employment of a longer duration. All activities were in Florida.

The cases cited by RCCL, none of which apply the FRCA, are inapposite. *Southeastern Fisheries Ass'n, Inc. v. Department of Natural Resources*, 453 So.2d 1351 (Fla. 1984), did not decide whether Florida's fish-trap law was "presumed to be limited to the territorial jurisdiction of Florida," as RCCL argues; if anything, the Supreme Court of Florida "recognize[d] that the state can regulate and control the operation of vessels and the acts of its citizens in waters outside Florida's territorial limits." *Id.* at 1354. Instead, it held that extra-territorial regulation was preempted by federal law. *Id.* at 1354–55. RCCL does not argue that the FCRA is preempted by superior federal law, and such an argument be ill-considered in light of the ADA savings clause in 42 U.S.C. § 12201(b) (discussed in the next section). *Young v. Norwegian Seafarers' Union*, 138 So. 3d 1189 (Fla. Dist. Ct. App. 2014), is another iteration of the meritless "internal order" argument above; it held that "[b]ecause labor disputes between foreign vessels and *foreign crews* concern only the internal affairs of the ship, they are treated differently than matters impacting the American public or even labor disputes between foreign vessels and American longshore-men." *Id.* at 1191 (emphasis added). Thus, Florida law would not extend to *foreign crew* on a foreign-flagged ship, but that does not help RCCL. *Priyanto v. M/S Amsterdam*, No. CV 07-3811 AHM, 2009 WL 175739, at *1, *8 (C.D. Cal. Jan. 23, 2009), applied the "internal order" presumption to hold that an Indonesian citizen aboard a Netherlands-flagged ship was not covered by state law. These cases do not support RCCL's geographic limit on the FCRA.

RCCL also cites two cases that applied a "primary-work-station" test to determine where a violation occurred for purposes of applying federal law to foreign citizens or U.S. citizens overseas. *See Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp.2d 59, 67–68 (D.D.C. 2002), *aff'd*, 409 F.3d 414 (D.C. Cir. 2005); *Wolf v. J.I. Case Co.*, 617 F. Supp. 858, 863 (E.D. Wis. 1985). Courts disagree about whether this is an appropriate test; other courts favor a "center-of-gravity test" that considers (among other things) where an employment relationship was created, where the terms of employment were negotiated, the locations of the employment, and where the allegedly discriminatory conduct took place, factors that would favor application of Florida law here. *See, e.g., Gomez v. Honeywell Int'l, Inc.*, 510 F. Supp. 2d 417, 423 (W.D. Tex. 2007) (finding primary-work-station test "vague and overly simplistic"); *Torrico v. Int'l Bus. Machines Corp.*, 213 F. Supp. 2d 390, 403–04 (S.D.N.Y. 2002) (setting forth "center of gravity" test). RCCL's

cases, at any rate, do not specifically help this Court construe the reach of the FCRA. *Sinclair*, 170 F.3d at 1048 (rejecting analogy to Title VII authority where FCRA language was plain and unambiguous). Even under RCCL's authority, multiple laws might apply to the same conduct. *See Wolf*, 617 F. Supp. at 862 ("an 'ambulatory' job, such as an airline pilot, ... might present [a] true case[ ] of dual foreign and United States employment subject to ADEA protection").

**B.     RCCL's Dormant Commerce Clause Argument Is Frivolous**

The purpose of the dormant Commerce Clause is to "safeguard[ ] Congress' latent power from encroachment by the several States." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154 (1982). Courts only "engage in [dormant Commerce–Clause] review when Congress has not acted or purported to act." *Id.* Once Congress acts, though, "courts are not free to review state . . . regulation under the dormant Commerce Clause." *Id.* Where there is "a clear expression of approval" by Congress of a local role in regulating commerce, *S. Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984), this dissipates any objection to such local law on dormant Commerce Clause grounds. *Accord Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985) ("[w]hen Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."); *White*, 460 U.S. 204, 213 (1983) ("[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce").

Congress included a savings clause in the ADA, 42 U.S.C. § 12201(b)—a section cited nowhere by RCCL—confirming that "[n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any . . . law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." Congress has acted, and that conclusively ends any dormant Commerce Clause challenge. *See Bowers v. NCAA,* 151 F. Supp. 2d 526, 539 (D.N.J. 2001) (citing § 12201(b), court adopts plaintiff's position that "Congress [in the ADA] has exercised its right to regulate interstate commerce regarding persons with disabilities, and, through that regulation, has expressly permitted states to enact their own laws protecting those with disabilities"). *See also Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018) (rejecting challenge to state minimum wage law under dormant Commerce Clause where § 218(a) of the FLSA provides that "[n]o provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum

wage higher than the minimum wage established under this chapter . . . ."); *Maryeli's Lovely Pets, Inc. v. City of Sunrise*, No. 14-61391-CIV, 2015 WL 11197773, at *2 (S.D. Fla. June 25, 2015) (rejecting dormant Commerce Clause challenge to local "puppy mill" ordinance where the federal Animal Welfare Act expressly states that it does "not prohibit any State (or political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary"). Congress authorized Florida to regulate the practices of Florida-headquartered employers like RCCL towards disabled applicants like Schultz under the FCRA.

Even absent this provision, though, RCCL's argument would fail. On its face, the FRCA does not treat interstate or international defendants any differently than in-state ones; it is not an act of naked, state-sanctioned economic protectionism of the sort decried in RCCL's various cases. *See Healy v. Beer Inst., Inc*., 491 U.S. 324, 341 (1989) (pricing rule applied "solely to interstate brewers or shippers of beer," while "exempting brewers and shippers engaging in solely domestic sales"); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 271 (1988) (Ohio grants tax advantage to ethanol produced in-state); *Pike v. Bruce Church, Inc*., 397 U.S. 137, 143–44 (1970) (challenge to law requiring Arizona farmers to package cantaloupes in Arizona before shipping them out-of-state, instead of shipping them directly out-of-state for packaging).

Nor would application of FCRA to this case "result in the regulation of commerce *wholly* outside Florida's boundaries," as in *In re Park West Galleries, Inc*., MDL No. 09-2076 RSL, 2010 WL 56044, at *4 (W.D. Wash. Jan. 5, 2010) (emphasis added), because all relevant events occurred in Florida (recruitment, offer, rehearsals, medical exam, rejection) plus the employer is headquartered there.[20] *See Bowers,* 151 F. Supp. 2d at 539 n.11 (rejecting application of dormant

---

[20] RCCL deletes the word "wholly" from its quotation (RCCL Br. at 20) of *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982), which states that "[t]he Commerce Clause also precludes the application of a state statute to commerce that takes place **wholly** outside of the State's borders, whether or not the commerce has effects within the State" (emphasis added). *See also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 311 (1st Cir. 2005) (discussing *Edgar*); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005) ("state statute that purports to regulate commerce occurring wholly beyond the boundaries of the enacting state outstrips the limits of the enacting state's constitutional authority and, therefore, is per se invalid"). In *In re Park West Galleries, Inc.*, 2010 WL 56044, at *4, the transaction occurred "wholly outside

Commerce Clause where "application of the [state law] here would not amount to application of a state statute to events taking place 'wholly outside of the State's borders'").

Tellingly, RCCL fails to produce a single case where the dormant Commerce Clause was applied to block a state- or local-law employment-discrimination or comparable labor case, even under the *Pike* standard. *See*, *e.g.*, *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011) (rejecting challenge to California wage-and-hour laws as applied to business travelers); *Bernstein v. Virgin Am., Inc.*, 227 F. Supp. 3d 1049, 1064–70 (N.D. Cal. 2017) (airline workers); *Yoder v. W. Express, Inc.*, 181 F. Supp. 3d 704, 717–23 (C.D. Cal. 2015) (interstate truckers). Under RCCL's argument, national employers would routinely challenge every application of state or local employment law in every case just by claiming an impact (however remote) on interstate commerce, even in cases where (as here) all of the relevant events occurred geographically within the state and there is otherwise no undue burden on interstate commerce.

RCCL notably offers no factual record, but merely conclusory statements, about the alleged burden that applying the FCRA would have on interstate commerce. *S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 471-72 (9th Cir. 2001) (rejecting Commerce Clause challenge where party challenging state law "relied solely on conclusory statements about the burden the [state regulation] has on interstate commerce," explaining that court "require[s] specific details as to how the costs of the [state regulation] burdened interstate commerce"). So, even if *Pike* applied, the Court has nothing to weigh in this case against Florida's manifest interest in eradicating discrimination within its borders. *See Bowers*, 151 F. Supp. 2d at 539 n.11.

## **CONCLUSION**

For the above-stated reasons, RCCL's motion for summary judgment should be denied, Schultz's motion for summary judgment should be granted, and the case should be set for trial for all issues that remain undecided, including damages and other relief.

Dated: April 3, 2020                              *s/ Kathleen Peratis*
      New York, NY                          Kathleen Peratis, Esq.

                                                               *s/Lindsey Wagner*
                                                               Lindsey Wagner, Esq.

---

Florida's boundaries," *i.e.*, ("the commerce at issue … occurred on international waters"). Here, all relevant events occurred in Florida.

**OUTTEN & GOLDEN LLP**
Kathleen Peratis, Esq.
KP@outtengolden.com
Aliaksandra Ramanenka, Esq.
aramanenka@outtengolden.com
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: 212.245.1000

Paul W. Mollica, Esq.
pwmollica@outtengolden.com
161 North Clark Street, Suite 1600
Chicago, Illinois 60601
Telephone: 312.809.7010

*Attorneys for Plaintiff*

**SCOTT WAGNER & ASSOCIATES, P.A.**
Cathleen Scott, Esq.
Florida Bar No. 135331
CScott@scottwagnerlaw.com
Lindsey Wagner, Esq.
Florida Bar No. 86831
LWagner@scottwagnerlaw.com
Jupiter Gardens
250 South Central Boulevard, Suite 104A
Jupiter, FL 33458
Telephone: 561.653.0008

## <u>CERTIFICATE OF SERVICE</u>

**I hereby certify** that a true and correct copy of the foregoing was served by electronic filing on April 3, 2020 on all counsel or parties of record on the Service List below.

<u>*s/ Kathleen Peratis*</u>
Kathleen Peratis, Esq.

<u>*s/Lindsey Wagner*</u>
Lindsey Wagner, Esq.

## <u>SERVICE LIST</u>

**OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.**
David M. DeMaio
Florida Bar No. 886513
<u>david.demaio@ogletreedeakins.com</u>
Gregory R. Hawran
Florida Bar No. 55989
<u>gregory.hawran@ogletree.com</u>
Two Datran Center
9130 S. Dadeland Blvd, Suite 1625
Miami, Florida 33156
Telephone: 305.374.0506

*Attorneys for Defendant*