# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 18-24023-Civ-TORRES

SAMUEL SCHULTZ,

       Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,
D/B/A AZAMARA CLUB CRUISES,

    Defendant.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The development of maritime and admiralty law has a rich history.  From our nation's founding, which owed much of its origin to wooden-hulled vessels navigating the Atlantic Ocean, the law of admiralty has been an essential component of our legal history.  So much so that its development was central to the thesis that a national constitution was essential in order for a federal judiciary to adjudicate maritime matters.  *E.g., The Federalist* No. 80, at 478 (A. Hamilton).

Much of that early legal development focused on what law would govern maritime disputes and where those disputes belonged.   And central to that debate was the importance of maritime and admiralty law with respect to our relationships with foreign nations.  Uniformity of law was thus paramount, thereby giving rise to

1

the broad expanse of federal admiralty and maritime jurisdiction that we follow today.[1]

Yet, as the Supreme Court has often recognized, maritime law is not a complete and perfect system even though uniformity and consistency are vital.[2] One reason for this dilemma may be that so much of what we come to recognize as the law of maritime and admiralty flows from judicial opinions that give rise to a "species of judge-made federal common law."[3]  Imperfection follows because judicial opinions can be laden with different verbiage and language that the author may not have intended to be magical or dispositive per se, but which over time evolves into binding law.  As Justice Holmes once bemoaned, "[i]t is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis."[4]

Take this case.   Much thoughtful and deliberate legal labor has been expended to argue about a judicial "test" that, in short, provides that the law of the

---

[1]     *See The Lottawanna,* 88 U.S. 558, 575 (1874) (the Constitution created a system of national maritime law to promote "the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states").

[2]     *E.g., Just v. Chambers,* 312 U.S. 383, 390 (1941).

[3]     *Yamaha Motor Corp, U.S.A. v. Calhoun,* 516 U.S. 199, 206 (1996).

[4]     *Hyde v. United States,* 225 U.S. 347, 391 (1912) (Holmes, C.J., dissenting), *quoted in Pennekamp v. Florida,* 328 U.S. 331, 352 (1946) (Frankfurter, J., concurring) (phrasing in judicial opinions should not be substitutes "for critical analysis by being turned into dogma") (criticizing over-reliance on "clear and present danger" test that Justice Holmes never intended to be deemed a technical formulaic legal doctrine).

port may not be applied, absent express and clear Congressional intent, to matters that fall within the "internal affairs" of a foreign-flagged vessel that finds itself in that port.  Here that matters because, arguably, the qualifications for employment to serve on extended ocean voyages for a foreign vessel falls within that broad term. Yet the first Supreme Court case that applied that rule by name[5] was relying on an earlier case that never used that broad phrase and instead referred to "internal discipline of the ship, and the general regulation of the rights and duties of the officers and crew towards the vessel or among themselves."[6]  In that narrower light, a seaman's initial qualification for employment seems to fall outside that sphere. But we are bound to apply the "internal affairs" test because later Supreme Court cases chose to utilize the broader phraseology without much distinction or careful qualification.[7]

Hence the legal landscape that we are presented with includes apparently contradictory and arbitrary distinctions that make little sense in practice, but are quite dispositive in effect.  As things now stand, the ADA may indeed apply here, but depending on how far the Court chooses to go.  If it goes too far, it may invade the internal affairs of a foreign vessel, which is frowned upon.  But the Court can try and apply the statute, notwithstanding the absence of a clear Congressional

---

[5]     *Patterson v. Eudora,* 190 U.S. 169, 177 (1903).

[6]     *Mali v. Keeper of the Common Jail*, 120 U.S. 1, 12 (1887)).

[7]     *See McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (citing *Mali* yet finding that there is a "well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship").

directive, on a paragraph-by-paragraph basis to a foreign vessel but in piecemeal fashion.  Some employees may be covered, others may not.  Some tasks may be subject to the ADA, while others are too "internal" and thus exempted.  So much for uniformity and consistency.[8]

The better answer would be to hold that, absent express Congressional authority or, better yet, international treaty, no law of general application like the ADA applies to foreign-flagged vessels.  That would force Congress to do its job and properly administer its Constitutional role of enforcing the law of admiralty.  We would then not be forced to adjudicate important and substantial cases like this one by deciphering loose judicial verbiage and make more of it than it originally deserved.  But clearly that is not the law today so we will do our best to apply the law that governs this case.

With that off our chest, we turn to the particular dispute presented on Royal Caribbean's ("Defendant" or "Royal Caribbean") and Samuel Schultz's ("Plaintiff" or "Mr. Schultz") cross-motions for summary judgment.  [D.E. 93, 98].  Both parties filed their respective responses [D.E. 108, 112].  Therefore, the motions are now ripe for disposition.  After careful consideration of the motions, responses, relevant authorities, and for the reasons discussed below, Defendant's motion for summary

---

[8]    *See Spector v. Norwegian Cruise Line, Ltd.,* 545 U.S. 119, 158 (2005) (Scalia J., dissenting) (To attempt to [fine-tune the ADA to avoid infecting the internal order of foreign vessels through] case-by-case adjudication is a recipe for endless litigation and confusion. . . . If Congress desires to impose this time-consuming and intricate process, it is certainly able to do so – though I think it would likely prefer some more manageable solution.").

judgment is **DENIED** and Plaintiff's motion for summary judgment is **GRANTED in part** and **DENIED in part**.[9]

## I.  BACKGROUND

Plaintiff filed this action on October 1, 2018 [D.E. 1] with a two-count complaint alleging that Defendant[10] violated Title I of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101 *et. seq*., and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01.  Plaintiff, a thirty-three year old Wisconsin resident and U.S. citizen, is a singer who applied for employment as part of an opera program onboard the Azamara *Journey*.  The vessel was scheduled to embark on a fourteen-week voyage from Singapore to Stockholm on March 25, 2018 to June 29, 2018.  Defendant gave Plaintiff a job offer with a condition that Plaintiff successfully completes a pre-employment medical examination ("PEME") under the guidelines of the International Labour Organization ("ILO").

Prior to the completion of Plaintiff's PEME, MCO Productions LLC ("MCO") and Defendant entered into a licensing and services agreement to provide on-board entertainment to passengers.  Plaintiff and MCO entered their own contractual agreement where Plaintiff would "[r]ehearse opera productions, opera cabarets, and recital music for shows aboard Azamara cruise lines ships," with the "[r]ehearsal period begin[ning] March 15, 2018, and end[ing] on March 21st, 2018."  [D.E. 92 at

---

[9]     On June 18, 2019, the parties consented to the jurisdiction of the undersigned Magistrate Judge.  [D.E. 27].

[10]     Defendant is a Liberian corporation headquartered in Miami that operates a global cruise vacation company. Defendant employs approximately 70,000 crewmembers from more than 125 countries.

¶ 53]. While the parties disagree on the identity of Plaintiff's employer, either MCO or Defendant compensated Plaintiff for his rehearsal time – all of which took place in the U.S.

Shortly thereafter, Defendant arranged Plaintiff's PEME with a medical vendor and Plaintiff's examination took place in New York City. The examining physician completed a form noting that Plaintiff was fit for duty at sea despite a history of depression and anxiety. However, the physician also included a note that Plaintiff needed psychiatric clearance. A reviewing doctor, a physician at Broward Health, agreed with that assessment and recommended that Plaintiff undergo a psychiatric evaluation. Defendant then informed Plaintiff that he needed to obtain a psychiatric evaluation that would address his history of depression, his current mental status, and his fitness for duty at sea.

To comply with this request, Plaintiff arranged a video session with his former treating psychiatrist, Dr. Bernard Gerber ("Dr. Gerber"). Dr. Gerber wrote a letter, following the session, that Plaintiff was mentally fit for duty at sea. Dr. Gerber also stated that, although Plaintiff suffered from major depression since the age of 9 and survived a prior suicide attempt[11], Plaintiff had been in remission with the help of medication and psychotherapy. Dr. Gerber found that that there was little to no risk of harm to Plaintiff or others and that the risk of suicidal ideation was low.

---

[11]     In 2011, Plaintiff attempted to commit suicide following a rape that he suffered the year prior.

Defendant's chief medical consultant, Dr. Benjamin Shore ("Dr. Shore"), then reviewed Plaintiff's medical file in March 2018.[12]   This included a review of Plaintiff's disclosures on his medical forms and Dr. Gerber's letter.  Based on this information, Dr. Shore concluded that Plaintiff was *not* fit for duty at sea under the applicable ILO guidelines because of Plaintiff's history of major depression.  More specifically, Dr. Shore found that Plaintiff's depression was persistent or reoccurring within the meaning of the ILO guidelines because Plaintiff continued to receive treatment for depression in the form of psychotherapy and medication.  Dr. Shore also determined that he could not exclude the possibility that Plaintiff's major depression would reoccur if Plaintiff were on a cruise ship for an extended period without access to medical services.   Based on Dr. Shore's assessment, Defendant withdrew its employment offer and Plaintiff filed this action seeking relief under the ADA and the FCRA.

## II.    APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[12]    After reviewing Plaintiff's medical file, Dr. Shore never examined or spoke to Plaintiff before rendering a decision on Plaintiff's ability to work at sea.

Fed. R. Civ. P. 56(c)(1).  On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are 'implausible.'"  *See Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592-94)).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary

will not be counted."). "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III. ANALYSIS

Both parties seek summary judgment on the question of whether two U.S. laws – namely the ADA and the FCRA – apply to the withdrawal of a job offer for a U.S. citizen seeking work on a foreign-flag vessel. Defendant argues that there is a longstanding principle that, absent a clear expression of legislative intent, U.S. laws do not apply to the internal management and affairs of a foreign vessel. Defendant claims that there is a well-established rule of international law that the law of the flag state – in this case Malta – governs the internal affairs of a ship, absent a congressional directive, and that this forecloses any relief Plaintiff seeks. *See McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (finding that there is a "well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship") (citing *Mali v. Keeper of the Common Jail*, 120 U.S. 1, 12 (1887)). Because Plaintiff has chosen not to seek relief under the laws of Malta[13], Defendant maintains that summary judgment must be granted.

On the other hand, Plaintiff contends that the ADA must apply because – even though Defendant is incorporated under the laws of another country – foreign employers doing business in the U.S. are treated as domestic employers if unlawful

---

[13]    Malta purportedly provides Plaintiff with several options for relief, including a review from an independent medical professional that would be the final arbiter with respect to Plaintiff's fitness for duty at sea.

conduct takes place entirely on U.S. soil.  *See Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998) ("[T]he plain language of the corresponding foreign-employer exclusions in Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act of 1990 (ADA), indicates that a foreign employer's domestic operations are not excluded from the reach of those statutes.") (internal citations omitted).  Plaintiff also claims that, while there is a longstanding doctrine that requires a clear statement of congressional intent for a U.S. law to apply to a foreign-flag vessel, that does not apply if Plaintiff's rights were violated on U.S. soil.  Plaintiff alleges, for example, that (1) Defendant recruited, hired, and lodged him in the U.S., (2) provided him with safety training in the U.S., and (3) required him to be a U.S. citizen.  In other words, Plaintiff maintains that Defendant's offer of employment, the processing of the offer (including the medical review), and subsequent withdrawal occurred exclusively in the U.S.  Plaintiff therefore reasons that he qualifies as a disabled person under the ADA and that there is direct evidence that Defendant refused to employ him because of his disability.  For these reasons, Plaintiff concludes that his motion for summary judgment should be granted and that this case should be set for trial on damages and any other issue that remains undecided.

### A.    *General Principles of Extraterritoriality*

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *E.E.O.C. v. Arabian America Oil Company*, 449

U.S. 244, 248 (1991) (internal quotations omitted) (hereinafter "Aramco").  "This principle represents a canon of statutory construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247, 255 (2010).  This presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters."  *Id.* (citing *Smith v. United States,* 507 U.S. 197, 204, n.5 (1993)).  It also "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013) (citations omitted).  The presumption against extraterritoriality is further supported by the understanding that Congress – unlike federal courts – has the "facilities necessary to make fairly such an important policy decision [to apply a U.S. law abroad] where the possibilities of international discord are so evident and retaliative action so certain."  *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957).  Therefore, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, "we must presume it is primarily concerned with domestic conditions." *Aramco,* 449 U.S. at 248 (internal quotation marks omitted).

In determining whether Congress has given a statute extraterritorial effect, courts consider "all available evidence about the meaning" of a statute, including its text, structure, and legislative history.  *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 177 (1993); *see also Smith,* 507 U.S. at 201–03 (reviewing text, structure, and legislative history of Federal Tort Claims Act when determining

its extraterritorial effect).  "Mere boilerplate language in a statute is insufficient to overcome this presumption."  *Nieman v. Dryclean U.S.A. Franchise Co.*, 178 F.3d 1126, 1129 (11th Cir. 1999).  The Supreme Court has "repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad."  *Aramco,* 449 U.S. at 251. Indeed, the presumption against extraterritoriality can only be overcome with a clear expression of congressional intent to extend the reach of a statute beyond those places where the United States has sovereignty or has some measure of legislative control.  *See id.* at 248.

Absent that, courts are "reluctant to attribute to Congress an intention to disrupt this comprehensive body of law by construction of an Act unrelated to maritime commerce and directed solely at American labor relations."  *Windward Shipping (London) Ltd. v. Am. Radio Ass'n, AFL-CIO*, 415 U.S. 104, 113 (1974); *see also McCulloch*, 372 U.S. at 21 (noting the "well-established rule" that "the law of the flag state ordinarily governs the internal affairs of a ship").  Thus, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *Morrison*, 561 U.S. at 255, and this applies regardless of whether there is a risk of conflict between an American statute and a foreign law, *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 173–174 (1993).

## B.     *The Clear Statement Presumption*

A "separate and different presumption" arises when there is a question as to whether a U.S. statute applies to a foreign-flag vessel operating in U.S. waters

because "a foreign-flag ship sailing in [the] United States waters is not extraterritorial." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000) (citing *Hartford Fire Ins. Co. v. California,* 509 U.S. 764 (1993) (Scalia, J., dissenting)); *see also Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 531 (D.C. Cir. 1993) ("By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders.").  In these circumstances, U.S. laws are presumed to apply "if the interests of the United States or its citizens, rather than interests internal to the ship, are at stake." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 130 (2005) (citing *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 127 (1923) (holding that the general terms of the National Prohibition Act apply to foreign-flag ships in United States waters because "[t]here is in the act no provision making it [in]applicable" to such ships); *Uravic v. F. Jarka Co.,* 282 U.S. 234, 240 (1931) (holding that "general words" should be "generally applied" and that therefore there is "no reason for limiting the liability for torts committed [aboard foreign-flag ships in United States territory] when they go beyond the scope of discipline and private matters that do not interest the territorial power")).

However, there is an exception to the general rule in that "[a]bsent a clear statement of congressional intent, general statutes may not apply to foreign-flag vessels insofar as they regulate matters that involve only the internal order and discipline of the vessel, rather than the peace of the port." *Spector*, 545 U.S. at 130. This derives from the understanding that, as a matter of international comity, "all matters of discipline and all things *done on board* which affec[t] only the vessel or

13

those belonging to her, and [do] not involve the peace or dignity of the country, or the tranquility of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged." *Mali*, 120 U.S. at 12 (emphasis added). To put it simply, if the failure to hire Plaintiff intruded upon the internal affairs of a foreign-flag vessel, a clear congressional statement would be required for Title I of the ADA to apply. *See Spector*, 545 U.S. at 132 ("The relevant category for which the Court demands a clear congressional statement, then, consists not of all applications of a statute to foreign-flag vessels but only those applications that would interfere with the foreign vessel's internal affairs."). Because the parties disagree on whether the acts complained of relate to Defendant's actions on U.S. soil or onboard a future sea voyage, both the principles of extraterritoriality and the clear statement presumption are relevant to the arguments presented.

To be sure, Title I does *not* include a clear congressional statement that the ADA applies to foreign-flag vessels operating in U.S. waters. It only includes statutory language that the law applies extraterritorially. Yet, as stated above, a clear congressional statement that a U.S. law applies to foreign vessels in domestic waters is not the same as a U.S. law applying extraterritorially. But, the latter remains relevant to the extent Defendant has the better side of the argument and we should focus on the sea voyage that Plaintiff would have undertaken as a member of an international crew. If Defendant's argument is compelling and we construe this case as an employee working onboard a vessel in international waters,

14

a question may arise as to whether the ADA should apply extraterritorially.  With that being said, we turn to the merits.

### C.  *Whether the ADA Applies to Mr. Schultz*

We begin with the question of whether the ADA applies to Mr. Schultz. Defendant argues that the clear statement presumption applies because Congress has never expressed an intent to apply U.S. employment laws to the crewmembers of foreign-flag vessels.  Defendant reasons that Congress is presumed to legislate against the "backdrop" of prior judicial decisions and that "[w]hen it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440 (1989).  Defendant also suggests that congressional awareness to make a clear statement of extraterritorial effect is confirmed in many statutes and that Congress could have, but did not, do so for the ADA.  *See, e.g.,* the Biological Weapons Anti–Terrorism Act of 1989, 18 U.S.C. § 175(a) (1994) ("There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States.").  Because Congress has chosen not to include any language in the ADA as to its application to the conduct of foreign-flag vessels, Defendant concludes that Plaintiff's ADA claim cannot stand.

Moreover, Defendant reasons that the regulation of the employment relationship is a matter reserved for a vessel's internal affairs and that appellate courts have uniformly held that these laws do not apply to foreign vessels without a clear statement of congressional intent:

15

> The Stewards claim that, even if *Benz* and *McCulloch* control, the internal affairs of Celebrity's ships would not be disrupted were we to apply the LMRA and the NLRA to this dispute. They argue that applying these statutes would merely compel the paying of wages, not affect the "movement and functioning" of the ships. This argument misapprehends the internal affairs inquiry. Federal courts are not charged with predicting the operational consequences of applying these statutes on a case-by-case basis. Nor have the Stewards presented support suggesting otherwise. To adopt this reasoning would lead to the kind of inquiry into the "internal order and discipline" that *McCulloch* concluded would be "entirely infeasible in actual practice." Because the Supreme Court has already determined that wage disputes between a foreign vessel and its foreign crew fall within the internal affairs of a ship, we are foreclosed from revisiting the question.

*Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 889 (11th Cir. 2013) (internal citations omitted); *Benz*, 353 U.S. at 142–44 (holding the Labor Management Relations Act was inapplicable to the picketing of a foreign ship operated entirely by foreign seamen); *McCulloch*, 372 U.S. at 12–13 (holding that the National Labor Relations Board could not order a union election because the National Labor Relations Act did not apply to foreign seamen aboard foreign vessels).

Defendant further argues that the facts of this case are analogous to the Supreme Court cases referenced above because any application of the ADA to Plaintiff would inevitably regulate the daily working relationship between a vessel owner and its crewmembers. Defendant suggests that any application would also dictate to the vessel owner who he or she must employ, what accommodations must be made, and otherwise constrain a vessel owner's ability to assign, remove, or change the duties of his crewmembers. In addition, Defendant asserts that Plaintiff's status as a U.S. citizen is entirely irrelevant because the determinative factor on whether the ADA applies is whether the law intrudes upon the internal

affairs of the vessel.  *See Brooks v. Hess Oil V.I. Corp.*, 809 F.2d 206, 208 (3d Cir. 1987) ("We see no logical reason to conclude that at some arbitrary point the number of American contacts outweighs the rule that the law of the flag controls the internal order and economy of foreign flag vessels, and accordingly we decide this case under Liberian law without reference to the various provisions of American labor law urged by plaintiffs.").  Because the hiring of a crewmember naturally interferes with the internal affairs of a vessel, Defendant concludes that Plaintiff has no remedy under the ADA.

### 1. *Supreme Court Precedent*

In reviewing the cases that the parties referenced, there is no dispute that the Supreme Court has established and reaffirmed a long-standing principle that a clear congressional statement is required for a U.S. law to apply to foreign vessels operating in domestic waters when the law "implicate[s] the internal order of the foreign vessel rather than the welfare of American citizens."  *Spector*, 545 U.S. at 131 (citing *McCulloch*, 372 U.S., at 21 (finding that "the law of the flag state ordinarily governs the *internal affairs* of a ship") (emphasis added)).[14]  A question

---

[14]    Like the Fifth Circuit's decision in *Spector v. Norwegian Cruise Line Ltd.*, 356 F.3d 641 (5th Cir. 2004), *rev'd*, 545 U.S. 119 (2005), Defendant states that U.S. laws do not apply to foreign-flag vessels in U.S. waters absent a clear statement of congressional intent.  This is not entirely accurate, however, because the general rule is that U.S. laws are presumed to apply to conduct that takes place aboard a foreign vessel in U.S. territories if the interests of citizens are at stake.  The exception to the rule is that U.S. laws may not apply to foreign vessels if they regulate matters that involve only the internal affairs of a vessel absent a clear statement of congressional intent.  While the difference is subtle, it is significant because only laws that implicate the internal order of a vessel require a clear statement of congressional intent.  Otherwise, U.S. laws are presumed to apply to foreign vessels operating in U.S. waters.

arises, however, as to whether the decision to give Plaintiff a conditional offer of employment and to then later withdraw it *before* embarking on a sea voyage involves matters of the internal order and discipline of a vessel.  If it does, then the clear statement presumption applies and Plaintiff has no remedy under the ADA because the statute lacks any language that it applies it to foreign-flag vessels.  On the other hand, if a failure to hire is unrelated to the internal affairs of a vessel then the ADA applies by default because Defendant operates a foreign vessel in domestic waters.  *See Spector*, 545 U.S. at 131 ("[G]eneral statutes are presumed to apply to conduct that takes place aboard a foreign-flag vessel in United States territory if the interests of the United States or its citizens, rather than interests internal to the ship, are at stake.").

Defendant relies on several cases to support its argument that a conditional offer of employment and a subsequent withdrawal intrudes upon the internal affairs of a vessel.  But, Defendant's cases are easily distinguishable.  Take, for instance, Defendant's reliance on the Supreme Court's decisions in *McCulloch* and *Benz*.  These cases concern the extension of domestic laws to *foreign nationals* on foreign-flag vessels.  *See McCulloch*, 372 U.S. at 20-21 (holding that the National Labor Relations Board could not order a union election because the National Labor Relations Act ("NLRA") does not apply to foreign seamen aboard foreign vessels); *Benz*, 353 U.S. at 143 (holding that "Congress did not fashion [the Labor Management Relations Act ("LMRA")] to resolve labor disputes between nationals of other countries operating ships under foreign laws," because "[t]he whole

background of the Act is concerned with industrial strife between American employers and employees.").[15]   Both cases considered the question of whether a wage dispute between a foreign-flag vessel and its foreign crew fell within the internal affairs of a ship.  And they each answered that question in the negative.

These cases are not dispositive because they only make clear that certain statutes – namely the LMRA and the NLRA – do not apply to "wage disputes arising on foreign vessels between *nationals* of other countries," even when "the vessel comes within our territorial waters."  *Benz*, 353 U.S. at 142 (emphasis added).  The same is true of Defendant's reliance on the Eleventh Circuit's decision in *Lobo v. Celebrity Cruises*, where the Court held – consistent with *McCulloch* and *Benz* – that "a wage dispute between a foreign-flag vessel and its foreign crew falls within the internal affairs of a ship."  *Lobo*, 704 F.3d at 889 (affirming the district court's dismissal of plaintiff's LMRA and NLRA claim because "*Benz* and *McCulloch* have plainly answered the question.") (citations omitted).  Given that this case involves a U.S. citizen that never made it onboard a seagoing vessel who merely complains of a vessel's employment practices under the ADA that took place entirely on U.S. soil, *McCulloch*, *Benz*, and *Lobo* are not analogous to the facts of this case.

Indeed, the Eleventh Circuit has even acknowledged that the "internal affairs" doctrine "generally has been applied where application of American law would interfere with the relations between the ship's foreign owner and the ship's

---

[15]   The *Benz* court also found this legislative history compelling, as "inescapably describ[ing] the boundaries of the Act as including only the workingmen of our own country and its possessions."  *Id.* at 144.

*foreign crew.*"  *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000) (emphasis added) (citing *Dowd v. International Longshoremen's Ass'n,* 975 F.2d 779, 788–89 (11th Cir. 1992) ("The Supreme Court has held that the NLRA does not regulate the practices of owners of foreign vessels which are temporarily present in an American port with regard to foreign employees working on these vessels.")); *see also E.E.O.C. v. Royal Caribbean Cruises, Ltd.*, 771 F.3d 757, 762 (11th Cir. 2014) ("RCCL has raised a legitimate question regarding whether the EEOC has jurisdiction over the claims of foreign nationals on foreign-flag ships, like Mr. Morabito, when doing so likely would interfere with the internal order of the vessels.") (citing cases).  The Florida Supreme Court has made the same observation in that "labor disputes between foreign vessels and foreign crews . . . are treated differently than matters impacting the American public or even labor disputes between foreign vessels and American longshoremen."  *Young v. Norwegian Seafarers' Union*, 138 So. 3d 1189, 1191–92 (Fla. 3rd DCA 2014) (citing *Spector,* 545 U.S. at 122 (applying the Americans with Disabilities Act to foreign-flag cruise ships); *Int'l Longshoremen's Local 1416, AFL–CIO v. Ariadne Shipping Co.,* 397 U.S. 195, 198-201, (1970) (applying the NLRA to a dispute between foreign ships and American longshoremen)).

The question presented is therefore distinguishable from *McCulloch*, *Benz*, and *Lobo* because, unlike those cases, this is not a run of the mill wage dispute with foreign nationals onboard a vessel.  Instead, this is a case where a U.S. citizen was denied employment *before* he ever boarded a foreign-vessel in international waters.

Neither party referenced a case where the applicability of the ADA was contested under a similar specific set of facts.  But, Plaintiff has directed the Court to several cases that either directly hold that the ADA applies to a foreign company's domestic operations or that reaffirm the principle that Congress intends for its laws to apply to foreign entities operating in U.S. territories.  *See Spector*, 545 U.S. at 132 ("It is . . . reasonable . . . to presume Congress does intend its statutes to apply to entities in United States territory that serve, *employ*, or otherwise affect American citizens, or that affect the peace and tranquility of the United States, even if those entities happen to be foreign-flag ships.") (emphasis added); *Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998) (finding that the ADA, Title VII, and the Age Discrimination in Employment Act "apply to a foreign company's domestic operations").

To bolster its argument, Defendant claims that *McCulloch* and its progeny support, at the very least, the broad proposition that labor relations fall within the internal affairs doctrine.[16]  This argument is feeble, for many of the same reasons, because these cases concern *wage disputes* with *foreign nationals* that were hired

---

[16]    Defendant also raises a separate argument that *McCulloch* stands for the proposition that even the possibility of international discord gives rise to the presumption that the law of the flag state controls the internal order of a seagoing vessel.  *See McCulloch*, 372 U.S. at 21 ("Our attention is called to the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship. The possibility of international discord cannot therefore be gainsaid.") (internal citations omitted).  We need not give much consideration to this argument because *McCulloch* merely stated a public policy reason for why courts require a clear statement of congressional intent for statutes that intrude upon the internal affairs of a foreign ship.  Thus, when possible, the goal is to always foster international comity where possible and that remains unchanged notwithstanding the applicability of U.S. law.  However, an ideal of fostering international harmony does not control if there is a clear statement of congressional intent or if the facts of a specific case do not intrude upon the internal affairs of vessel.

and working on a foreign vessel. By contrast, this case concerns a U.S. citizen that never set foot on a sea voyage. And none of Defendant's cases dictate that labor relations, as an entire category, intrude upon the internal affairs of a vessel. It is therefore hard to equate any of Defendant's cases with the facts presented. This is not to say that *McCulloch*, *Benz*, and *Lobo* stand for the proposition that the clear state presumption is limited *only* to foreign nationals. No court has come to that conclusion. But, at the same time, none of these cases considered how general statutes apply to U.S. citizens or whether conduct that complains of a defendant's pre-employment practices act as a precursor to boarding a seagoing vessel. Therefore, Defendant's reliance on the Supreme Court cases discussed above is misplaced.

## 2. *The Spector Decision*

When confronted with the fact that Supreme Court has not addressed several of the questions presented in this case, Defendant argues that the denial of Plaintiff's employment is an interest internal to the vessel because, if Defendant hired Mr. Schultz, the ADA could dictate when and under what circumstances a shipboard employee must be relieved of his shipboard duties. That is, Defendant is concerned that the ADA could constrain the circumstances under which an employer could alter the conditions of the employment relationship while the vessel operates in international waters. Defendant therefore concludes that, if the Court finds otherwise, a vessel owner could have no control of the day-to-day working relationship.

That argument faces a major obstacle.  The Supreme Court has upheld enforcement of the ADA against a foreign-flagged vessel that, like Royal Caribbean, does most of its business in and from the United States.  The same practical and compelling arguments were made by that cruise line that Defendant makes now. They were initially successful before the Fifth Circuit.  *Spector v. Norwegian Cruise Line Ltd.*, 356 F.3d 641 (5th Cir. 2004).  The question presented in that case was whether the public accommodation provisions of Title III of the ADA applied to Norwegian's foreign-flag cruise ship in U.S. waters.  The plaintiffs – consisting of disabled and companion passengers – alleged that physical barriers denied them access to emergency evacuation equipment, facilities (i.e. public restrooms), and cabins with a balcony or a window.  The Fifth Circuit held that Title III did not apply, in any respects, to foreign-flag vessels because, when Congress enacted the statute, it "failed to express any intention to subject foreign-flagged cruise ships to its dictates," and therefore "application of Title III to foreign-flagged cruise ships [was] impermissible."  *Id.* at 650.

The Supreme Court reversed the Fifth Circuit's decision and held that Title III was applicable to foreign-flag ships operating in U.S. waters, except to the extent that particular application of the statute's requirements invaded a ship's "internal affairs."  *Spector*, 545 U.S. at 134-36.  The Court stated that general statutes are presumed to apply to conduct that takes place aboard a vessel in U.S. waters "if the interests of the United States or its citizens, rather than interests internal to the ship, are at stake."  *Id.* at 130 (citations omitted).  That is, a clear statement of

congressional intent is only required when a general statute regulates "matters that involve only the internal order and discipline of the vessel, rather than the peace of the port." *Id*. Because the Fifth Circuit's holding – that Title III did not apply to disabled passengers in any respects – undermined the general rule and resulted in a "harsh and unexpected interpretation of a statute designed to provide broad protection," the Supreme Court remanded the case to the Fifth Circuit for further review of the plaintiffs' physical barrier claims. *Id*.

Defendant argues that the Supreme Court's decision in *Spector* supports its position because it reaffirmed the principle that Title I of the ADA cannot apply to crewmembers because it would directly regulate the internal management and affairs of a vessel. But, *Spector* never considered the question of whether the physical barriers at issue in that case interfered with a ship's internal affairs. The Court remanded that question to the Fifth Circuit for further review. The Court only held that Title III was applicable to foreign-flag ships operating in U.S. waters.

In light of that more limited holding, Defendant pushes back against *Spector* as a relevant case because it was a plurality opinion that considered Title III and the rights of passengers aboard vessels (as opposed to crewmembers under Title I). *Spector* is more relevant, however, than Defendant suggests because it belies the argument that the ADA is inapplicable in all respects to foreign vessels. *See also Stevens v. Premier Cruises, Inc.*, 284 F.3d 1187, 1188 (11th Cir. 2002) ("We determined that the district court erred in its conclusion that Title III of the ADA-as a matter of law-can have no application to cruise ships in United States waters

24

which sail under a foreign flag and are owned by a foreign corporation."). That leaves open the question, of course, as to whether this broader statute, in so far as Title I is concerned, does in fact intrude upon the "internal affairs" or "internal discipline" of a vessel and, if so, whether that law includes a clear statement of congressional intent.

Plaintiff pushes back and portrays the Defendant's argument as akin to the flawed Fifth Circuit's holding because the effect remains the same. In other words, Plaintiff construes Defendant's argument as one where a prospective employee cannot raise *any* ADA-related complaints with a foreign vessel's employment practices because doing so would intrude upon the working relationship of a vessel. The logical conclusion of that argument is debatable because, if an applicant cannot raise an ADA claim during the early stages of his employment, it is unclear when a person could ever do so. As such, Plaintiff implies that Defendant's argument – while stated differently – is that Title I of the ADA does not apply to U.S. citizens who complain of a foreign-flag vessel's employment practices.

Plaintiff then suggests that Defendant's argument is untenable for several other reasons. First, Plaintiff states that it undermines the Supreme Court's decision in *Spector* and other appellate court decisions against blanket pronouncements that the ADA does not apply to foreign-flag vessels operating in U.S. waters.[17] Second, Plaintiff claims that Defendant fails to articulate how the

---

[17] The Second Circuit has found, for example, that Title VII, the ADA, and the Age Discrimination in Employment Act all "apply to a foreign company's domestic operations." *Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998). The Second Circuit also noted that "U.S. subsidiaries of foreign corporations are generally subject to

facts of this case intrude upon the internal affairs of a vessel in international waters when Plaintiff only takes issue with the ways in which Defendant revoked his offer of employment in the U.S. Plaintiff complains that Defendant failed to properly evaluate his medical record and that the gravamen of his allegations has nothing to do with any work performed on a vessel. Plaintiff therefore speculates that the reason for Defendant's focus on an international voyage – as opposed to his domestic allegations – is because the former is an entirely different case than the one presented.

Indeed, Plaintiff maintains that his allegations are targeted solely at Defendant's employment practices on U.S. soil while Defendant instead tries to stretch those limited allegations far afield in order to claim that they then infringe on the internal affairs of a vessel.

Plaintiff concedes that, if allowed to misconstrue this claim, Defendant could then avoid liability because Title I of the ADA has no clear statement of congressional intent that it applies to foreign-flag vessels operating in U.S. waters. But, Plaintiff points out that Defendant failed to reference a single case where a court has allowed a hypothetical future relationship onboard a vessel to bar an ADA claim when a plaintiff merely raises concerns with a foreign-flag vessel's employment process on U.S. soil.[18] The reason for that omission might be that

U.S. antidiscrimination laws, and, absent treaty protection . . . a U.S. branch of a foreign corporation is not entitled to an immunity not enjoyed by such subsidiaries." *Id.* at 44 (citations omitted).

[18] Plaintiff also suggests that it would be entirely speculative to consider any potential consequences of a working relationship onboard a vessel because that is

there is no case directly on point, but Plaintiff implies that this Court should not be the first to make that leap of faith.

Defendant takes issue with Plaintiff's arguments because they misconstrue the proper way to view this case. Defendant suggests that this case is distinguishable from the Fifth Circuit's now-reversed decision because Defendant never contemplates that Plaintiff is barred from ever filing a Title I claim against a foreign employer's pre-employment practices. In fact, Defendant agrees that outposts of foreign entities operating on U.S. soil expose themselves to domestic anti-discrimination laws. Defendant claims, however, that Plaintiff has no recourse under the ADA in this case because his job was to be performed in international waters – not within the U.S. If Plaintiff had complained of Defendant's employment practices with work that was performed in the U.S., then Defendant reasons that this would be covered under the ADA.

Defendant then takes issue with Plaintiff's position that this case only relates to Defendant's employment decisions in the U.S. Defendant suggests these determinations are irrelevant, in large part, because it is the location of Plaintiff's workstation (i.e. on the high seas) that controls the location of Plaintiff's employment. *See, e.g., Gantchar v. United Airlines, Inc.*, 1995 WL 137053, at *8 (N.D. Ill. March 28, 1995) ("[E]mployment in international waters or airspace

---

not what occurred in this case and it is unclear what conditions, if any, would impact his work as a crewmember onboard a vessel. Plaintiff implies that we need not reach the question of whether this case implicates the internal affairs of a vessel because his allegations are targeted solely at the pre-employment process. He therefore reasons that any future effects to the employment relationship would be premature and would go outside the scope of this case.

should be considered outside the territory of the United States"); *Wolf v. J.I. Case Co.*, 617 F. Supp. 858, 863 (E.D. Wis. 1985) ("[I]t is the location of the 'work station,'" rather than place where plaintiff is hired or where termination decision is made, "that determines the applicability of the ADEA"); *accord Priyanto v. M/S Amsterdam*, 2009 WL 175739, at *7-8 (C.D. Cal. Jan. 23, 2009) ("[S]ince Plaintiffs' work is performed at sea, it is not within California, and is thus not protected by California wage law").  If the location of Plaintiff's employment is foreign-based, Defendant reasons that the conduct complained of must relate to the internal affairs of the vessel – not to any domestic employment decisions.

In resolving these questions, we agree that – to determine whether the ADA applies – we must consider the location of Plaintiff's employment.  If Plaintiff's employment is domestic-based, then Defendant – by its own representation – has availed itself of U.S. law and Plaintiff has a remedy under the ADA.  However, if Plaintiff's employment is foreign-based, it raises questions of whether the ADA has extraterritorial application and whether the failure to hire him intrudes upon the internal affairs of a foreign-flag vessel.

### 3. *The Location of Plaintiff's Employment*

Turning to the location of Plaintiff's employment, Plaintiff argues that the ADA applies because every allegation in this case relates to conduct that took place in the U.S.   Plaintiff claims, for example, that this is where Defendant recruited him, where Defendant gave him a conditional offer of employment, where he

performed his medical examinations, where he attended rehearsal, and where Dr. Shore determined that he was unqualified for shipboard duty.

Defendant asserts, on the other hand, that none of Plaintiff's job duties were to be performed in the U.S. and that Plaintiff had to fly to Singapore to "officially begin" his work as a Royal Caribbean employee on an international voyage.   In determining the location of Plaintiff's workplace, Defendant states that the relevant test – generally known as the primary workstation test – is where the job is to be performed, not where an applicant is recruited, trained, or where employment decisions are made.   Defendant relies primarily on a district court decision in *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 64 (D.D.C. 2002), *aff'd, Shekoyan v. Sibley Int'l*, 409 F.3d 414 (D.C. Cir. 2005).[19]   There, Mr. Shekoyan, a non-citizen, was hired to work in the Republic of Georgia but was "hired by, trained at, and reported to the defendant's corporate headquarters" in Washington, D.C.   *See id.* at 62.  Mr. Shekoyan was later terminated and consequently brought suit under Title VII, alleging that he had been discriminated against on the basis of his

---

[19]      While *Shekoyan* concerned the location of a discriminatory employment act for a non-citizen under Title VII, courts have made no distinction when determining a U.S. citizen's place of employment under other related statutes.  *See, e.g., Denty v. SmithKline Beecham Corp.*, 907 F. Supp. 879, 884 (E.D. Pa. 1995), *aff'd*, 109 F.3d 147 (3d Cir. 1997) (concluding that the "site of the workplace determines the applicability of the ADEA," but that "[t]he relevant work site is the location of the[ ] positions" for which the plaintiff, a U.S. citizen, was applying, "not the location of [the plaintiff's] employment at the time of the alleged discrimination"); *Pfeiffer v. Wm. Wrigley Jr. Co.,* 755 F.2d 554, 556 (7th Cir. 1985) (examining provisions of the ADEA similar to those found in Title VII and concluding that the a U.S. citizen's work station was "foreign" because he was "employed overseas—lived and worked there—continuously throughout his entire period of employment"); *Wolf v. J.I. Case Co.*, 617 F. Supp. 858, 862 (E.D. Wis. 1985) (examining the ADEA and determining that a U.S. citizen worked outside the United States because "over ninety percent of his time was spent abroad").

national origin.  The court was required to evaluate whether Mr. Shekoyan was employed in the United States or abroad.

The court held that an employee's place of employment is determined based on "the location of the employee's primary workstation."  *Id.* at 68.  Although Mr. Shekoyan's position had some connection to the United States, the district court held that his "primary workstation and thus his place of employment" was located in the Republic of Georgia because he was "specifically hired by the defendant to work in the Republic of Georgia and performed his primary work related duties there."  *Id.*  Consequently, Title VII did not apply.  *See id.* at 68–69.

While the primary work station test focuses on the place where work is actually performed – and disregards other factors such as the location where a plaintiff is hired or trained – there is not yet a settled formulation of this "test." One district court, for instance, in the Western District of Texas has observed that under the "primary work station test," individuals are employed within the place where they "spend[] the majority of [their] working hours."  *Gomez v. Honeywell Int'l, Inc.,* 510 F. Supp. 2d 417, 421–23 (W.D. Tex. 2007).  However, another district court has concluded that a non-citizen works outside the United States when "he live[s] and carrie[s] out his duties in Japan."  *Iwata v. Stryker Corp.,* 59 F. Supp. 2d 600, 604 (N.D. Tex. 1999).  The confusion on how to the apply this test has led some courts to abandon it entirely because the test is too vague and overly simplistic:

This Court finds that the primary-work-station test is vague and overly simplistic in its determination of employment within the United States. First, the test assumes that an employee *has* a primary work station-an assumption that may be invalid given the nature of our global economy with its mobile workforce. And even if an employee has a primary work station, this might not be the only issue a court would want to consider. For example, an employee might spend a third of her working hours at a site in Mexico, and the remaining two-thirds of her working hours spread among five sites in the United States. Although this employee would seem to have a primary work station in Mexico, she would spend a majority of her time in the United States. That an employer could avoid liability in such a situation simply because an employee spends a plurality of her time at a work station in Mexico is an odd, counterintuitive outcome.

*Gomez,* 510 F. Supp. 2d at 423.

In lieu of the primary workstation test, some courts have used a center of gravity test that a district court formulated in *Torrico v. Int'l Bus. Machines Corp.*, 213 F. Supp. 2d 390, 401 (S.D.N.Y. 2002). In that case, a non-U.S. citizen filed an action against his former employer alleging a violation of the ADA and the New York Human Rights Law. The court held that the location of the alleged acts did not, by itself, control the question of whether a non-citizen employee fell within the scope of the ADA because the cases that preceded it focused on a primary workstation test that oversimplified the analysis. Unlike most of those cases, the court found that none involved a temporary fixed-term assignment from an existing U.S. based position like the one presented in *Torrico*.

The court therefore turned to related decisions where courts have determined the location of a plaintiff's employment under other federal antidiscrimination laws and found that a "center of gravity" test is more appropriate because it takes into account the entire employment relationship between a plaintiff and an employer.

31

This test, unlike the primary workstation test, focuses on a variety of non-exhaustive factors based on a totality of the circumstances:

> The center of gravity of an individual's relationship with an employer is determined by considering a variety of factors, including (but not limited to) whether any employment relationship had, in fact, been created at the time of the alleged discrimination, and if so, where that employment relationship was created and the terms of employment were negotiated; the intent of the parties concerning the place of employment; the actual or contemplated duties, benefits, and reporting relationships for the position at issue; the particular locations in which the plaintiff performed those employment duties and received those benefits; the relative duration of the employee's assignments in various locations; the parties' domiciles; and the place where the allegedly discriminatory conduct took place.   The list is not meant to be exhaustive; the center of gravity of the parties' relationship is to be determined based on the totality of circumstances.

*Torrico*, 213 F. Supp. 2d at 403–04.

If we accept Defendant's position and apply the primary workstation test, then the place where Plaintiff was hired and trained is irrelevant in determining his place of employment.   *See Shekoyan*, 409 F.3d at 422.   Instead, the most controlling factor is the location of where the work was performed.   *See Herrera v. NBS, Inc.*, 759 F. Supp. 2d 858, 865 (W.D. Tex. 2010) ("The primary work station test focuses on the place where the work is actually performed, and disregards other factors such as the location where the plaintiff was hired, trained, or the location of the employees supervisors.") (citing *Shekoyan,* 217 F. Supp. 2d at 68).   Defendant suggests that this ends the inquiry because it is undisputed that Plaintiff never *worked* in the U.S.   Instead, Plaintiff's would have only begun his employment as a Royal Caribbean employee once he boarded a vessel in international waters.   To

determine whether Defendant's argument has merit, we must again review the relevant facts.

In November 2017, MCO and Defendant entered into a licensing and services agreement to provide on-board entertainment to passengers. On January 19, 2018, Plaintiff and MCO entered into their own contractual arrangement where Plaintiff would "[r]ehearse opera productions, opera cabarets, and recital music for shows aboard Azamara cruise lines ships," with the "[r]ehearsal period begin[ning] March 15, 2018, and end[ing] on March 21st, 2018." [D.E. 92 at ¶ 53]. From this point onward, the parties strongly dispute several material facts as to the identity of Plaintiff's employer and whether he worked for Defendant before he boarded a vessel in international waters.

Plaintiff argues that he worked for Defendant during this time because (1) Defendant influenced the terms of the agreement (i.e. Plaintiff's compensation and rehearsal schedule), (2) Defendant labeled Plaintiff as one of its employees, and (3) Defendant paid Plaintiff $1,000 per week with $50 per diem for rehearsal time. Plaintiff also claims that Defendant organized his day-to-day life during rehearsals and that he lived in Defendant's housing facilities in Florida.[20] If true, this suggests that the location of Plaintiff's employment was in the U.S. because he rehearsed for at least two months before Dr. Shore made his unfavorable medical determination in March 2018.

Defendant claims, on the other hand, that Plaintiff is relying on an abundance of factual inaccuracies and that the underlying agreement was solely

---

[20]    The fact that Plaintiff lived in Defendant's housing facilities is undisputed.

between MCO and Plaintiff.  Defendant contends that nothing in the agreement states that Defendant set Plaintiff's compensation rates or his rehearsal schedule, and that MCO – not Defendant – paid Plaintiff for his rehearsal time in the U.S. Defendant also pushes back against the assertion that Plaintiff worked as an employee during his rehearsals because the agreement only states that Defendant "may" treat cast members as employees.  Indeed, Defendant states that it is only after a cast member "joins" a vessel in international waters that they can begin their work as an employee of Royal Caribbean.  Because Plaintiff never made it that far, Defendant concludes that there is no evidence that Plaintiff ever worked for Defendant in the U.S., that the location of Plaintiff's employment is on the high seas, and that his ADA claim fails because it intrudes on the internal affairs of a vessel.

In applying the primary workstation test, we cannot determine the location of Plaintiff's employment because there are too many issues of fact on whether Plaintiff worked in the U.S.  Plaintiff points to evidence that he was Defendant's employee for two months on U.S. soil and Defendant argues that Plaintiff never worked for the company because he failed to join a vessel in international waters. These facts are unlike every other case that the Court has reviewed because it is unclear as to whether Plaintiff "worked" in the U.S. and whether he "worked" as Defendant's employee. *Cf. Pfeiffer,* 755 F.2d at 556 (plaintiff worked "continuously" overseas); *Wolf,* 617 F. Supp. at 858 ("[N]inety percent of plaintiff's time was spent abroad"); *Gantchar, et al. v. United Airlines, Inc.,* 1995 WL 137053, at *10 (N.D. Ill.

34

March 24, 1995) (finding that approximately eighty percent of the plaintiff's work time spent abroad).

The test itself is also problematic because it is unclear how courts define whether a plaintiff "worked" if a plaintiff never made it onboard a foreign-flag vessel. There are also lingering questions as to whether it matters if a plaintiff "worked" in conjunction with a third-party, and whether the time spent "working" on U.S. soil should outweigh a future working relationship abroad that never materializes. In addition, the test is unhelpful to our set of facts because, as the court in *Torrico* identified, the cases applying the primary workstation test have generally involved plaintiffs with "employment in the United States [that] was never contemplated." *Torrico*, 213 F. Supp. 2d at 401 (citing cases). The primary workstation cases are distinguishable for another reason because they never contemplated a plaintiff "having first worked in the United States," nor did they address situations where employment overseas was intended to be temporary (in our case only fourteen weeks). *Id*. For these reasons, we reject the primary workstation test as unworkable here because it provides little to no guidance on how to determine the location of Plaintiff's employment when the facts are in dispute and it is unclear whether Plaintiff ever began his employment with Royal Caribbean.

As for the center of gravity test, this has been applied much more frequently in recent cases because it includes a compressive list of factors to determine the location of a plaintiff's employment. *See, e.g.*, *Rabe v. United Airlines, Inc.*, 2009

35

WL 2498076, at *5–7 (N.D. Ill. Aug. 14, 2009), *rev'd on other grounds Rabe v. United Air Lines, Inc.*, 636 F.3d 866 (7th Cir. 2011) (adopting "more comprehensive" center of gravity test, after concluding that the primary work station test is "vague and overly simplistic," in particular given "the nature of our global economy with its mobile workforce"); *Bakeer v. Nippon Cargo Airlines, Co., Ltd.*, 2011 WL 3625103 at *31 (E.D.N.Y. 2011); *Gomez*, 510 F. Supp. 2d at 423 (criticizing "primary workstation" test as "vague and overly simplistic" and adopting the "more comprehensive" center of gravity test); *Rodriguez v. Filtertek, Inc.*, 518 F. Supp. 2d 845, 851 (W.D. Tex. 2007) ("The test assumes that an employee *has* a primary work station—an assumption that may be invalid given the nature of our global economy with its mobile workforce.  And the case law on the primary-work-station test provides scant guidance.").   These factors, as touched upon earlier, include the following:

> (1) [T]he site of the creation of the employment relationship including where the terms of employment were negotiated; (2) the intent of the parties concerning the location of the employment; (3) the locations of the reporting relationships for the position at issue; (4) the actual locations where the employee performed duties and received benefits as well as the relative amount of time the employee spent at each of these sites; and (5) the location of employee's domicile.

*Gomez,* 510 F. Supp. 2d at 423.

In applying this test, the first factor favors Plaintiff because, although Defendant claims that the cast members were to be hired and paid by Royal Caribbean only after they joined the vessel, the employment relationship was created in Florida when Defendant gave Plaintiff a conditional job offer.  The terms

of the relationship are also tied to the U.S. because – as Defendant concedes in its statement of disputed facts – it "required that MCO add an addendum to the Independent Contractor Agreement with the Opera on the High Seas cast clarifying the duties of the performers and the on-bard regulations 'once [the cast was] on board.'" [D.E. 113 at ¶ 54].  While Defendant maintains that Plaintiff was not officially hired until he joined the vessel, Defendant cannot sidestep the fact that the terms of the employment relationship were decided in the U.S.

The second and third factors are, in some respects neutral, because although the parties intended Plaintiff to be trained and to attend rehearsals in the U.S., they also anticipated Plaintiff to be an opera singer in international waters and to report to a vessel owner while on the high seas.  The fourth factor, however, weighs strongly in Plaintiff's favor because the U.S. is the only location where he actually performed any duties and received benefits.  Defendant suggests that this factor is less relevant because the duties Plaintiff performed were not as an employee of Royal Caribbean and the benefits he received were from MCO.  But, even if we assume that to be true, the fourth factor still weighs in Plaintiff's favor because the work Plaintiff performed was a necessary prerequisite to joining Defendant's vessel on the high seas.  It is also undisputed that Plaintiff rehearsed for two months and that he received payment as compensation for his services.

Finally, the fifth factor weighs in Plaintiff's favor because the U.S. is the location of Plaintiff's domicile.  The voyage that Plaintiff would have embarked upon was only fourteen weeks long and there is no evidence that Plaintiff, as a

Wisconsin resident, had any intent to be domiciled elsewhere after he completed his job duties. Therefore, under the center of gravity test, at least three of the five factors dictate that the location of Plaintiff's employment was domestic-based as opposed to a matter concerning a foreign vessel.

This conclusion is further supported with the limited reach of Plaintiff's allegations that only take issue with Defendant's employment practices on U.S. soil. For example, Defendant gave Plaintiff a conditional job offer, reviewed his medical filed, and then rescinded that job offer all before Plaintiff ever stepped foot on a foreign vessel. Defendant's position is further weakened because Defendant failed to direct the Court to a single case where allegations of unlawful conduct occurred solely in the U.S., where a plaintiff performed any related job duties in the same location, and where a court still found that a plaintiff's complaint intrudes on the internal affairs of a seagoing vessel.[21] This is not to say that a similar case will reach the same result, especially if a future plaintiff actually works in some capacity on a foreign vessel and then sues under the ADA. But, given the facts of this case where every relevant fact took place in the U.S. – as opposed to a future employment relationship on the high seas – Defendant has failed to show that the denial of Plaintiff's employment categorically "interfere[s] with matters that

---

[21] If Plaintiff was barred from bringing this claim, it is difficult to envision how any U.S. applicant could ever avail himself of the ADA with a foreign-flag vessel operating in U.S. waters. As such, Plaintiff's concern that Defendant's position, if adopted, would mirror the Fifth Circuit's now-reversed decision is well taken. *See Spector*, 545 U.S. at 130 ("This Court has long held that general statutes are presumed to apply to conduct that takes place aboard a foreign-flag vessel in United States territory if the interests of the United States or its citizens, rather than interests internal to the ship, are at stake.").

concern only the ship's internal operations." *Spector*, 545 U.S. at 121. Accordingly, we hold that the ADA is not foreclosed as a matter of law from applying to the facts of this case (which we construe in the light most favorable to Plaintiff).

### 4. *Extraterritorial Application and the Foreign Law Exception*

Having determined that Title I of the ADA could apply here, there is no need to consider the extraterritorial application of the statute because the conduct that Plaintiff alleges only took place in the U.S. However, one argument that Defendant raises that could preclude an entry of summary judgment, as to the application of the ADA, is the foreign law exception. This exception provides that it is not unlawful for an entity to act in compliance with the laws of a foreign country if doing so conflicts with parts of the ADA:

> It shall not be unlawful under this section for a covered entity to take any action that constitutes discrimination under this section with respect to an employee in a workplace in a foreign country if compliance with this section would cause such covered entity to violate the law of the foreign country in which such workplace is located.

42 U.S.C. § 12112(c)(1).

Plaintiff contends that the foreign law exception does not apply and directs the Court's attention to the expert opinions of Nicholas Valenzia ("Mr. Valenzia ") and Dr. Veronique Dalli ("Dr. Dalli"). These experts opine that Malta has its own anti-discrimination law – the Equal Treatment Regulations – that safeguards the employment rights of people with disabilities and that the ADA is "entirely consistent with Maltese law." [D.E. 98 at 20]. The experts also state that Defendant incorrectly applied the ILO guidelines and, in any event, mistook the

ILO guidelines as the only applicable law of Malta. Indeed, Dr. Dalli and Mr. Valenzia pronounce that the ILO guidelines are not meant "to replace in any way the judgment or experience of the medical practitioner;" rather, they are meant only as "a tool to assist in the conduct of examination of seafarers."[22] [D.E. 92 at ¶ 119]. For these reasons, the experts conclude that, under Maltese law, Plaintiff was fit to perform onboard a vessel and that there was no conflict with the ADA.

Although Defendant failed to submit any expert opinions on whether compliance with Maltese law violates the ADA, Defendant takes issue with Plaintiff's experts because they rely on legal conclusions that are improper for consideration on a motion for summary judgment.[23] Defendant also contends that – even if these opinions could be considered – summary judgment in favor of the ADA's application would be improper because the question of whether there is a conflict of law involves factual matters that are best reserved for a jury. Defendant suggests, for example, that there are factual disputes as to (1) whether Plaintiff's medical history includes persistent and reoccurring symptoms, and (2) whether there is a likelihood of Plaintiff's depression resurfacing. Defendant argues that these are not questions of law and that the parties are in agreement on most of the statutory language under Maltese law. A dispute only arises on how Maltese law is

---

[22]    Dr. Shore agreed, in part with this assessment, because he also stated that the ILO guidelines involve a matter of discretion. [D.E. 92 at ¶ 120] ("They're guidelines, and we adhere to them as closely as we can. And there's a bit of discretion to be used, unlike a policy or law, so I consider these to be guidelines.").

[23]    For the reasons stated in the Court's Order on Defendant's motion in limine, Plaintiff's experts meet the requirements under *Daubert* to testify on matters related to Maltese law. We need not repeat that analysis here.

applied. So, because that determination involves the weighing of evidence, Defendant concludes that there are genuine issues of material fact that preclude the application of the ADA.

Defendant's argument has several noticeable shortcomings. The most glaring is Defendant's hesitation that a conflict even exists between the ADA and the laws of Malta. Indeed, Defendant only speculates on the *possibility* of a conflict as it never takes a firm position one way or another. [D.E. 93 at 13] ("Requiring a foreign-flag vessel to comply with Title I of the ADA with respect to its hiring and handling of crewmembers could therefore result in forcing the vessel to violate the very laws that bind it."). This is insufficient for Defendant to avail itself of the "foreign law" exception because "an inference based on speculation and conjecture is not reasonable." *Hammett v. Paulding Cty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) (citation and internal quotation marks omitted). Nor is mere speculation sufficient to create a genuine issue of material fact. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact.") (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")).

Defendant's argument is also unavailing because, "[u]nder general principles of statutory construction, '[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the

exception.'" *Rogers v. Windmill Pointe Vill. Club Ass'n, Inc.*, 967 F.2d 525, 527 (11th Cir. 1992) (quoting *U.S. v. Columbus Country Club,* 915 F.2d 877, 882 (3rd Cir. 1990)).    Defendant has not met this burden because it merely raises unsupported inferences on whether the ADA complies with Maltese law.  Defendant claims, for example, that there are several factual questions that only a jury can decide, but Defendant then fails to point to a single provision of Maltese law to support that a conflict even exists.   To put it differently, Defendant makes an analytical misstep because it assumes that there are factual questions on the application of Maltese law that preclude summary judgment without first laying the predicate that a conflict even exists.

Making matters worse, Defendant never relies on a single piece of expert testimony on how to interpret and apply Maltese law.[24]  Defendant merely suggests that it adopts the legal principles in Plaintiff's expert report but then disavows how those experts applied them.  This sort of legal gymnastics is entirely unhelpful because it leaves the Court with little to determine if a conflict of law exists and how to then apply the legal principles of a foreign state.  *See, e.g.*, *Beaman v. Maco Caribe, Inc.*, 790 F. Supp. 2d 1371, 1380 (S.D. Fla. 2011) ("Though federal courts routinely apply foreign law . . . the Court would likely have to rely on expert

---

[24]    The propriety of presenting an expert on foreign law is specifically recognized in the Federal Rules of Evidence:

> In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law.

Fed. R. Civ. P. 44.1.

testimony and evidence concerning the substance of Mexican law.") (citations omitted).

Defendant also fails to reference a case where a court has allowed a party to raise a genuine issue of material fact as to the interpretation and application of foreign law with speculation, guesswork, and the absence of any competing expert testimony. *See, e.g., Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 153 F.3d 82, 92 (2d Cir. 1998) (noting that district courts must focus on "the persuasive force of the opinions [foreign law experts have] expressed" when resolving questions of foreign law); *see also United States v. McNab,* 331 F.3d 1228, 1234 (11th Cir. 2003), *as amended* (May 29, 2003) (affirming decision of district court which required foreign law determination where district court was "[p]ersuaded by the testimony of [the government's expert and] found that the government met its burden of establishing the validity of the Honduran laws that served as the predicate for the Lacey Act charges"). [25]  We therefore fail to see, given the unique question presented, how we can determine that there is a conflict of law between the ADA and Malta, and then determine whether Plaintiff's experts misapplied that analysis without any competing expert evidence. *Dixieben Co. v. Falkenburg,* 737 F. Supp. 1542, 1547 (N.D. Ala. 1990), *aff'd,* 974 F.2d 1348 (11th Cir. 1992) (citing *Curtis v. Beatrice Foods Co.,* 481 F. Supp. 1275 (S.D.N.Y. 1980)).

---

[25]    The fact that *McNab* was a criminal case is of no consequence, as foreign law determinations are governed by the same standards in both civil and criminal proceedings. *Compare* Fed. R. Cr. P. 26.1, *with* Fed. R. Civ. P. 44.1.

Accordingly, Plaintiff's motion for summary judgment, as to the application of the ADA and the applicability of the foreign law exception, is **GRANTED** and Defendant's motion is **DENIED** because the location of Plaintiff's employment occurred primarily in the U.S. and every relevant fact took place away from a foreign vessel.

### D.   <u>*Whether Plaintiff is Entitled to Judgment on Liability*</u>

The next question raised in Plaintiff's motion for summary judgment is whether he is effectively entitled to judgment as a matter of law on Defendant's liability for ADA discrimination.  The ADA forbids covered entities from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the *hiring*, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis added).[26]  "To establish a prima facie case, a plaintiff may show that (1) he was disabled, (2) he was qualified to perform the job, and (3) he was subjected to an adverse employment action because of his disability."  *Ward*, 580 F. App'x at 740 (citing *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)).   Plaintiff argues that each element has been satisfied as a matter of law. But before we consider the merits of whether Plaintiff has met his ultimate burden, we must address several questions that will inform the Court's analysis.

---

[26]   "Discrimination" includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless doing so would impose "undue hardship" on the employer.  42 U.S.C. § 12112(b)(5)(A).

### 1. *Whether this Case Involves Direct or Circumstantial Evidence*

The first question is whether this case involves direct or circumstantial evidence.  To establish a case of intentional discrimination in violation of the ADA, a plaintiff may rely on direct or circumstantial evidence, and the type of evidence before the court affects the allocation of evidentiary burdens:

> First, if direct evidence of discrimination exists, the familiar framework of establishing a *prima facie* case based on circumstantial evidence and the alternating burdens of proof established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) do not apply . . . Moreover, when a case for discrimination is proved by direct evidence, it is incorrect to rely on a *McDonnell Douglas* form of rebuttal.

*Loperena v. Scott,* 2009 WL 1066253, *9 (M.D. Fla. April 21, 2009).

In a direct evidence case, an unlawful motive has been deemed a determinative factor in an employment decision, and the burden is then on the defendant to prove by a preponderance of the evidence that the same decision would have been reached even absent the discriminatory motive.  *See id.*; *see also Farley v. Nationwide Mut. Ins., Co.,* 197 F.3d 1322, 1335 (11th Cir. 1999).  Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987) (citation, emphasis and brackets omitted).

However, evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.,* 907 F.2d 1077, 1081–82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence.  In other words,

direct evidence is evidence that, if believed by the trier of fact, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1283 (11th Cir. 2000) (quoting *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998)).

Generally, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitutes direct evidence of discrimination. *See Rojas v. Florida,* 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999) (citations and quotations omitted)). "For example, in an ADA case, a decisionmaker's blanket statement that people with a certain disability are not competent to perform a particular job would amount to direct evidence of discrimination." *Bennett v. Brookdale Senior Living, Inc.*, 2011 WL 13285770, at *7 (N.D. Ala. Sept. 14, 2011) (citing *Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995) ("[A] statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence [of discriminatory intent].")).

"Where the plaintiff is able to prove by direct evidence that the employer acted with a discriminatory motive, in order to prevail the employer must prove, by a preponderance of the evidence, that the same decision would have been reached even absent that motive." *Beatty v. Hudco Indus. Prod., Inc.*, 881 F. Supp. 2d 1344, 1352 (N.D. Ala. 2012) (citing *Haynes v. W.C. Caye & Co.,* 52 F.3d 928, 931 (11th Cir.

1995); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 875–76 (11th Cir. 1985)).  Because of the high burden of proof placed on an employer in a direct evidence case, "a finding that direct evidence of discrimination exists, standing alone, is normally sufficient to defeat a motion for summary judgment." *Loperena,* 2009 WL 1066253, *9.

On the other hand, in a case where the evidence relied upon is only circumstantial, courts apply Title VII's burden-shifting analysis, which requires the plaintiff to prove a *prima facie* case of disability discrimination by a preponderance of the evidence.  *McDonnell Douglas,* 411 U.S. at 802–803.  To establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must show that, at the time of the adverse employment action, that he had a disability, that he was a qualified individual, and that he was subjected to unlawful discrimination because of his disability.  *See Ward v. United Parcel Serv.*, 580 F. App'x 735, 740 (11th Cir. 2014).  Once the employee's *prima facie* burden is established, the employer's "burden on rebuttal is to produce a legitimate, nondiscriminatory reason for the challenged employment decision . . . [t]his burden is merely one of production, not persuasion, and is exceedingly light." *Quick v. Tripp, Scott, Conklin and Smith, PA,* 43 F. Supp. 2d 1357, 1364 (S.D. Fla. 1999).

"If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment

decision'." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997)). If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment. *See id.* at 1024–25.[27]

Here, Plaintiff argues that this is a direct evidence case because Dr. Shore informed Plaintiff, in a written email, that Defendant's "medical team . . . assessed [Plaintiff's] persistent and recurrent conditions involving [m]ajor [d]epression and associated complications," and that "[u]nder the applicable ILO Guidelines, the Company cannot medically clear [Plaintiff] for shipboard duty." [D.E. 89-37]. Dr. Shore also testified in his deposition that Plaintiff's employment offer was withdrawn for the same reasons:

> My answer is very simple.  That it doesn't matter whether it is likely or not.  One only needs to try to commit suicide on a cruise ship one time, and the preponderance of the act being successful is very much against favor of the individual. . . . In simpler words, it doesn't matter whether it's a likely or unlikely event.  You only need to try once, and if you're successful we have a tragedy on our hands.

[D.E. 89-12 at 203:3-12].

Plaintiff takes this statement – in connection with Dr. Shore's deposition testimony of Plaintiff's prior suicide attempt – as proof that this is direct evidence of disability discrimination.  While Plaintiff suggests that the reasons for Defendant's refusal to hire Plaintiff are clear, there is more than one potential motive for the

---

[27]   Plaintiffs often proceed with the use of circumstantial evidence because direct proof of discrimination is generally uncommon.  *See Combs,* 106 F.3d at 1537.

action that Dr. Shore took.  Thus, Plaintiff draws an errant conclusion that this constitutes a direct evidence case because, for this to be a direct evidence case, there must be "blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).  That element is arguable in this case because there is evidence that the underlying motive for Dr. Shore's decision was to merely comply with the ILO guidelines and that he had no choice but to deny revoke Plaintiff's job offer and to state the reasons for that decision.  He further considered the fact that employment on the vessel would present a serious danger to Plaintiff.  And as he testified, his motive was not discrimination but instead the exercise of reasonable care on the part of the vessel to protect its employees.  This case therefore arguably lacks direct evidence because Dr. Shore's communications do not prove "the existence of [the] fact in issue without inference or presumption." *Burrell v. Board of Trustees of Georgia Military College,* 125 F.3d 1390, 1393 (11th Cir. 1997).

This is even clearer when examining Eleventh Circuit precedent that "has marked severe limits of the kind of language to be treated as direct evidence," and in every context there has been no other intent that could be presumed.  *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998).  One of the most common areas where direct evidence arises is in age discrimination cases where statements – such as "[I don't] want to hire any old pilots," *Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008), "[f]ire Early-he is too old," *Earley,* 907 F.2d at 1081, or "when the position open[s]

up, the company [will] be looking for a person younger than Lindsey to fill it," *Lindsey v. Am. Cast Iron Pipe Co.,* 772 F.2d 799, 801–02 (11th Cir. 1985) – meet this high threshold.

Although this is an ADA case, the Age Discrimination in Employment Act "is the ADA's counterpart with respect to age," and these examples inform how blatant the discriminatory animus must be to rise to the level of direct evidence. *Walls v. Lowe's Home Centers, LLC*, 789 F. App'x 852, 854 (11th Cir. 2019) (citing 29 U.S.C. § 623(a)(1)). A similar showing in this case would have to occur where Dr. Shore states, for example, that Defendant should "fire Plaintiff because he is too mental." Or alternatively that he should not be hired because he is "mentally disabled." Yet, no statement comes close to that remark and Defendant has not conceded that it intended to discriminate against Plaintiff for his mental disability. Absent such evidence, Plaintiff must still establish a *prima facie* case of disability discrimination under *McDonnell Douglas.*[28]

### 2. *The Prima Facie ADA Case*

The second question is the role of direct evidence and circumstantial evidence on a *prima facie* ADA claim. "[D]irect evidence is relevant solely to a plaintiff's ability to satisfy the fourth element of his claim—that the defendant took the adverse employment action with discriminatory intent." *Leme v. S. Baptist Hosp. of Fla., Inc.*, 248 F. Supp. 3d 1319, 1338 (M.D. Fla. 2017). A plaintiff must still

---

[28]   We also note that "language not amounting to direct evidence," is not useless in the *McDonnell Douglas* framework because it "may be significant evidence of pretext once a plaintiff has set out a *prima facie* case." *Jones,* 151 F.3d 1321, 1323 n.11.

establish that he has a disability, that he is a qualified individual, and that defendant took an adverse employment action against him. This is generally a source of confusion for many parties because the *prima facie* elements of an ADA claim are the *same* as the elements under *McDonnell Douglas*.

However, the elements serve different roles depending on whether a case sets forth direct evidence. If a plaintiff meets the *prima facie* elements and sets forth direct evidence of discrimination, that means that the case is strong enough to go to a jury. This is in contrast to a case where a plaintiff meets the same elements with only circumstantial evidence. In that circumstance, a case only establishes a rebuttable presumption. The term "*prima facie* case" therefore has two meanings. On one hand, "it refers to the quantum of evidence needed to create a jury question" or "a case strong enough to go to a jury." *Wright,* 187 F.3d at 1292. On the other hand, in the *McDonnell Douglas* context, "the term relates to a step in the analytical framework and means the "establishment of the facts required to establish the *McDonnell Douglas* presumption." *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1153 n.7 (11th Cir. 2005). As the Eleventh Circuit has explained:

> This point has been the source of some confusion, because the quantum of evidence needed to create a jury question under the traditional framework and the establishment of the facts required to establish the *McDonnell Douglas* presumption are both known as the "prima facie case." The phrase "prima facie case," however, has a meaning under the traditional framework very different from its meaning under *McDonnell Douglas*—in the former case it means a case strong enough to go to a jury, in the latter case it means the establishment of a rebuttable presumption.

*Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999) (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254 n.7 (1981)).  Thus, regardless of whether a plaintiff presents direct evidence or relies on *McDonnell Douglas*, the plaintiff "always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected characteristic." *Wright*, 187 F.3d at 1292.

An example of a case that establishes this point is in *Galloway v. Aletheia House*, 509 F. App'x 912 (11th Cir. 2013).  There, the Eleventh Circuit affirmed a district court's order granting summary judgment to an employer, despite the plaintiff's purported presentation of direct evidence.  *See id.* at 913.  The Court found that even "[a]ssuming arguendo that [the plaintiff] presented direct evidence of discrimination, he nonetheless failed to present evidence to establish an essential element of his case: that he was a qualified individual under the ADA." *Id.* at 913-14.  The Court reasoned that, "[s]ummary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an essential element of its case, and on which it bears the burden of proof at trial." *Id.* at 913.  The same is true in *Tetteh v. Waff Television*, 638 F. App'x 986, 988–89 (11th Cir. 2016), where the Eleventh Circuit affirmed a district court's order that declined to determine whether the plaintiff had presented direct evidence because the plaintiff failed to establish that she was qualified.  *See Tetteh*, 2015 WL 1419043

at *7 n.8.  Because of this deficiency, summary judgment in favor of the employer was proper. [29]  *See Tetteh*, 638 F. App'x at 988–89.

Clearing up this confusion is essential to understanding the framework that follows because, as a case where there is only circumstantial evidence, Plaintiff must set forth sufficient evidence to establish a rebuttable presumption of discrimination.  If Plaintiff establishes a *prima facie* case then the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason for the adverse action.   If Defendant meets that burden, the presumption of intentional discrimination disappears.  But, of course, Plaintiff can still reach the jury if he can show that Defendant's explanation is pretextual.[30]

### 3. *Disparate Treatment and Disparate Impact*

A third question is whether Plaintiff is proceeding under a theory of disparate treatment or disparate impact because both "are cognizable under the ADA." *Raytheon Co. v. Hernandez,* 540 U.S. 44, 53 (2003); *see also Schwarz v.*

---

[29]   The Eleventh Circuit did the same in *Jordan v. City of Union City, Ga.*, 646 F. App'x 736, 739 (11th Cir. 2016), where the Court affirmed a district court's order granting summary judgment to an employer due to the plaintiff's failure to establish that he was a qualified individual, despite the presence of direct evidence.

[30]   While a plaintiff may prove a case with direct or circumstantial evidence, the Eleventh Circuit has cautioned that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff also may defeat a summary judgment motion by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (quotation marks omitted).  We need not explore this alternative option because, for the reasons stated below, Plaintiff has presented sufficient evidence to present his case to the jury under *McDonnell Douglas*.

*City of Treasure Island,* 544 F.3d 1201, 1209 (11th Cir. 2008) (noting three distinct theories of disability discrimination: disparate treatment, disparate impact, and a failure to reasonably accommodate).  The Supreme Court has instructed courts to carefully distinguish between disparate treatment and disparate impact theories because "'the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes.'" *Raytheon,* 540 U.S. at 53 (quoting *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 252 n.5 (1981)).

"[T]he central difference between disparate treatment and disparate impact claims is that disparate treatment requires a showing of discriminatory intent and disparate impact does not." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1278 (11th Cir. 2000) (citing *In re Employment Discrimination Litig. Against State of Ala.*, 198 F.3d 1305, 1310 n.8 (11th Cir. 1999)).  The Supreme Court created the theory of a disparate impact claim to redress facially neutral policies or practices that have a disproportionate effect on groups protected under Title VII.  *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) ("Under the act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."); *Lanning v. Southeastern Pennsylvania Transp. Auth.,* 181 F.3d 478, 485 (3rd Cir. 1999) (finding that "plaintiffs establish a prima facie case of disparate impact by demonstrating that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern").

On the other hand, a disparate treatment claim "is the most easily understood type of discrimination." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). This occurs where an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Id*. Unlike a disparate impact claim, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id*. (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

Although Plaintiff never clarifies in his motion or response on the type of theory he is proceeding under, this is clearly a disparate treatment case as there is no neutral policy that Plaintiff complains of that had a disproportionate effect on people with his medical history. Instead, Plaintiff alleges that Defendant treated him less favorably because of his history of depression and his prior suicide attempt. Therefore, this is a circumstantial evidence case proceeding under a theory of disparate treatment and therefore requires Plaintiff to demonstrate intentional disability discrimination to succeed on his claim. *See Raytheon,* 540 U.S. at 52 ("Liability in a disparate-treatment case depends on whether the protected trait . . . actually motivated the employer's decision." (internal quotation omitted)). With these principles in mind, we can now turn to question of whether Plaintiff has met his burden of establishing a *prima facie* ADA claim.

### E.   *McDonnell Douglas Burden-Shifting*

#### 1. *Whether Plaintiff is Disabled*

To establish the first element of a *prima facie* ADA claim, Plaintiff must show that he is disabled.  A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1).  The terms "substantially limits" mean "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. §§ 1630.2(j)(1)(i),(ii).  Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i) (1997).

An impairment meets the first definition if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  "Substantially limits" is interpreted "broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."  *Id*. § 1630.2(j)(1)(i).  The Act also includes a non-exclusive list of "major life activities," including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). To determine whether an impairment substantially limits a major life activity, courts compare a plaintiff's ability to perform an activity "to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). To determine whether an impairment substantially limits a major life activity, courts consider: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." The functional limitation required for a disability is lower than that required by courts prior to the passage of the ADA Amendments Act in 2009, and it usually does not require the consideration of medical or statistical evidence. *See id.* § 1630.2(j)(1)(iv)-(v).

For the second definition, a plaintiff "has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). The Act considers a person "to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment." *Id.* § 1630.2(k)(2). The Act protects an individual who has a record of past disability, even if that individual is no longer disabled. *See* 29 C.F.R. pt. 1630 app. § 1630.2(k). A plaintiff can support his or her *prima facie* case with several types of records, "including but not limited

to, education, medical, or employment records." *Id.*

A plaintiff can meet the third definition of "disability" if "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). This definition does not apply "to impairments that are transitory and minor." *Id.* § 12102(3)(B). The third definition of "disability" is grounded on "Congress's understanding that unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities are often just as disabling as actual impairments, and [its] corresponding desire to prohibit discrimination founded on such perceptions." 29 C.F.R. pt. 1630 app. § 1630.2(l) (2015) (citations and internal quotation marks omitted).

Plaintiff argues that he meets every disability definition described above. But, the third definition is the most appropriate because – despite Plaintiff's history of depression and a prior suicide attempt – this entire case is premised on his belief that he was fit for duty at sea and Defendant misapplied the law in evaluating his medical background with the decision to revoke his offer of employment. A plaintiff is "regarded as" being disabled if he meets one of three conditions:

> (1) he has a physical impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or (3) has no physical or mental impairment but is treated by an employer as having such an impairment.

58

*Rossbach v. City of Miami*, 371 F.3d 1354, 1359–60 (11th Cir. 2004) (citing 29 C.F.R. § 1614.203(a)(5)).  To prevail under this theory, a plaintiff must show two things[31]: "(1) that the perceived disability involves a major life activity; and (2) that the perceived disability is 'substantially limiting' and significant." *Rossbach*, 371 F.3d at 1360 (citing *Sutton v. Lader,* 185 F.3d 1203, 1209 (11th Cir. 1999)); *see also Cox v. City of Tampa*, 418 F. App'x 845, 846 (11th Cir. 2011) "'[A] person is regarded as disabled within the meaning of the [Americans with Disabilities Act] if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities, to the extent that the person is precluded from more than one type of job.") (internal quotation marks omitted).

Plaintiff meets the third disability definition because the reason Defendant withdrew Plaintiff's employment offer was because there was a risk that Plaintiff might take his own life.  *See, e.g.*, *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1181 (11th Cir. 2019) (finding that a plaintiff satisfied the third disability definition because the employer's "own stated reason for putting [the plaintiff] on leave—that it feared for [the plaintiff's] safety in view of [the plaintiff's] heart condition—demonstrates the [employer's] belief that [the plaintiff's] medical condition set her apart from other police officers.").  Dr. Shore determined, for example, that Plaintiff was unfit for sea duty because Plaintiff suffered from "severe anxiety," "depression," a "mental disorder likely to impair performance," and a

---

[31]    "The mere fact that an employer is aware of an impairment is insufficient to show that an employer regarded the employee as disabled or that the perception caused an adverse employment action." *Jenks v. Naples Cmty. Hosp., Inc.*, 829 F. Supp. 2d 1235, 1254 (M.D. Fla. 2011) (citing *Schwertfager v. City of Boynton Beach,* 42 F. Supp. 2d 1347, 1361 (S.D. Fla. 1999)).

medical background that included "persistent or recurrent symptoms." [D.E. 89-12]. In fact, Dr. Shore suggested that a person who takes a serious step towards ending his or her own life is so debilitating that the person is unsafe to put onboard a vessel:

> [I]f somebody has taken a serious step towards ending their life, I would have defined that as something that is an impairment of seriousness and severity enough that I wouldn't think that that person would be safe to put onboard.

[D.E. 89-12 at 185:18-23].

Defendant therefore perceived that Plaintiff possessed a disability that could end his own life and that this disability was so limiting that it justified the withdrawal of Plaintiff's employment offer.  Because this evidence meets the third disability definition and Defendant concedes that it applies, Plaintiff has produced sufficient evidence to meet the first element of his ADA claim.  [D.E. 112 at 20] ("RCCL does not contest that Schultz's recurrent major depression satisfies the definition of a 'disability' under the ADA, given the changes to the definition of 'disability' made by the ADA Amendments Act of 2008").

## 2. *Whether Plaintiff is a Qualified Individual*

To establish the second element of an ADA discrimination claim, a "plaintiff bears the burden of proving that [he] is a 'qualified individual with a disability'— that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of [his] job." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (quoting 42 U.S.C. § 12111(8)).  "Determining whether an individual is 'qualified' for a job is a two-step process." *Reed v. Heil Co.*, 206 F.3d 1055, 1062

(11th Cir. 2000).   First, the Court considers whether the plaintiff satisfies the position's prerequisites, including "sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job." *Id*.   Then, the Court analyzes whether the individual can perform the essential functions of the job. *Id*.

Whether a certain job function is essential is "evaluated on a case-by-case basis by examining a number of factors," *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000)), and not just a written job description.   ADA regulations provide, for example, a number of considerations including but not limited to:

> (1) the employer's judgment[32] as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the amount of time spent on the job performing the function, (4) the consequences of not requiring the incumbent to perform the function, (5) the terms of a collective bargaining agreement, (6) the work experience of past incumbents in the job; and (7) the current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).   A person who is not able to perform the essential functions of a job even with a reasonable accommodation is not a qualified individual and, therefore, not covered by the ADA.   *See Davis*, 205 F.3d at 1305.   Essential functions are defined as "the fundamental job duties of the employment position"

---

[32]   The first factor – the employer's judgment – is "'entitled to substantial weight in the calculus,'" though "[it] alone is not conclusive." *Lewis v. City of Union City*, 934 F.3d 1169, 1182 (11th Cir. 2019) (quoting *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007)).

but do not include "the marginal functions of the employment position." 29 C.F.R. § 1630.2(n)(1).

Here, Defendant argues that there is sufficient evidence – to at least raise a genuine issue of material fact on whether Plaintiff was a qualified individual – because Plaintiff's medical records show that he suffers from recent episodes of depression and that his performance, including his health, would have suffered as a result. Defendant claims, for instance, that there are medical records confirming that Plaintiff continues to suffer from severe bouts of depression and that Plaintiff copes with his medical conditions through the use of daily medication and psychotherapy. But, given that psychotherapy is unavailable on Defendant's vessels, Defendant concludes that there is evidence to conclude that Plaintiff was unqualified for duty at sea.

On the other hand, Plaintiff argues that there is sufficient evidence that he was qualified to be an opera singer and that one need look no further than the testimony of Ms. Bjorndal who worked as Defendant's Director of Entertainment. Ms. Bjorndal testified that Plaintiff "was a good guy, and that it was [Defendant's] loss that he didn't come on board," and that, Plaintiff "really was our star in this cast, and that he would do an absolutely outstanding performance." [SMF ¶84] Plaintiff also relies on the medical evaluation of Dr. Gerber who opined in his report that Plaintiff's conditions were in remission for many years and that Plaintiff had showed no signs of reoccurring illness for the past seven years. On the ADA Psych Questionnaire/Safety form, Dr. Gerber even confirmed that there was little or no

risk of harm to Schultz himself or others and the risk of active suicidal ideation was "quite low."  *Id*.  Thus, Plaintiff concludes that – despite Defendant's concerns – he was qualified under the ADA.

The parties' apparent agreement that a genuine question of material fact exists as to whether Plaintiff is disabled is consistent with our own review of the record.  Unlike most ADA cases, Defendant fails to specify an essential function that Plaintiff could not perform.  Defendant implies, however, that Plaintiff was susceptible to performing none of them because, if Plaintiff's depression and suicidal ideations had resurfaced, he was at risk of taking his own life.  At the same time, Plaintiff has also produced evidence, through his psychiatrist Dr. Gerber, that he was stable for seven years prior and that Defendant's concerns were unfounded:

> [Schultz] has remained stable and has shown no signs of recurring illness for the past 7 years . . . He is fully capable of managing with the work requirements of employment onboard ship.  Given his profession as a singer, he is used to changes in routine and schedules . . .  His condition is in remission and he has been functioning very well at home and at work with no restrictions.

[SMF ¶ 43].

Given this evidence, a jury could find that Plaintiff is a qualified individual depending on how it weighs the medical evidence in the record.  If, for example, a jury finds that Dr. Gerber's assessment was correct and that daily medication would have allowed Plaintiff to perform any necessary function of his duties as an opera singer then Plaintiff would be deemed a qualified individual under the ADA.  A jury could also conclude, consistent with Dr. Shore's opinion, that no accommodation could have been provided because of Plaintiff's history of depression and suicidal

tendencies.  Because there is sufficient evidence to raise a genuine issue of material fact on whether Plaintiff was qualified and the parties agree that this is an issue necessary for a jury to decide, Plaintiff has met the second element of his *prima facie* ADA claim.

### 3.  *Whether the Failure to Hire is an Adverse Employment Action*

Turning to the third prong of a *prima facie* ADA claim, we must now determine whether Plaintiff has suffered an adverse employment action as a result of Defendant's decision to withdraw his offer of employment.[33]   An adverse employment action is one that "impact[s] the 'terms, conditions, or privileges' of [a] plaintiff's job in a real and demonstrable way."  *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006).   Although proof of direct economic consequences is not required in all cases, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's

---

[33]   Many courts have confused the third prong of a *prima facie* ADA claim with a requirement that a plaintiff provide evidence that a defendant discriminated against him  "because of his disability."  *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017).  But, this is incorrect because "if a plaintiff has proved that he was discriminated against because of his disability, he has actually proved his entire case (and he is entitled to have judgment entered in his favor), not simply made a prima facie showing."  *Sheppard v. Peters*, 2009 WL 10702065, at *1 (N.D. Ga. May 26, 2009).   Instead, the third prong is premised on a showing that a plaintiff has suffered an adverse employment action.   Courts have misread the Eleventh Circuit's decisions on the third prong for more than two decades because, despite the way the Eleventh Circuit articulates the third prong, it has never applied it in the way the test is articulated.   "Instead, the Eleventh Circuit has simply required a plaintiff to present facts from which an inference of discrimination can be made (as is true in all other discrimination cases)."  *Id*. Therefore, while the language of the Eleventh Circuit suggests one thing, we will follow the practice of the Eleventh Circuit and merely require Plaintiff to show that an adverse employment action was taken.

employment." *Id.* That is, an employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it. *See Perryman v. West,* 949 F. Supp. 815, 819 (M.D. Ala. 1996); *see also Doe v. Dekalb County School Dist.,* 145 F.3d 1441, 1448–49 (11th Cir. 1998) (adopting an objective test to evaluate allegations of "adverse employment actions" for ADA claims and holding that "[a]n ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse.").

Here, Plaintiff has suffered an adverse employment action because, after Defendant's medical review, Defendant withdrew Mr. Schultz's employment offer. A reasonable person would perceive this withdrawal as an adverse employment action because it precludes future employment opportunities and performances onboard Defendant's vessels. *See Fortner v. State of Kansas,* 934 F. Supp. 1252, 1266 (D.Kan.1996), *aff'd, Fortner v. Rueger,* 122 F.3d 40 (10th Cir. 1997) (finding that a term or condition of employment may be said to have been affected if there is a "demonstrable adverse impact on future employment opportunities or performances."); *see also Unal v. Los Alamos Pub. Sch.,* 2015 WL 13260396, at *7 (D.N.M. Mar. 6, 2015), *aff'd,* 638 F. App'x 729 (10th Cir. 2016) ("[T]he withdrawal of Plaintiff's employment offer is an adverse employment action."). Because federal courts have adopted "a liberal reading of adverse employment activity," and the withdrawal of Plaintiff's employment offer ended any hope of working as an employee on a sea voyage for one of Defendant's vessels, Plaintiff has met all three

elements of a *prima facie* ADA claim. *Nelson v. Univ. of Maine Sys.*, 923 F. Supp. 275, 281 (D. Me. 1996).

### 4. *Whether Defendant has a Legitimate Non-Discriminatory Reason*

Having established that Plaintiff has met his initial burden of a *prima facie* ADA claim under *McDonnell Douglas*, the burden now shifts to Defendant to provide a legitimate non-discriminatory reason for the adverse employment action. The employer's burden, at this stage, is an "exceedingly light" one of production, not persuasion, which means the employer "need only produce evidence that could allow a rational fact finder to conclude that [the plaintiff's] discharge was not made for a discriminatory reason." *Standard*, 161 F.3d at 1331; *see also Meeks v. Comput. Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) ("[T]he defendant must merely proffer non-[discrimination] based reasons, not prove them.") (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992)).

Defendant has met this burden, for many of the reasons already stated because there is sufficient evidence that the reason Dr. Shore revoked Plaintiff's employment offer is because Plaintiff did not meet the ILO guidelines as a worker fit for duty at sea.   Plaintiff does not make a direct challenge to this argument – because Plaintiff assumed that this was a direct evidence case – but Plaintiff suggests that this reason is insufficient because Dr. Shore misapplied the ILO guidelines in determining whether Plaintiff could work onboard a seagoing vessel. This is unpersuasive because, even if Dr. Shore made a mistake and misapplied the ILO guidelines, that does not undermine the legitimacy of the reason given for the

adverse employment action.  Thus, Defendant has met its burden of establishing a legitimate nondiscriminatory reason for the revocation of Plaintiff's job offer.

### 5. *Whether Plaintiff Can Show Pretext*

Now that Defendant has met its burden of presenting a legitimate non-discriminatory reason for the adverse employment action, the burden shifts back to Plaintiff to "demonstrate that the reason given was a pretext for disability discrimination." *Ward v. United Parcel Serv.*, 580 F. App'x 735, 740 (11th Cir. 2014).  "The inquiry into pretext requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997)).

The Eleventh Circuit has referred to "pretext" as a "purpose or motive alleged . . . in order to cloak one's real intention." *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1184 (11th Cir. 2005).  In determining whether pretext exists, "[w]e are not interested in whether the [employer's] conclusion is a correct one, but whether it is an honest one.  Therefore, the question the factfinder must answer is whether [the employer's] proffered reasons were 'a coverup for a . . . discriminatory decision.'" *Rojas*, 285 F.3d at 1342 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 805); *see also Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a

phony reason for some action.'") (quoting *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995)).

Given the manner in which the issues have developed, Defendant did not formally move for judgment as a matter of law because Plaintiff could not meet that burden.   We thus need not dwell on it because we readily find that there is a sufficient jury question on whether Defendant's stated reason for withdrawing the employment offer was due to discriminatory animus, contrary to the ADA, as opposed to legitimate safety concerns over Plaintiff's ability to perform on the vessel.

### F.    *Whether Plaintiff is Entitled to a Trial Solely on Damages*

A final question, on Plaintiff's ADA claim, is whether Plaintiff is entitled to summary judgment on his ADA claim and what issues should be presented to a jury.   Plaintiff suggests that this case should be set for trial on all undecided issues, including damages.   Based on this contention, it is unclear as to what Plaintiff considers an "undecided issue," but Plaintiff is *not* entitled to only a jury trial on damages.   Instead, Plaintiff has only met his *prima facie* burden for establishing an ADA claim and that relates to the "quantum of evidence needed to create a jury question" or whether "a case [is] strong enough to go to a jury."   *Wright,* 187 F.3d at 1292.   It does not mean, however, that the only outstanding issue left to be determined is damages because there are genuine issues of material fact as to whether Defendant violated the ADA.   Plaintiff has merely established a *prima facie* case of disability discrimination to defeat Defendant's motion for summary

judgment and now it is the role of the jury to make the final determination as to whether a violation occurred. At this point, Plaintiff must meet his ultimate burden of showing "that, more probably than not, the employer took an adverse employment action against him on the basis of a protected characteristic." *Wright*, 187 F.3d at 1292.

On this score, we must also take into account the limitations of the *Spector* decision that Plaintiff has been banking on. The plurality opinion expressly holds that the ADA could apply to a Title III claim but only in so far as the statute is not interpreted to extend to interfere with the vessel's internal affairs. 545 U.S. at 137-38. The opinion itself described this as a permissible "application-by-application" approach to protecting the internal affairs limitation. And it constrained the internal affairs limitation as a "rule of interpretive caution." *Id*. at 138. As a result, it remanded the Fifth Circuit's blanket rejection of ADA coverage in favor of a particularized approach (criticized by the dissent as unreasonable and unworkable):

> If, on remand, it becomes clear that even after these limitations are taken into account Title III nonetheless imposes certain requirements that would interfere with the internal affairs of foreign ships . . . the clear statement rule would come into play. It is also open to the court on remand to consider application of the clear statement rule at the outset if, as a prudential matter, that appears to be the more appropriate course.

*Id*. at 142.

This aspect of the plurality's decision is essential to the holding that we are bound to follow. So what does this mean in a Title I case like ours? In the first place, the Court or trier of fact may have to take into account in painstaking detail

just how Plaintiff's job duties could be deemed to fall within exempted internal affairs of the operation of the vessel. Perhaps the type of vessel that Plaintiff could have been assigned to matters. And just how often entertainers in Plaintiff's position are tasked with non-entertainment tasks on the vessel also plays a part in the analysis. At the same time, the veracity and extent of the health and safety considerations that Defendant relies upon will also have to be considered. Though one could agree with Justice Scalia that such an undertaking is "delusional," the Court would still have to follow that directive, either directly or through fact-finding with the assistance of the jury. Either way, the record on summary judgment simply does not allow that analysis to be definitively rendered. The trial will be necessary for these task-by-task and section-by-section considerations to take place. And as a result, summary judgment on liability in Plaintiff's favor cannot possibly be entered. If we are to apply *Spector* here, as Plaintiff maintains, then Plaintiff will have to navigate through this time-consuming process before any finding of liability can be made.

Accordingly, Plaintiff's motion for summary judgment, as to his ADA claim, is **GRANTED** but only to the extent that the ADA could apply to this Plaintiff, that Defendant has failed to meet its burden of establishing that the foreign exception applies as a matter of law, and that Plaintiff has met his *prima facie* burden to present his ADA claim case to a jury. In doing so, Plaintiff will have to show that his proposed application of the ADA does not invade the vessel's internal affairs. In

all other respects, both parties' motions, in connection with Plaintiff's ADA claim,

are **DENIED**.

### G.      *Whether the FCRA Applies*

The final issue is whether the FCRA applies to the facts of this case.   The

FCRA provides in section 760.10 that:

> It is an unlawful employment practice for an employer: (a) to discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

Fla. Stat. § 760.10.  The FCRA defines an "employer" as "any person employing 15

or more employees for each working day in each of 20 or more calendar weeks in the

current or preceding calendar year, and any agent of such a person."[34]   *Id.* §

760.02(7).  When considering claims brought under the FCRA, Florida courts

generally look to decisions interpreting Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.* for guidance.   *See Harper v. Blockbuster Entm't Corp.,* 139

F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions

construing Title VII are applicable when considering claims under the Florida Civil

Rights Act, because the Florida act was patterned after Title VII."); *see also*

*Castleberry v. Edward M. Chadbourne, Inc.,* 810 So. 2d 1028, 1030 n.3 (Fla. 1st

DCA 2002) ("The Florida Civil Rights Act is patterned after Title VII, and therefore

---

[34]      "Person" is defined as "an individual, association, corporation, joint apprenticeship committee, joint-stock company, labor union, legal representative, mutual company, partnership, receiver, trust, trustee in bankruptcy, or unincorporated organization; any other legal or commercial entity; the state; or any governmental entity or agency."  Fla. Stat. § 760.02.

federal case law regarding Title VII is applicable."); *Carter v. Health Mgmt. Assocs.,* 989 So. 2d 1258, 1262 (Fla. 2nd DCA 2008) ("Florida courts follow federal case law when examining FCRA retaliation claims.").

Defendant argues that – absent a clear legislative expression to apply the FCRA extraterritorially – the FCRA cannot apply because Plaintiff, as a Wisconsin resident, sought a job on a foreign-flag vessel that was scheduled to operate outside the state of Florida. *See, e.g.*, *Southeastern Fisheries Ass'n, Inc. v. Dep't of Nat. Res.*, 453 So. 2d 1351, 1355 (Fla. 1984) ("Since there is no clear expression by the legislature that it is unlawful 'to set, lay, place or otherwise attempt to fish for saltwater finfish with any trap' outside the territorial waters of Florida, we find it would be improper to apply this statute to extra-territorial waters by implication and confront the federal government with its asserted validity.").

Defendant relies primarily on the text of the statute where it states, at several points, that the purpose of the FCRA is to only protect individuals "within the state":

> The general purposes of the Florida Civil Rights Act of 1992 are to secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

Fla. Stat. § 760.01(2).  Because the language and purpose of the FCRA dictate that the statute was never intended to apply to a Wisconsin resident seeking work on a

foreign-flag vessel operating in international waters, Defendant concludes that Plaintiff's FCRA claim cannot stand.

Defendant's argument is unpersuasive for several important reasons. To begin, there is nothing in Plaintiff's complaint [D.E. 46] to suggest that he seeks to apply the FRCRA extraterritorially. Plaintiff only complains that Defendant discriminated against him *in Florida* because this is where Defendant gave him his offer and later withdrew it. Defendant also contends that, as a non-Florida resident, Plaintiff cannot avail himself of the FCRA. But, this is also incorrect because a plaintiff need only show that a defendant "employs 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such a person." *Id.* § 760.02(7). "Nothing in the statute's plain language requires a showing that fifteen employees were employed in the state of Florida." *Sinclair v. De Jay Corp.*, 170 F.3d 1045, 1046 (11th Cir. 1999) (holding that the plain meaning of the FCRA includes employees outside of Florida but within the United States). In fact, the Eleventh Circuit has reasoned that the FCRA may even apply to foreign citizens based in Florida because the plain and unambiguous language of the FCRA "says nothing about where the employees must work." *Sinclair*, 170 F.3d at 1048.

Defendant then references an abundance of cases where federal courts have construed the scope of Title VII and demands that these inform the Court's interpretation of the FCRA. This argument is equally unavailing because, although "the FCRA was modeled after and employs nearly identical language to Title VII,"

73

"[t]he language employed by the Florida legislature is clear and unambiguous, and there is no geographical limitation on the face of the statute." *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F. Supp. 2d 1329, 1341 (S.D. Fla. 2003). "Moreover, the FCRA does not contain clauses similar to those in Title VII limiting its extraterritorial effect, nor is its meaning further articulated by an amendment history similar to that of Title VII." *Id.* Thus, the cases interpreting Title VII and other federal statutes are less relevant because the FCRA is as unambiguous statute. And as the Florida Supreme Court has long held, "when the language of a statute is unambiguous and conveys a clear and ordinary meaning, there is no need to resort to other rules of statutory construction," because "the plain language of the statute must be given effect." *Starr Tyme, Inc. v. Cohen,* 659 So. 2d 1064, 1067 (Fla. 1995).

Defendant also relies, as support, on the Third District's decision in *Young*, 138 So. 3d at 1192. In that case, the plaintiffs entered into a bargaining agreement with Royal Caribbean and it required them to arbitrate any wage and hour claims. To avoid the arbitration provision, the plaintiffs filed a class action against their union for a declaratory judgment, seeking a declaration under Florida law that the union did not have the authority to represent the plaintiffs and that the collective bargaining agreement was invalid. The Third District affirmed the lower court, for similar reasons presented in *McCulloch*, *Benz*, and *Lobo* – because absent a clear statement from the Florida Legislature – labor disputes between foreign vessels and foreign crews concern the internal affairs of a vessel. This case is distinguishable for the same reasons already discussed, with respect to Plaintiff's ADA claim,

74

because Plaintiff is neither a foreign national nor did he ever become an employee onboard a vessel operating in international waters; instead he complains of Defendant's pre-employment process that was conducted solely on U.S. soil.  For these reasons, *Young* is not compelling and each argument presented, in opposition to the FRCA applying to the facts of this case, is meritless.

Alternatively, Defendant claims that any extraterritorial application of the FCRA would be unconstitutional because it would violate the dormant Commerce Clause of the U.S. Constitution.  There are several ways a state or local law may violate the dormant Commerce Clause.   A state or local law may discriminate, for example, by restricting market participation or curtailing the movement of articles of interstate commerce based on whether a market participant or article of commerce is in-state versus out-of-state, or local versus non-local.[35]  *See, e.g., Fulton Corp. v. Faulkner,* 516 U.S. 325, 333 (1996).   A state or local law may also discriminate by conditioning participation in an interstate market on the in-state or local processing of goods.  That is, a state or local government may not require a diversion of resources of an interstate market into the local market to serve local interests.  *See, e.g., C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994).

Significantly, a discriminatory law is no less discriminatory because it

---

[35]   The Supreme Court's dormant Commerce Clause decisions establish the types of state or local laws that not discriminatory.   "A state or local law is not discriminatory where it (1) has incidental negative effects on some (but not all) out-of-state market participants and (2) does not reduce or curtail access to interstate markets."  *Florida Transp. Servs., Inc. v. Miami-Dade Cty.*, 703 F.3d 1230, 1244 (11th Cir. 2012) (citing *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117 (1978)).

applies "alike to the people of all the States, including the people of the State enacting such statute." *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992) (internal quotation mark omitted); *accord Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 354 n.4 (1951) (explaining that local ordinance's subjecting non-local, in-state residents to same proscription as out-of-state residents is "immaterial" to dormant Commerce Clause analysis); *see Carbone,* 511 U.S. at 393–94 (invalidating local waste disposal ordinance that required both in-state and out-of-state waste disposal companies to use local processing facility). A state or local law may therefore impermissibly discriminate against interstate commerce even if a state or local law applies to all.

Without belaboring the point, Defendant's argument lacks merit because Plaintiff does not seek to apply the FCRA to a foreign-flag vessel nor does he complain of any treatment suffered in international waters. Plaintiff only seeks to apply the FCRA to conduct that occurred within the state of Florida. Defendant uses the same reasoning as it did, in relation to Plaintiff's ADA claim, in an attempt turn this case into one where Plaintiff's allegations target conduct onboard a seagoing vessel. But, those are not the facts of this case. And while there are cases suggesting that the FCRA applies extraterritorially, we need not answer that question because the statute – as it applies in this case – targets only conduct that took place in Florida. *See, e.g.*, *Mousa*, 258 F. Supp. 2d at 1341 ("[T]he FCRA does not contain clauses similar to those in Title VII limiting its extraterritorial effect, nor is its meaning further articulated by an amendment history similar to that of

Title VII."). Accordingly, Defendant's motion for summary judgment on Plaintiff's FCRA claim is **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's motion for summary judgment [D.E. 93] is **DENIED** and Plaintiff's motion for summary judgment [D.E. 98] is **GRANTED in part** and **DENIED in part**:

A.  Defendant's motion for summary judgment [D.E. 93] is **DENIED**.

B.  Plaintiff's motion for summary judgment [D.E. 98] is **GRANTED** but only to the extent that the ADA applies, that Defendant has failed to meet its burden to rely on the foreign law exception, and that Plaintiff has met his *prima facie* burden to present his ADA and FCRA claim to a jury.

C.  In all other respects, Plaintiff's motion for summary judgment is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of June, 2020.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge